IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEEPING GOVERNMENT BEHOLDEN, INC.,
    Plaintiff,

v.

UNITED STATES DEPARTMENT OF
JUSTICE,

    Defendant.

Case No. 1:17-cv-01569-KBJ

## THIRD DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"),[1] in Winchester, Virginia.  I have held this position since August 1, 2002.  Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 239 employees who staff a total of twelve Federal Bureau of Investigation Headquarters ("FBIHQ") units and two field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and

---

[1] In May 2018, the FBI changed the name of its Records Management Division to IMD.

information pursuant to the FOIA as amended by the OPEN Government Act of 2007; the OPEN

FOIA Act of 2009; the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial

decisions; and other Presidential and Congressional directives.  My responsibilities also include

the review of FBI information for classification purposes as mandated by Executive Order

13526,[2] and the preparation of declarations in support of Exemption 1 claims asserted under the

FOIA.  I have been designated by the Attorney General of the United States as an original

classification authority and a declassification authority pursuant to E.O. 13526, §§1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to Plaintiff's requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552.  Specifically, I am familiar with the FBI's handling of

the FOIA requests Plaintiff submitted to the FBI on March 20, March 21, April 3, May 10 and

May 11, 2017.

(4)     This is my third declaration in this case.  It supplements and incorporates by

reference the information previously provided in my first declaration of November 15, 2017,

(Dkt. No. 15-1), my second declaration of December 12, 2017 (Dkt. No. 20-1), and my first *in

camera* declaration dated March 14, 2019.  The FBI prepared a *Vaughn* Index to further explain

the withholdings on the responsive processed pages.  *See* **Exhibit A.**  The FBI processed a total

_____

[2] 75 Fed. Reg. 707 (2010).

of 3,616 pages in response to Plaintiff's six FOIA requests. Specifically, 558 pages were released in full ("RIF"), 1,595 pages were released in part ("RIP"), 1,086 pages were withheld in full ("WIF") per exemptions, 373 pages were withheld as duplicates and 4 pages were found to be non-responsive to the requests.

(5)    The FBI submits this declaration in support of its motion for summary judgment. In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration provides the Court and Plaintiff with a brief administrative history of Plaintiff's FOIA requests; a description of the FBI's recordkeeping system; the procedures used to search for, review, and process responsive records subject to the FOIA; and the FBI's justification for withholding records in part or in full pursuant to FOIA Exemptions 1, 3, 4, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

## ADMINISTRATIVE HISTORY OF PLAINTIFF'S FOIA REQUESTS

### Sixth Cause; FOIPA Request No. 1374170-000 (Priority 1[3])

(6)    On May 10, 2017, Plaintiff submitted a FOIA request, through the FBI's electronic FOIA online system ("eFOIA"), seeking "all correspondence or information sent to or received from Members of Congress, Congressional Committees, or Congressional staffers since May 1, 2017 regarding the termination of FBI Director James Comey." *See* **Exhibit B.**

(7)    By letter dated May 25 2017, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1374170-000. In addition, the FBI advised Plaintiff its request was submitted consistent with the FBI eFOIA terms of service and future correspondence

---

[3] Through conversations between Plaintiff and DOJ on or about September 29, 2017, Plaintiff specifically requested, to the extent possible, prioritizing of his requests in accordance with a schedule set by Plaintiff. Plaintiff specifically requested Cause 6 be processed first, followed by Cause 5, then Cause 2 and finally Cause 1. Cause 3 was addressed in my Second Hardy Declaration as an improper FOIA. Cause 4 is addressed *infra* as an improper FOIA. See ¶¶ 48-53.

about his FOIA request would be provided in an email link.  Also, for the purposes of assessing fees, Plaintiff was advised its fee waiver was being considered and he would be advised of the decision at a later date.  *See* **Exhibit C.**

(8)      By letter dated June 14, 2017, the FBI informed Plaintiff its request for expedited processing was approved as it involves "a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect pubic confidence."  *See* 28 C.F.R. § 16.5(E)(1)(iv).  *See* **Exhibit D.**

(9)      By letter dated November 30, 2017, the FBI advised Plaintiff of its first interim release of material responsive to Plaintiff's requests.  This included documents responsive to Plaintiff's Sixth Cause and Fifth Causes.[4]  The FBI reviewed 511 pages and released 303 pages in full or in part.  Exempt material was withheld pursuant to FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  First, the FBI advised Plaintiff the documents represented the final release of records for Cause Six.  Second, the FBI advised Plaintiff it was consulting with other government agencies ("OGAs") concerning documents which originated with, or contained information concerning the OGAs.  Third, the FBI informed Plaintiff duplicate copies of the same document were not processed.  Fourth, the FBI advised Plaintiff's waiver of fees was granted and the documents were being provided at no charge.  Lastly, the FBI informed Plaintiff of its right to appeal the FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter; and/or seek dispute resolution services by contacting the Office of Government Information Services ("OGIS") and/or the FBI's FOIA Public Liaison.  *See* **Exhibit E.**

---

[4] Documents Bates Stamped KGB-1 through KGB-22 represent all records responsive to Cause Six.  Documents Bates Stamped KGB-23 through KGB-511 are responsive to Cause Five.

**Fifth Cause; FOIPA Request No. 1374169-000 (Priority 2 – Parallel to Priority 1)**

(10)     On May 11, 2017, Plaintiff submitted a FOIA request through eFOIA seeking "all emails sent or received by former FBI Director James Comey from January 1, 2017 to May 9, 2017 which contain the word 'transitory.'"[5]  *See* **Exhibit F.**

(11)     By letter dated May 24, 2017, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1374169-000.   In addition, the FBI advised Plaintiff his request was submitted consistent with the FBI eFOIPA terms of service and future correspondence about his FOIA request will be provided in an email link.  Also, for the purposes of assessing fees, Plaintiff was advised his fee waiver was being considered and he would be advised of the decision at a later date.  *See* **Exhibit G.**

(12)     By letter dated June 30, 2017, the FBI informed Plaintiff its request was not a valid request.  Plaintiff's request did not comport with the requirements of 28 C.F.R. § 16.3(b), as it did not provide enough detail to enable personnel to locate records "with a reasonable amount of effort."  The FBI administratively closed Plaintiff's request.  *See* **Exhibit H.**

(13)     By June 30, 2017, through OIP's electronic FOIA online system, Plaintiff submitted an appeal to OIP contesting the FBI's determination as described in its May 24, 2017, letter.  In this appeal, Plaintiff alleged it "specifically limited the request to emails sent to or from one person (Director Comey) within a specific time frame (January-May) containing a specific term (transitory)." *See* **Exhibit I.**

(14)     Subsequent to the filing of the lawsuit, the FBI re-reviewed Plaintiff's request and determined the request was valid based on the narrowed parameters of Plaintiff's request.  As described *supra*, by letter dated November 30, 2017, the FBI provided Plaintiff with the first

---

[5] Plaintiff further narrowed his request to only Director Comey's email account.  Plaintiff did not limit the search of his request to the CRS.

release of material responsive to Plaintiff's requests, which included material responsive to Plaintiff's Fifth Cause. *See* **Exhibit E.**

(15)   By letter dated December 29, 2017, the FBI provided Plaintiff its second interim release of material responsive to Plaintiff's requests. This included material responsive to Plaintiff's Fifth Cause. The FBI reviewed 511 pages and released 129 pages in full or in part. Exempt material was withheld pursuant to FOIA Exemptions (b)(1), (b)(3), 50 U.S.C. § 3024(i)(1), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). The FBI informed Plaintiff duplicate copies of the same document were not processed. Additionally, the FBI informed Plaintiff of its right to appeal the FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter; and/or seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public Liaison. *See* **Exhibit J.**

(16)   By letter dated January 31, 2018, the FBI provided Plaintiff its third interim release of material responsive to Plaintiff's requests. This included material responsive to Fifth Cause. The FBI reviewed 509 pages and released 291pages in full or in part. Exempt material was withheld pursuant to FOIA Exemptions (b)(1), (b)(3) [50 U.S.C. § 3024(i)(1)], (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). First, the FBI advised Plaintiff it was consulting with OGAs concerning documents which originated with, or contained information concerning the OGAs. Second, the FBI informed Plaintiff duplicate copies of the same document were not processed. Lastly, the FBI informed Plaintiff of its right to appeal the FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter; and/or seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public Liaison. *See* **Exhibit K.**

(17)   By letter dated February 28, 2018, the FBI provided Plaintiff its fourth interim release of material responsive to Plaintiff's requests. This included material responsive to

Plaintiff's Fifth Cause.  The FBI reviewed 505 pages and released 201 pages in full or in part.

Exempt material was withheld pursuant to FOIA Exemptions (b)(1), (b)(3) [50 U.S.C. §

3024(i)(1)], (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  First, the FBI advised

Plaintiff it was consulting with OGAs concerning documents which originated with, or contained

information concerning the OGAs.  Second, the FBI informed Plaintiff duplicate copies of the

same document were not processed.  Lastly, the FBI informed Plaintiff of his right to appeal the

FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter;

and/or seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public

Liaison.  *See* **Exhibit L.**

(18)     By letter dated March 30, 2018, the FBI provided Plaintiff its fifth interim release

of material responsive to Plaintiff's requests.  This included material responsive to Plaintiff's

Fifth cause, all material responsive to Plaintiff's Second Cause, and material responsive to

Plaintiff's First Cause.[6]  The FBI reviewed 500 pages and released 354 pages in full or in part.

Exempt material was withheld pursuant to FOIA Exemptions (b)(3) [50 U.S.C. § 3024(i)(1)],

(b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  First, the FBI advised Plaintiff it was

consulting with OGAs concerning documents which originated with, or contained information

concerning the OGAs.  Second, the FBI informed Plaintiff duplicate copies of the same

document were not processed.  Lastly, the FBI informed Plaintiff of his right to appeal the FBI's

determination by writing to DOJ OIP within ninety (90) days from the date of its letter; and/or

seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public Liaison.  *See*

---

[6] Documents Bates Stamped KGB-2037 through KGB-2108 are responsive to Cause Five.
Documents Bates Stamped KGB-2109 through KGB-2225 represent all records responsive to
Cause Two.  Documents Bates Stamped KGB-2226 through KGB-2536 are responsive to Cause
One.

**Exhibit M.**

(19)     By letter dated June 29, 2018, the FBI provided Plaintiff its eighth and final interim release of material responsive to Plaintiff's requests.  This included material responsive to Plaintiff's First and Fifth Causes.[7]  The FBI reviewed 123 pages and released 99 pages in full or in part.  Exempt material was withheld pursuant to FOIA Exemptions (b)(1), (b)(3) [50 U.S.C. § 3024(i)(1) per FBI and 10 U.S.C. § 424 per DIA/DOD], (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  The FBI advised Plaintiff it had completed its consultations with OGAs and it had notated within the records where Exemptions were asserted per the OGAs' requests.  In addition, following consultation with the United States Deputy Attorney General's Office, four (4) pages[8] were determined to be non-responsive to Plaintiff's request and were not provided in the released documents.  Finally, the FBI informed Plaintiff of his right to appeal the FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter.  *See* **Exhibit N.**

**Second Cause: FOIPA Request No. 1371008-000 (Priority 3)[9]**

(20)     By eFOIA dated April 2, 2017 and letter dated April 3, 2017, Plaintiff submitted a FOIA request to the FBI seeking "all records documenting or memorializing training, guidance, or instruction given to FBI employees or contractors regarding how to define 'pertinent' in terms of the CRS, how to determine which records are 'of investigative significance' or 'of investigative interest' sufficient to warrant being placed in the CRS, or anything else which

---

[7] Documents Bates Stamped KGB-2070 and KGB-3045 through KGB-3047 were determined not to be responsive to Plaintiff's Cause Five and Cause One, respectively.

[8] KGB-2070 and KGB-3554 through KGB-3047.

[9] The FBI advised Plaintiff records responsive to Cause Two had been previously processed and made available on the FBI's FOIA Library ("The Vault") on the FBI's public website, http://vault.fbi.gov.  The FBI informed Plaintiff the responsive records were located under Records Management Policy Guide.

would reflect training, guidance, or instruction about how FBI employees or contractors should determine which records to place in the CRS." *See* **Exhibit O.**

(21)   By letter dated April 10, 2017, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1371008-000.  In addition, the FBI advised Plaintiff his request was submitted consistent with the FBI eFOIA terms of service and future correspondence about his FOIA request will be provided in an email link.  For the purposes of assessing fees, Plaintiff was advised his fee waiver was being considered and he would be advised of the decision at a later date. *See* **Exhibit P.**

(22)   As described *supra*, by letter dated March 30, 2018, the FBI made its fifth interim release in response to Plaintiff's request which included all records responsive to Plaintiff's Second Cause. *See* **Exhibit M.**

**First Cause: FOIPA Request No. 1196229-000 (Priority 4)**

(23)   By letter dated March 20, 2017, Plaintiff submitted a FOIA request to the FBI seeking "all records documenting or memorializing training given to staff of the following offices since January 1, 2016 about records management or retention:"

- Office of the Director
- Office of Integrity and Compliance
- Record/Information Dissemination Section
- Washington Field Office

 *See* **Exhibit Q.**

(24)   As described *supra,* by letter dated March 30, 2018, the FBI made its fifth interim release in response to Plaintiff's request, which included records responsive to Plaintiff's First Cause. *See* **Exhibit M.**

(25)   By letter dated April 30, 2018, the FBI provided Plaintiff its sixth interim release of material responsive to Plaintiff's requests.  This consisted of material responsive to Plaintiff's

9

First Cause.  The FBI reviewed 505 pages and released 450 pages in full or in part.  Exempt material was withheld pursuant to FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(E).  The FBI informed Plaintiff duplicate copies of the same document were not processed.  Additionally, the FBI informed Plaintiff of his right to appeal the FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter; and/or seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public Liaison.  *See* **Exhibit R.**

(26)     By letter dated May 31, 2018, the FBI provided Plaintiff its seventh interim release of material responsive to Plaintiff's requests.  This consisted of material responsive to Plaintiff's First Cause.  The FBI reviewed 512 pages and released 322 pages in full or in part. Exempt material was withheld pursuant to FOIA Exemptions (b)(1), (b)(3) [50 U.S.C. § 3024(i)(1)], (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E).  First, the FBI advised Plaintiff it was consulting with OGAs concerning documents which originated with, or contained information concerning the OGAs.  Second, the FBI informed Plaintiff duplicate copies of the same document were not processed.  Lastly, the FBI informed Plaintiff of his right to appeal the FBI's determination by writing to DOJ OIP within ninety (90) days from the date of its letter; and/or seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public Liaison.  *See* **Exhibit S.**

(27)     As described *supra,* by letter dated June 29, 2018, the FBI provided Plaintiff its eighth and final interim release of material responsive to Plaintiff's request, which included the final release of material responsive to Plaintiff's First Cause.[10]  *See* **Exhibit N.**

---

[10] Documents Bates Stamped KGB-through KGB-2070 and KGB-3045 through KGB-3047 were determined to be unresponsive to Plaintiff's request for Cause Five and Cause One, respectively.

## Third Cause: FOIPA Request No. 1370336-000[11]

(28)    By facsimile ("fax") dated March 20, 2017, Plaintiff submitted a FOIA request to the FBI seeking "all email correspondence exchanged between J.P. Schmidt and any FBI email address since January 1, 2016."[12]  *See* **Exhibit T.**

(29)    By letter dated March 30, 2017, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1370336-000.  Additionally, the FBI stated that absent express authorization and consent from the third-party individual whose records are sought, proof of death for the third-party, or a clear demonstration that the public interest in disclosure outweighs the privacy of the third-party, the "FBI can neither confirm nor deny the existence of any records responsive to his request, which, if they were to exist, would be exempt from disclosure pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)."  The FBI enclosed a Certification of Identity form ("Privacy Waiver"), to be completed by the subject of the request. The FBI notified Plaintiff of his right to appeal the FBI's decision to OIP within ninety (90) days from the date of its letter; and/or seek dispute resolution services by contacting OGIS and/or the FBI's FOIA Public Liaison.  *See* **Exhibit U.**

(30)    On April 5, 2017, Plaintiff submitted an appeal through OIP's electronic FOIA online system contesting the FBI's March 30, 2017 response.  Plaintiff argued first, "none of the records are law enforcement records, making Exemption (b)(7)(C) completely inappropriate"

---

[11] FOIPA Request Number 1370336-000 was fully explained and defended in my Second Hardy declaration dated December 12, 2017.  See Dkt. No. 20.1.

[12] Plaintiff expanded its request to include "if another Appraisal Archivist was assigned to FBI at any point in this time period, please expand the scope of this request to include that person's email correspondence with FBI as well."  Plaintiff stated RIDS "may limit the scope of this request to employees or contractors whose official duties would include interacting with NARA regarding records management issues."

and second, that "NARA Appraisal Archivist has no privacy interest in the records."  *See*

**Exhibit V.**

(31)    By letter dated April 6, 2017, OIP acknowledged receipt of Plaintiff's appeal and

assigned it appeal number AP-2017-003393.  (*See* **Exhibit W.**)

(32)    By letter dated August 2, 2017, OIP affirmed on modified grounds, the FBI's

March 30, 2017 determination.  OIP advised Plaintiff "a proper FOIA request for records must

reasonably describe the records sought."  See 5 U.S.C. § 552(a)(3)(A).  Additionally, OIP

informed Plaintiff it had "not reasonably described the subject of its request and the request does

not provide enough detail to allow agency personnel to locate responsive records with a

reasonable amount of effort."  In addition, OIP advised Plaintiff of his right to file a lawsuit in

the federal district court if he was dissatisfied with its action on the appeal.  Finally, OIP advised

Plaintiff he could use the mediation services of OGIS, and that using OGIS services does not

affects his right to pursue litigation.  *See* **Exhibit X.**

**Fourth Cause: Non-FOIPA Request No. NFP-70180**

(33)    By fax dated March 21, 2017, Plaintiff submitted a FOIA request to the FBI

seeking "all email correspondence which is not stored in the Central Records System ("CRS")

sent or received by the following officials (or acting officials, if appropriate) in the ten business

days prior to the date you commence your search:

- Director of the FBI and Chief of Staff
- Chief Compliance Office, Office of Integrity and Compliance
- Chief of the Record/Information Dissemination Section
- Assistant Director in Charge and Special Agents in Charge of the Washington Field
  Office
- Assistant Director in Charge and Special Agents in Charge of the New York Field
  Office
- Legal Attaché of the U.S. Embassy in London, England

*See* **Exhibit Y.**

(34)     By letter dated April 4, 2017, the FBI acknowledged Plaintiff's request and assigned it Non-FOIPA Request Number NFP-70180.  The FBI informed Plaintiff his request was not a valid request.  Plaintiff's multi-part request does not comport with the requirements of 28 C.F.R. § 16.3(b), as it does not provide enough detail to enable personnel to locate records "with a reasonable amount of effort."  Plaintiff's multi-part request is overbroad in scope, seeks information in vague and undefined terms, and prescribes no time-frame limits.  The FBI administratively closed Plaintiff's request.  *See* **Exhibit Z.**

(35)     On April 25, 2017, Plaintiff submitted an appeal through OIP's electronic FOIA online system contesting the FBI's determination as described in its April 4, 2017, response letter.  In this appeal, Plaintiff argues its request was "narrowly focused only on the emails located in the email accounts of a small number of people during a small period of time." *See* **Exhibit AA.**

(36)     By letter dated April 25, 2017, OIP acknowledged receipt of Plaintiff's appeal and advised Plaintiff it assigned appeal number DOJ-AP-2017-003725 to this appeal.  *See* **Exhibit BB.**

(37)     By letter dated May 31, 2017, OIP affirmed the FBI's April 4, 2017 determination.  OIP advised Plaintiff "a proper FOIA request for records must reasonably describe the records sought."  See 5 U.S.C. § 552(a)(3)(A).  Additionally, OIP informed Plaintiff it had "not reasonably described the subject of its request and the request does not provide enough detail to allow agency personnel to locate responsive records with a reasonable amount of effort."  OIP advised Plaintiff's request would require multi-part searches followed by multi-level manual review and comparison.  In addition, OIP advised Plaintiff of his right to file a lawsuit in the federal district court if he was dissatisfied with its action on the appeal.  Finally,

OIP advised Plaintiff it could use the mediation services of OGIS, and that using OGIS services does not affects his right to pursue litigation.  *See* **Exhibit CC.**

## FBI'S SEARCHES FOR RECORDS IN RESPONSE TO FOIA REQUESTS

(38)     The FBI's general practice is to search the Central Records System ("CRS") to determine if the FBI has records about a particular subject in response to most FOIA requests.  In the CRS, FBI employees record index terms in files that are useful to a particular investigation or are deemed potentially useful for future investigative/intelligence retrieval purposes, such as names of individuals, organizations, companies, publications, activities, or foreign intelligence matters (or programs).  They do not index every individual name or other subject matter in the general indices.  As a threshold matter, the FBI would like to point out a standard index search of the CRS in response to Plaintiff's FOIA request would be unlikely to locate responsive records. The request sought training-related information, communications concerning the termination of former FBI Director Comey, and emails containing the word "transitory" – records that are difficult to search via an index search.  As a result, the request does not lend itself to the searches the FBI routinely conducts in response to FOIA requests.

(39)     In situations such as Plaintiff's requests where the subject matter of a FOIA request does not lend itself to a standard CRS index search, the FBI's practice is to conduct a more individualized inquiry  of specific FBI divisions and offices deemed reasonably likely to possess any potentially responsive records based on the subject matter of the request.  In this instance, regarding Causes Six, Two and One of Plaintiff's May 10, April 3, and May 20, 2017 request letters, respectively, RIDS canvassed the Office of Integrity and Compliance ("OIC"), the Director's Office ("DO"), Training Division, RIDS Front Office ("RIDS FO"), RIDS Training Services Unit ("RIDS TSU"), the Records Policy and Administration Section

14

("RPAS"), the Office of Congressional Affairs ("OCA"), and Office of Public Affairs ("OPA"), the FBI Headquarters ("FBIHQ") divisions reasonably likely to possess responsive records; and the Washington Field Office ("WFO") to search for responsive material and to include any record located within the scope of the requested information.  RIDS provided a copy of Plaintiff's request letter to assist with the description of the records sought.  This search located records for Cause Six, Two and One.  Additionally, RIDS conducted a search of former Director Comey's emails for responsive material within the scope of the requested information and located responsive records for Cause Five.

### ADEQUACY OF SEARCH

### Sixth Cause: Targeted Search of DO, OCA and OPA

(40)     On or about September 19, 2017, RIDS submitted an Electronic Communication ("EC") to the DO, OCA and OPA requesting these offices conduct searches for "all correspondence or information sent or received from Members of Congress, Congressional Committee, or Congressional Staffers since May 1, 2017 regarding the termination of FBI Director James Comey."  RIDS deemed DO, OCA, and OPA to be the FBI offices most likely to possess responsive records because their regular assigned duties could include communicating with members of Congress and/or their staff.  On or about October 3, 2017, the DO, OCA and OPA sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter.  Staff within DO, OCA and OPA conducted searches of their internal electronic and paper records for all records related to communications/information sent or received to/from  FBI personnel and Members of Congress, Congressional Committee and/or Staffers, related to the former Director's termination.  The OCA searches resulted in approximately 22 pages of

potentially responsive records consisting of OCA Correspondence, United States Senate Letter to James Comey dated May 10, 2017, OCA Phone Logs dated May 11, 2017, and a Letter from United States House of Representatives to the Deputy Attorney General and the FBI dated May 9, 2017.  The DO and OPA provided RIDS with identical records.  Only one copy of the documents was processed for release to Plaintiff.  Additionally, the FBI found no indication within the processed records, and was not provided with any information by DO, OPA, and OCA, indicating responsive records were likely to be housed in any other location.

**Second Cause: Targeted Search of the RPAS and the FBI Policy Library**

(41)    On or about April 7, 2017 prior to initiation of this instant action, RIDS submitted an email to RPAS[13] requesting RPAS conduct a search of their records for "all records documenting or memorializing training, guidance, or instruction given to FBI employees or contractors regarding how to define 'pertinent' in terms of the CRS, how to determine which records are 'of investigative significance' or 'of investigative interest' sufficient to warrant being placed in the CRS, or anything else which would reflect training, guidance, or instruction about how FBI employees or contractors should determine which records to place in the CRS."  RIDS deemed RPAS to be the most likely FBI office to possess responsive records because RPAS' core duties included creation and dissemination of FBI records management policy and training. RPAS personnel conducted searches of their internal electronic and paper records for training materials related to indexing within the CRS.  The searches resulted in approximately 117 pages of potentially responsive records consisting of the Indexing User Manual for Sentinel.  On or about October 3, 2017, following the filing of the lawsuit, RIDS submitted a follow-up search request to RPAS for records responsive to Plaintiff's request.  On or about October 10, 2017,

---

[13] RPAS was recently absorbed into FBI IMD Records and Information Management Section ("RIMS").

RPAS sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter.  RPAS conducted searches of their internal electronic and paper records for any training materials related to indexing within the CRS.  The additional searches failed to locate any additional responsive records.  Additionally, RIDS conducted a search of the FBI's Policy Library (an electronic library were FBI policy guides are stored and access) utilizing the search terms "Central Records System" and "CRS."  This search resulted in the location of the Records Management Policy Guide, which the FBI advised Plaintiff was located on the FBI's "Vault," a compilation of FOIA records made available for the public on the FBI's public website, www.fbi.gov.

### First Cause: Targeted Search of the OIC, WFO, Training Division, IMD TSU, RIDS FO, and DO

(42)     On or about September 19, 2017, RIDS submitted search requests to OIC, WFO, RIDS FO, and the DO for "all records documenting or memorializing training given to staff of the following offices since January 1, 2016 about records management or retention: DO, OIC, RIDS, and WFO."  On or about October 3, 2017, OIC sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter.  OIC conducted searches of their internal electronic and paper training records for all records related to training of their employees on records management matters.  The search resulted in approximately 167 pages of potentially responsive records.

(43)     On or about October 3, 2017, WFO sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter. WFO conducted searches of their internal

electronic and paper training records for all records related to training of their employees on records management matters.  The search resulted in approximately 121 pages of responsive records.  WFO directed RIDS to contact the Training Division for possible additional responsive records.  On or about October 19, 2017, RIDS contacted the Training Division and requested their personnel conduct a search for records responsive to Plaintiff's request.  On or about October 22, 2017, the Training Division sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter. The Training Division conducted searches of their internal electronic training records utilizing the search term "Records Management."  The search resulted in approximately 1,758 pages of potentially responsive records consisting of training rosters from OIC, WFO, RIDS, and the DO.

(44)     On or about October 3, 2017, RIDS FO sent an all-employee email to their front office staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter.  RIDS FO conducted searches of their internal electronic and paper training records for all records related to training of their employees on records management matters.  This search did not yield any potentially responsive records.  However, RIDS FO advised an additional search of IMD's TSU for potentially responsive records was warranted.  On or about October 19, 2017, IMD TSU was tasked with searching for records responsive to Plaintiff's request.  On or about October 22, 2017, IMD TSU sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter.  IMD TSU conducted searches of their internal electronic and paper training records for all records related to training of their employees on records management matters.  The search resulted in

18

approximately 6,119 pages of potentially responsive records consisting of National Archives and Records Administration ("NARA") Training.[14]   In addition, the search resulted in approximately 472 pages of potentially responsive pages consisting of Training Rosters.

(45)     On or about October 10, 2017, the DO sent an all-employee email to their staff requesting employees conduct a search for information responsive to Plaintiff's request.  The email included a copy of Plaintiff's request letter. The DO conducted searches of their internal electronic and paper training records for all records related to training of their employees on records management matters.  The search did not yield any potentially responsive records. However, it is important to note the Training Division provided the DO's Training Rosters as following their search of Training Division records.

### Fifth Cause: Email Search

(46)     On or about October 3, 2017, RIDS requested a search of former Director James Comey's emails from January 1, 2017 to May 9, 2017.  RIDS conducted a search of Comey's accounts within the FBI's unclassified and classified email systems using the search term "transitory."  The date range was restricted to records created between January 1, 2017 and May 9, 2017.  This search yielded approximately 2,086 pages of potentially responsive records.

### Summary of Search Efforts

(47)     RIDS conducted searches reasonably calculated to locate records responsive to Plaintiff's requests.  Following Plaintiff's prioritization of his requests, the FBI conducted searches of the following FBI offices' records: OCA, OPA, RPAS, OIC, WFO, RIDS FO, and the DO.  Second, following information provided by WFO concerning additional potentially responsive records, RIDS also tasked the FBI Training Division with additional searches.  Third,

---

[14] RIDS referred these records to NARA for direct response to Plaintiff.  NARA reviewed and released the training to Plaintiff in its entirety.

following additional information provided by RIDS FO, IMD's TSU also conducted a search for

responsive records.  Fourth, RIDS conducted a search of the FBI's Policy Library.  Finally,

RIDS requested a search of the classified and unclassified email systems for transitory emails

within former Director James Comey's accounts.

## CAUSE THREE AND FOUR OF PLAINTIFF'S REQUESTS ARE NOT PROPER FOIA REQUESTS

(48)     RIDS determined it was not obligated to search for records responsive to either of

Plaintiff's March 20, 2017 FOIA requests (Cause Three and Four) as they did not comply with

the FOIA and its regulations.   Legally compliant FOIA requests must (i) reasonably describe the

records sought; and (ii) be made in accordance with published rules.  *See* 5 U.S.C. §

552(a)(3)(A).  DOJ's FOIA regulation requires requesters to "describe the records sought in

sufficient detail to enable Department personnel to locate them with a reasonable amount of

effort." *See* 28 C.F.R. § 16.3(b).    As a corollary to the "reasonably described" requirement,

courts have held that agencies are not required to conduct wide-ranging, unduly burdensome

searches or research projects, answer questions, or draw conclusions concerning queried data if

the request lacks specificity or is too vague.  I fully addressed Cause Three (FOIPA Request

Number 1370336-000) in my Second Hardy Declaration dated December 12, 2017.  *See* Dkt. No.

20-1.

## Fourth Cause: NFP-70180

(49)     Plaintiff's May 20, 2017 FOIA request sought "all email correspondence which is

not stored in the Central Records System ("CRS") sent or received by the following officials (or

acting officials, if appropriate) in the ten business days[15] prior to the date you commence your

---

[15] On or about November 2, 2017, Plaintiff clarified via email "that 'in the ten business days
prior to the date you commence your search' does not mean just those emails sent on business

search: Director of the FBI and Chief of Staff; Chief of Compliance Officer, OIC; Chief of

RIDS; Assistant Director in Charge ("ADIC") and Special Agents in Charge ("SAC") of WFO;

ADIC and SAC of NYFO; and Legal Attaché of the U.S. Embassy in London, England."  RIDS

determined this request was not a valid FOIA request as it required substantial research, was

overly broad, and would require unduly burdensome searches.

(50)     RIDS conducted some basic queries of its classified and unclassified email

systems to support its determination that Plaintiff's request did not satisfy the statutory and

regulatory requirements for a proper FOIA request.  RIDS conducted a basic email search of

both the classified and unclassified systems for potentially responsive records between

September 4 and September 15, 2017 for the following individuals:

- Director Christopher Wray
- Chief of Staff James Rybicki
- Chief Compliance Officer Patrick W. Kelley
- Chief of RIDS David M. Hardy
- NYFO ADIC William F. Sweeney
- NYFO SAC George F. Ennis, Jr.
- NYFO SAC Charles F. McGonigal
- NYFO SAC C. Bryan Paarmann
- NYFO SAC Michael C. McGarrity
- NYFO SAC Gregory W. Ehrie
- NYFO SAC Aristedes Mahairas
- WFO ADIC Andrew W. Vale
- WFO SAC Trina C.R. Washington
- WFO SAC Timothy R. Slater
- WFO SAC Stephen C. Laycock
- WFO SAC Frankland "Matt" Gorham
- WFO SAC Philip A. Celestini
- Legal Attache, London, England Brian P. Boetig

(51)     In order for RIDS to gain knowledge as to whether or not another FBI employee

---

days.  It merely sets the temporal scope of the search from 'the date which is ten business days
prior to the date you commence your search' to 'the date you commence your search.'  But if
someone sent or received an email on a weekend that's still responsive."

was acting for any of the above named FBI employees during the indicated timeframe, RIDS would have had to reach out to each named FBI employee, have them conduct an internal search of their time and attendance records, work and personal calendars in order to determine if they were out of the office during the indicated timeframe; and also determine if another FBI employee had been to assume their duties  in their absence.  Further, RIDS would have had to conduct an additional email search for the acting FBI employee's emails during the indicated timeframe.

(52)    Even with only a search limited to the names above, RIDS identified approximately 106,000 pages of potentially responsive emails.[16]

(53)    To comply with Plaintiff's request as written, RIDS would then have to conduct an additional multi-layer review of each of these 106,000 emails to identify the records responsive to Plaintiff's request.  To verify which emails constitute "email correspondence *which is not stored in the CRS*", RIDS would have to conduct an in-depth analysis of each email to identify proper terms to search within the CRS for the individual emails.  Then, RIDS would need to carefully and diligently search these terms for every email to verify their status within the CRS.   RIDS estimates such reviews/searches would take approximately 30 minutes per email considering the likelihood of multiple search terms being utilized.  Assuming each email is approximately three pages in length, the FBI's limited sample identified *supra* would require approximately 17,666 hours of searching.[17]   Considering the multi-layer research required to

---

[16] Due to the scope and size of the Director's classified and unclassified emails during the indicated timeframe, RIDS only pulled the first 10 emails on both systems.

[17] Dividing approximately 106,000 pages of emails by approximately three pages per email results in approximately 35,333 emails.  Multiplying approximately 35,333 emails by approximately 30 minutes per email results in approximately 1,059,990 minutes which equals approximately 17,666 hours of searching.

fulfill Plaintiff's request, and the exorbitant amount of resources required to complete necessary

searches for responsive records, Plaintiff's request is not a proper FOIA request.  It is not framed

in a manner that allows FBI personnel to locate responsive records with a reasonable amount of

effort.

### JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

(54)     All responsive documents subject to FOIA were reviewed under the access

provisions of the FOIA to achieve maximum disclosure.  Every effort was made to provide

Plaintiff with all material in the public domain and with all reasonably segregable, non-exempt

information in the responsive records.  In total, the FBI was able to segregate for at least partial

release approximately 2,149 pages[18] from the total pool of responsive records.  No reasonably

segregable, non-exempt portions have been withheld from Plaintiff.  Further description of the

information, beyond what is provided in this declaration, could identify the actual exempt

information that the FBI has protected.  Copies of the pages released in part and in full have been

Bates stamped consecutively "KGB-1 through KGB-3616 at the bottom right of each page.

Pages withheld in their entirety were categorized in Deleted Page Information Sheets ("DPIS")

provided to Plaintiff when the processed documents were released.  These DPISs identified the

reasons and/or the applicable FOIA Exemptions relied upon to withhold pages in full.  The DPIS

---

[18] By letters dated November 30, 2017, the FBI advised Plaintiff it had reviewed 511 pages and
released 303 pages as part of FOIPA Request Numbers 1374170-000 (Cause Six) and 1374169-
000 (Cause Five).  By letters dated December 29, 2017, January 31, February 28, and March 30,
2018, the FBI advised Plaintiff it had reviewed a total of 2,025 pages and released 975 pages as
part of FOIPA Request Number 1374169-000 (Cause Five), 1371008-000 (Cause Two) and
1384404-000 (Cause One).  By letters dated April 30 and May 31, 2018, the FBI advised
Plaintiff it had reviewed a total of 1,017 pages and released 772 pages as part of FOIPA Request
Number 1384404-000 (Cause One).  By letter dated June 29, 2018, the FBI advised Plaintiff it
had completed consultations with OGAs and reviewed 123 pages and released 99 pages as part
of FOIPA Request Numbers 1374169-000 (Cause Five) and 1384404-000 (Cause One).  *See*
Exhibits E, J-M, and Q-S.

Case 1:17-cv-01569-FYP   Document 30-1   Filed 07/01/19   Page 24 of 77


and Bates-numbered pages withheld in part or released in full were provided to Plaintiff in release letters responsive to FOIPA Request Numbers 1374170-000, 1374169-000, 1371008-000, and 1384404-000, and will be made available to the Court upon request.[19]  The Exemptions asserted by the FBI as grounds for non-disclosure of portions of documents are FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7 (E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

**Explanation of the Coded Format Used to Describe and Justify Withholdings**

(55)    The Bates-numbered documents contain, on their faces, coded categories of Exemptions that detail the nature of the information withheld pursuant to the provisions of the FOIA.  The coded categories are provided to aid the Court's and Plaintiff's review of the FBI's explanations of the FOIA exemptions it has asserted to withhold the material.  Each instance of information withheld on the Bates-numbered documents is accompanied by a coded designation that corresponds to the categories listed below.  For example, if "(b)(7)(E)-1" appears on a document, the "(b)(7)(E)" designation refers to FOIA Exemption 7(E) which protects information concerning law enforcement techniques and/or procedures, the disclosure could reasonably be expected to risk circumvention of the law.  The numerical designation of "1" following the "(b)(7)(E)" narrows the main category into a more specific subcategory, as detailed in the table below.  In this instance, the 1 pertains to "Internal FBI Secure Fax Number, Email or IP Address, Intranet/Web Address."

(56)    The FBI has prepared and included a *Vaughn* Index describing each of the reviewed pages, their applicable Bates page numbers, all coded Exemptions applied on each

---

[19] To assist the Court and Plaintiff's review, a Vaughn Index describing the responsive documents released in full ("RIF"), released in part ("RIP") or withheld in full ("WIF") is attached at **Exhibit A**.

page, and designations whether the pages were RIF, RIP, WIF per one or more Exemptions, or WIF because the pages were duplicate of other pages accounted for elsewhere in the FBI's production.  The coded, Bates-numbered pages together with this declaration and the *Vaughn* Index demonstrate that all challenged material withheld by the FBI in FOIPA Request Numbers 1374170-000, 1374169-000, 1371008-000, and 1384404-000 is exempt from disclosure pursuant to the cited FOIA Exemptions, or is so intertwined with protected material that segregation is not reasonably possible without revealing the underlying protected material.

(57)    Listed below are the categories used to explain the FOIA Exemptions asserted to withhold exempt information:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption (b)(1)** | **CLASSIFIED INFORMATION** |
| *Cited at times with other exemptions (e.g., (b)(3), 6/7(C), 7(D), 7(E))* | |
| (b)(1)-1 | Information Properly Classified By an FBI Official Pursuant to E.O. 13526 |
| **Exemption (b)(3)[20]** | **INFORMATION PROTECTED BY STATUTE** |
| *Cited at times in conjunction with other exemptions (e.g., (b)(1), 6/7(C))* | |
| (b)(3)-1 | National Security Act of 1947 [50 U.S.C. Section 3024(i)(1)] |
| **Exemption (b)(5)** | **PRIVILEGED INFORMATION** |
| *Cited at times in conjunction with other exemptions (e.g., 6/7(C))* | |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney Work Product |
| (b)(5)-3 | Attorney Client Privilege |
| **Exemption (b)(6) and Exemption (b)(7)(C)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |

---

[20] Exemption category (b)(3)-2 was created as part of the coding scheme set up at the beginning of processing and was inadvertently cited on Bates pages 1754 and 1757.

| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of FBI Special Agents and Professional Staff |
|---|---|
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-3 and (b)(7)(C)-3 | Names and/or Identifying Information of Non-FBI Federal Government Personnel |
| (b)(6)-4 and (b)(7)(C)-4 | Names and/or Identifying Data of 3rd Parties with Criminal Records/Rap Sheets |
| (b)(6)-5 and (b)(7)(C)-5 | Names and/or Identifying Information of Local Law Enforcement Personnel |
| (b)(6)-6 and (b)(7)(C)-6 | Names and/or Identifying Data of Third Parties of Investigative Interest |
| (b)(6)-7 and (b)(7)(C)-7 | Names and/or Identifying Information of Third Parties Who Provided Information to the FBI<br>*[cited at times in conjunction with 7(D)]* |
| (b)(6)-8 and (b)(7)(C)-8 | Names and/or Identifying Data Regarding Third Party Victims |
| **Exemption (b)(7)(A)** | **PENDING LAW ENFORCEMENT PROCEEDINGS** |
| (b)(7)(A)-1 | Information, Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Law Enforcement Proceedings |
| **Exemption (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| *Cited at times in conjunction with other exemptions (e.g., 6/7(C))* | |
| (b)(7)(D)-1 | Names, Identifying Data and/or Information Provided by Sources Under Implied Assurances of Confidentiality |
| (b)(7)(D)-2 | Names, Identifying Data and/or Information Provided by Individuals Under an Express Assurance of Confidentiality (including Symbol Source Informants) |
| (b)(7)(D)-3 | Foreign Government Agency Information Under Implied Confidentiality |
| (b)(7)(D)-4 | Foreign Government Agency Information Under Express Confidentiality |
| **Exemption (b)(7)(E)** | **LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| *Cited at times in conjunction with other exemptions* | |
| (b)(7)(E)-1 | Internal FBI Email Addresses,, IP Addresses, or Intranet/Web Addresses |
| (b)(7)(E)-2 | Collection/analysis of Information |
| (b)(7)(E)-3 | Identity and/or Location of FBI or Joint Units, Squads, Divisions |
| (b)(7)(E)-4 | Database Identifiers/Printouts |

| (b)(7)(E)-5 | Sensitive File Number and Sub-file Name |
|---|---|
| (b)(7)(E)-6 | Operational Directives |
| (b)(7)(E)-7 | Specific Law Enforcement Technique Utilized to Conduct National Security Investigations |
| (b)(7)(E)-8 | Information Regarding Targets, Dates, and Scope of Surveillance |
| (b)(7)(E)-9 | Investigative Focus of Specific Investigations |
| (b)(7)(E)-10 | Dates/Types of Investigations |
| (b)(7)(E)-11 | CART Data |
| (b)(7)(E)-12 | SARs Material |
| (b)(7)(E)-13 | Sensitive Group Login and/or Event Authorization Number |
| (b)(7)(E)-14 | Tactical Information Contained in Operational Plans |

***Exemption (b)(1) – Classified Information***

(58)   5 U.S.C. § 552(b)(1).  Exemption (b)(1) protects from disclosure records that are:

(a)  specifically authorized under criteria established by Executive Order to be kept secret in the interest of national defense or foreign policy; and

(b)  are in fact properly classified pursuant to such Executive Order.

(59)   Before I can consider an Exemption (b)(1) claim for withholding agency records, I must determine whether the information in those records is information that satisfies the requirement of the E.O. 13526, the executive order that governs the classification and protection of information that affects the national security, and whether the information complies with the various substantive and procedural criteria of the order.  E.O. 13526, signed by President Barack Obama on December 29, 2009, is the executive order that currently applies to the protection of national security information.  I am bound by the requirements of E.O. 13526 when making classification determinations.

(60)   For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

27

E.O. 13526 § 1.1(a):

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more categories of information listed in § 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(61)    As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified and requires a classification marking at the "Secret" level since the authorized disclosure of the information reasonably could be expected to cause serious damage to national security. See E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered properly classified, such as proper identification and marking of documents. In particular, I made certain that all procedural requirements of E.O. 13526 were followed:

> (1) Each document was marked as required and stamped with the proper classification designation;
>
> (2) Each document was marked to indicate clearly which portions are classified, and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b);
>
> (3) The prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;
>
> (4) The declassification policies set forth in E.O. 13526 § 3.1 and 3.3 were followed; and

(5) Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

### FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)

(62)     With the above requirement in mind, I personally and independently examined the FBI information withheld pursuant to Exemption 1.  As a result of this examination, I determined that this classified information is owned by, was produced by or for, and/or is under the control of the U.S. Government.  I further determined the classified information continues to warrant classification at the "Secret" level pursuant to E.O. 13526 § 1.4(c), intelligence activities (including covert action), intelligence sources or methods, or cryptology, and E.O. 13526 § 1.4(d), foreign relations or foreign activities of the United States, including confidential sources. The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States.  This information was not examined in isolation.  Instead, the information was evaluated with careful consideration given to the impact disclosure of this information will have on other sensitive information contained elsewhere in the United States' intelligence files, including the secrecy of that other information.  Equal consideration was given to the impact that the other information, either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined, and upon attempts by hostile entity to analyze such information.

(63)     In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification

authority and designated that information as classified in the interest of national security at the "Secret" level, and invoked FOIA Exemption (b)(1) to prevent disclosure. Likewise, the justifications for the withheld classified information has been prepared with the intent that they be read with consideration given to the context in which the classified information is found, but also other information already in the public domain, as well as information likely known or suspected by hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth herein with respect to the intelligence activities (including covert action), sources or methods and foreign relations or foreign activities of the United States, including confidential sources could reasonably be expected to jeopardize the national security of the United States. As a result, the information appearing in the challenged document has been appropriately classified pursuant to E.O. 13526 and withheld pursuant to FOIA Exemption (b)(1). Additionally, the FBI is also asserting FOIA Exemption (b)(3) [50 U.S.C. § 3024(i)(1) (National Security Act of 1947)] in conjunction with (b)(1). Additional information supporting the assertion of FOIA Exemptions (b)(1) and (b)(3) will be provided to the Court *in camera, ex parte* as the withheld information cannot be further discussed on the public record, beyond what I describe herein, without revealing classified information.

<u>Exemption (b)(1) – E.O. 13526 § 1.4(c)</u>
<u>INTELLIGENCE ACTIVITIES, SOURCES AND METHODS</u>

(64)    E.O. 13526 § 1.4(c) exempts intelligence activities (including covert action), intelligence sources or methods, or cryptology from disclosure. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of a national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method as

two characteristics.  First, the intelligence activity or method – and information generated by it – is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved.

(65)     The FBI withheld information protected by Exemption 1 because it describes and pertains to intelligence activities, sources, and methods utilized by the FBI in gathering intelligence information.  Thus, the information identified in the accompanying Index as being withheld pursuant to Exemption 1 concerns information withheld pursuant to E.O. 13526 § 1.4(c).  The FBI protected information under FOIA Exemption (b)(1) and § 1.4(c) because the information is classified and the release of such information would reveal intelligence activities and methods used by the FBI against targets of domestic counterterrorism investigations; or disclose the intelligence gathering capabilities of the activities or methods directed at targets.

(66)     It is my determination the release of this information could permit hostile persons, entities, and/or foreign governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence-gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information.  This revelation of intelligence activities and methods would severely disrupt the FBI's intelligence-gathering capabilities and could cause serious damage to our national security.  This information is properly classified at the "Secret" level pursuant to E.O. 13526, § 1.4(c).  Thus, the information is exempt from disclosure pursuant to Exemption 1.  Furthermore, simultaneous to the filing of the public declaration, I am also submitting a declaration *in camera*, *ex parte* to further explain the FBI's withholdings pursuant to Exemption 1.

(67)    The FBI protected the following categories of information specific to intelligence activities and methods because disclosure reasonably could be expected to cause serious damage to the national security.

**Detailed Intelligence Activities**

(68)    The classified information withheld within these documents contains detailed intelligence activity information gathered or compiled by the FBI on a specific individual or organization of national security interest.  The disclosure of this information could reasonably be expected to cause serious damage to the national security, as it would: (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the method; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time.  This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

**File Numbers**

(69)    The classified information withheld includes FBI file numbers assigned to specific intelligence activities, including channelization and dissemination instructions.  Their release would lead to exposure of the particular intelligence activities and methods at issue. Individual file numbers are assigned by FBIHQ and field offices and contain a geographical prefix or the originating office and case number, which includes the numerical characterization of the type of investigation followed by a chronological number assigned to a specific investigation/activity.

(70)    The disclosure of an intelligence file number in the aggregate will enable a hostile analyst to attribute any information released from the documents containing such a file number

32

to that particular file.  A hostile analyst can identify the specific intelligence activity by
supplying further missing pieces.  Hence, a partial mosaic of the activity begins to appear as
more information is identified with the file leading to the exposure of actual current activities or
methods.  Disclosure of file numbers will allow a hostile analyst, or anyone not privileged to this
information, to patch bits and pieces of information together until the actual use of the
application of the source or method can be determined.  The identification of these intelligence
methods, which continue to furnish positive intelligence information to this day, will severely
limit its application.  In addition, disclosure will inform hostile intelligence of the possible range
of our intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or
can collect, concerning them.  This knowledge provides potential or actual violators of the
United States' national security laws a means of deflection or avoidance of lawful regulations.
Disclosure will allow countermeasures to be implemented, making future operations more
difficult, and compromise other ongoing planned intelligence operations.  Accordingly, the
release of the file numbers can lead to the exposure of the actual intelligence activity or method
utilized in FBI investigations, and can reasonably be expected to cause serious damage to
national security.  The file numbers are properly classified at the "Secret" level and withheld
pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

***Character and/or Title of Case***

(71)    The classified information withheld identifies the character and/or title of the case
for a specific type of intelligence activity directed at a specific target of national security interest.
Disclosure of the characterization and/or title of the case could reasonably be expected to cause
serious damage to the national security, as it would (a) disclose a particular intelligence or
counterintelligence investigation; (b) disclose the nature, scope or thrust of the investigation; and

(c) reveal the manner of acquisition of the intelligence or counterintelligence information.  This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

***Targets of Foreign Counterintelligence/Espionage Investigations***

(72)     The classified information withheld identifies targets of FBI foreign counterintelligence/espionage investigations.  The disclosure of this information could reasonably be expected to cause serious damage to the national security, as it would: (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the method; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time.

(73)     It is my determination that the release of this information could permit hostile individuals and foreign governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence-gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information.  This would severely disrupt the FBI's intelligence-gathering capabilities.  This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

***Code Words***

(74)     The classified information withheld consists of code words that have never been publicly revealed and which, if disclosed, will reveal a specific intelligence subject of continuing value to the FBI in its ongoing investigations.  Code words are unique and assigned solely to one particular intelligence subject.  They are used in lieu of the actual name, description, and information concerning a specific investigation of national security interest.  The withheld code

words are sensitive and synonymous with on-going investigations that are still active today in collecting intelligence information.  Public disclosure of a code word will allow a hostile analyst, or one not privileged to this code word, to patch bits and pieces of information together until the actual use of this application can be determined.  In addition, the disclosure of a code word will inform hostile intelligence of the possible range of our intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or can collect, concerning them.  This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

### *Intelligence Sources*

(75)    An intelligence source who requires continued classification is an individual who provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in serious damage to the FBI's intelligence and counterintelligence-gathering capabilities.

(76)    My review determined that the information contained in these documents, which pertains to classified intelligence sources, is likely to identify these sources if released.  The withheld information and material provided by -- or which pertains to -- these sources is specific and, if disclosed, reasonably could be expected to reveal the identities of the contributing sources.  I considered a number of factors in reaching this conclusion, including most importantly, the damage to the national security that would result by publicly identifying sources utilized in intelligence investigations, and the FBI's ability to protect and recruit intelligence sources in the future.

(77)    Disclosure of the identities of FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and

potential intelligence sources to fear that their identities will be publicly revealed at some point, despite the FBI's express or implied assurances of confidentiality.  The disclosure of sources' identities could jeopardize the emotional and physical well-being of the source or the sources' family or associates, and/or subject them to public ridicule and ostracism.

(78)    Thus, the release of information I determined to be source-identifying could reasonably be expected to cause damage to the national security by causing current intelligence sources to cease providing information, and discourage potential intelligence sources from cooperating with the FBI for fear their identities would be publicly revealed at some point.  Such a source reaction would eliminate one of the most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to damage the national security through violation of the United States criminal and national security laws.  The classified information provided by intelligence sources on certain pages is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

(79)    The following categories of intelligence source information were withheld:  (1) detailed intelligence source information; and (2) source file numbers.  Below is a more detailed discussion of each of these categories.

(80)    Detailed Intelligence Source Information:  The classified information withheld contains detailed information provided by human intelligence sources.  This information is specific in nature and reflects the specific vantage point of the source(s).  If disclosed, this information would identify the intelligence source(s).  As a result, this information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

36

(81)   <u>Intelligence Source File Numbers</u>:  The classified information withheld contains

file numbers assigned by FBI field offices to intelligence sources for the channelization and

dissemination of intelligence information gathered by or attributed to the sources.  The release of

these file numbers could reasonably be expected to cause serious damage to the national security,

as it would result in the disclosure of the sources' identities, which thereby would  neutralize the

sources and compromise information previously provided by the sources.  As a result, this

information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, §

1.4(c), and is exempt from disclosure pursuant to Exemption 1.

**<u>Exemption (b)(1) – E.O. 13526 § 1.4(d)</u>**
**<u>FOREIGN RELATIONS OR FOREIGN ACTIVITIES</u>**

(82)   E.O. 13526 § 1.4(d) protects foreign relations or foreign activities of the United

States, including confidential sources.  The classified information withheld contains sensitive

intelligence information gathered by the United States either about or from a foreign country.

This information is sensitive due in part to the delicate nature of international diplomacy, and

must be handled with care so as not to jeopardize the fragile relationships that exist between the

United States and certain foreign governments.

(83)   The unauthorized disclosure of information concerning foreign relations or

foreign activities of the United States can reasonably be expected to lead to diplomatic or law

enforcement curtailment in the sharing of intelligence and/or new investigative equipment

advancements; identify the target, scope, or time frame of intelligence activities of the United

States in or about a foreign country, which may result in the curtailment or cessation of these

activities; enable hostile entities to assess United States intelligence gathering activities in or

about a foreign country and devise countermeasures against these activities; or compromise

cooperative foreign sources, which may jeopardize their safety and curtail the flow of

37

information from these sources.  Thus, the information identified in the accompanying Index as being withheld pursuant to Exemption 1 concerns information withheld pursuant to E.O. 13526 § 1.4(d) to protect foreign relations or foreign activities is currently and properly classified at the "Secret" level and withheld pursuant to E.O. 13526 § 1.4 (d), and is exempt from disclosure pursuant to Exemption (b)(1).

### Exemption (b)(3)—Information Protected by Statute

(84)   Exemption 3 protects information that is:

> specifically exempted from disclosure by statute requiring … provides that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009,[21] specifically cites to this paragraph.

### (b)(3)-1    Information Specifically Exempted by 50 U.S.C. § 3024(i)(1) (National Security Act of 1947)

(85)   The FBI withheld information pursuant to Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 3024(i)(1), which provides the Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence sources and method."[22]  As relevant to U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009.  On its face, this federal statute leaves no discretion to agencies about withholding from the public information about intelligence

---

[21] The OPEN FOIA Act of 2009 was enacted October 28, 2009.  See Pub.L. 111-83, 123 Stat. 2142, 2184.

[22] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1).  As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

sources and methods.  Thus, the protection afforded to intelligence sources and methods by 50

U.S.C. § 3024(i)(1) is absolute.  *See CIA v Sims*, 471 U.S. 159 (1985).  In order to fulfill its

obligation of protecting intelligence sources and methods, the DNI is authorized to establish and

implement guidelines for the Intelligence Community ("IC") for the classification of information

under applicable laws, Executive Orders, or other Presidential Directives, and for access to and

dissemination of intelligence.  50 U.S.C. § 3024(i)(1).  In implementing this authority, the DNI

promulgated Intelligence Community Directive 700, which provides that IC elements shall

protect "national intelligence and intelligence sources and methods and activities from

unauthorized disclosure."[23]

(86)     The FBI is one of 17 member agencies comprising the IC, and as such must

protect intelligence sources and methods.  As described above, Congress enacted the NSA, as

amended by the IRTPA, to protect the IC's sources and methods of gathering intelligence.

Disclosure of such information presents the potential for individuals to develop and implement

countermeasures, which would result in the loss of significant intelligence/information relied

upon by national policymakers and the IC.  Given that Congress specifically prohibited the

disclosure of information pertaining to "intelligence sources and methods" used by the IC as a

whole, I have determined that the FBI's intelligence sources and methods would be revealed if

any of the withheld information is disclosed to Plaintiff.[24]  Furthermore, as evident by the

markings on 151 pages, the information withheld pursuant to FOIA Exemption (b)(3)/ 50 U.S.C.

§ 3024(i)(1) was classified at the Secret level.  The information pertains to intelligence activities

---

[23] Intelligence Community Directive ("ICD") 700, dated June 7, 2012, at ¶2a.

[24] Although § 3024(i)(1) does not impose a requirement to articulate harm, disclosure of this
information presents a bona fide opportunity to develop and implement countermeasures,
resulting in the loss of significant intelligence information, sources, and methods relied upon by
national policymakers and the IC to safeguard national security.

source and methods and is prohibited from disclosure as prescribed by the National Security Act

under 50 U.S.C. § 3024(i)(1), the information was properly withheld pursuant to FOIA

Exemption (b)(3) in conjunction with FOIA Exemptions (b)(1), as both Exemptions apply to this

information.

### Exemption (b)(5) – Privileged Information

(87)    Exemption (b)(5) exempts "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party other than an agency in litigation with the

agency."  5 U.S.C. § 552(b)(5).

(88)    Exemption 5 has been construed to exempt documents or information normally

privileged in the civil discovery context, and incorporates the attorney work product, attorney-

client, and deliberative process privileges.  Generally, the attorney work product privilege

protects documents and other memoranda prepared by an attorney or under the direction of an

attorney as part of, or in reasonable anticipation of litigation.  The attorney-client privilege

protects confidential communications from a client to an attorney and from an attorney to a client

for the purpose of seeking and providing legal advice.  The privilege covers client-supplied

information and opinions given by an attorney based on and reflecting that information.  The

deliberative process privilege protects pre-decisional, deliberative communications that are part

of a process by which agency decisions are made.  It protects opinions, advice, evaluations,

deliberations, proposals, or recommendations that form part of an agency decision-making

process, as well as the selection and sorting of factual information relied upon as part of the

decision-making process.

(89)    In order to apply Exemption 5, agencies must first satisfy the threshold

requirement – *i.e.*, show that the information protected consists was "inter-agency or intra-

agency." Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege.

**(b)(5)-1**                    **Deliberative Process Privilege**

(90)    The deliberative process privilege protects the internal deliberations of the government by insulating recommendations, analyses, opinions, and other non-factual information comprising the decision-making process. In turn, Exemption 5 allows for the withholding of such privileged material—i.e., material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations. The privilege also protects records and information that if disclosed, would reveal the agency's collection of multitudinous facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations or reach a final agency decision. The agency's treatment of such information is, itself, a deliberation and is a deliberative process properly protected by the privilege.

(91)    Exemption (b)(5) is predicated on the recognition release of privileged information would inhibit the government's development of policy and stifle its decision-making process. Furthermore, exempting such information from disclosure also protects against public confusion resulting from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the FBI. The FBI invoked Exemption (b)(5) and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date; and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully-explored options developed from robust debate.

(92)     As discussed *supra*, in order to apply FOIA exemption (b)(5), agencies must first

satisfy the threshold requirement, showing the information protected was either "inter-agency" or

"intra-agency".  Once this threshold is satisfied, agencies must then satisfy the elements of the

pertinent privilege.  With respect to the deliberative process privilege, agencies must first show

the withheld information is pre-decisional.  The information must be antecedent to the adoption

of agency policy and or a final agency decision and contribute to decision-making and/or policy

creation.  Then an agency must show the information is deliberative – it was a direct part of the

deliberative process in that it makes recommendations or expresses opinions on legal or policy

matters, reflects the give and take of the consultative process, and bears on the formulation or

exercise of agency policy-oriented judgment.  Furthermore, an agency must identify the role of a

contested document in a specific deliberative process.

(93)     The FBI applied Exemption (b)(5), at times in conjunction with Exemption 7(E),

to protect deliberative, intra-agency information responsive to Plaintiff's requests, located within

investigative records attached to administrative email records as well as investigative

information within the administrative email records.  The FBI applied Exemption (b)(5) to

protect pre-decisional information prepared in the context of agency employees' deliberations.

Specifically, the information withheld consists of preliminary opinions, evaluations, and

comments of various Headquarters and Field Office Special Agents pertaining to policies, policy

decisions, and proposed investigative/prosecutorial actions.  They are contained within

Memorandums, Electronic Communications ("ECs"), and email communications between SAs

and FBIHQ executive management.  These inter-agency communications contain information

that is clearly pre-decisional because the discussions predate final agency decisions, and consist

of FBI staff providing advice, exchanging questions within the agency, and/or refining agency

42

positions to come up with best final decisions and/or courses of action.

(94)     Additionally, the FBI withheld specific information within administrative

documentation (i.e., policy documents, organizational charts, flow charts, Office of Professional

Responsibility ("OPR") adjudication summaries, and executive statements), pursuant to

Exemption (b)(5), in conjunction with the deliberative process privilege.  This information is

intra-agency; clearly pre-decisional because it predates final agency decisions; and is deliberative

as it consists of FBI staff providing advice, asking questions, and/or discussing proposed

solutions to determine a final decision and/or course of action pertaining a wide-variety of

administrative actions which directly impact the investigative and intelligence gathering mission

of the FBI.

(95)     Disclosure of the protected information would lay bare the FBI's deliberative

process as it would reveal internal discussions and information FBI personnel thought were

pertinent to their analysis, and their compilation and sorting of facts.  This material was used in

reaching final decisions regarding the investigative material collected and analyzed during

investigations/prospective prosecutions; and during the FBI's formulation of proper responses to

FOIPA requests.  These deliberations were recent[25] and of relative import – they were related to

the FBI's core law enforcement mission and the agency's statutory requirements under the

FOIPA.  The harm associated with such a release would be a chilling effect on agency

personnel's willingness to fully and frankly deliberate during decision-making/policy creation.

Essentially, agency personnel would be much less likely to share their unrefined ideas while

trying to make the best agency decisions or adopt the best agency policies.  In order to make the

---

[25] The FOIA Improvement Act of 2016 limits the application of Exemption 5 pursuant to the
Deliberative Process Privilege to records created within the last 25 years.  This information is
much less than 25 years old.

best decisions/policies, a whole host of ideas must be explored.  Some raw ideas, in retrospect,

may seem ill-conceived or even foolish, but the consideration of such ideas is absolutely

necessary to refine and implement the best decisions/policies.  If agency personnel believed their

raw ideas would be subject to public scrutiny, they would be much more guarded in fully

participating in the deliberation process.   Thus, considering release of this information could

greatly degrade the quality of internal agency deliberations, the FBI properly asserted Exemption

(b)(5) in conjunction with the deliberative process privilege to withhold this information.

**(b)(5)-2**                    **Attorney Work Product**

(96)     The FBI protected privileged attorney work products.  The attorney work product

privilege protects such tangible and intangible items as interviews, memoranda, correspondence,

mental impressions, and personal beliefs prepared or developed by an attorney in anticipation of

litigation.  The privilege is predicated on the recognition that proper preparation of a case

depends on an attorney's ability to assemble information, sort relevant from irrelevant facts, and

prepare his/her legal theories and strategies without intrusive or needless scrutiny.

(97)     The FBI relied on the attorney work product privilege to protect materials created

by attorneys involved in criminal proceedings against third parties, located within the records

responsive to Plaintiff's requests.  The FBI also protected communications between DOJ

attorneys and FBI Special Agents in relation to the drafting of policy documents.  This

information satisfies Exemption 5's threshold because these records were exchanged within the

DOJ (i.e., between the FBI and U.S. Attorney's Office) who were coordinating litigation strategy

and providing guidance on drafting of policy documentation.  Furthermore, these records are

quintessential attorney work products and readily satisfy the elements of the attorney work

product privilege because they were created by attorneys during criminal litigation as part of the

attorneys' representation of the government during criminal proceedings of third parties; or,

consist of attorney-provided changes to policy guidance, made to formalize and finalize policy

guidance for FBI employees.  Finally, because the attorney work product privilege protects both

factual and deliberative material, segregation is not required.  Accordingly, the FBI properly

withheld this information pursuant to Exemption 5.

**(b)(5)-3**                            **Attorney-Client Privilege**

(98)    The FBI protected privileged attorney-client communications.  The attorney-client

privilege is appropriately asserted to protect confidential communications between a client

seeking legal advice from a professional legal adviser in his/her capacity as a lawyer.  Such

communications are permanently protected from disclosure by the legal adviser unless the client

waives the protection.  This privilege encompasses confidential communications made to an

agency attorney by decision-making personnel as well as lower echelon employees who possess

information relevant to an attorney's advice-rendering function.  Disclosure of communications

between the FBI attorneys and their clients, or between the FBI and the DOJ attorneys

representing the Bureau, would inhibit candor between the clients and their attorneys in relation

to the issues about which they are seeking legal advice.  Such candor and full disclosure is

necessary in order to ensure that thorough and sound legal advice is provided.

(99)    The FBI protected communications between and among FBI counsel and their

FBI clients and employees that reflect the seeking and/or providing of legal advice with respect

to those involved in the criminal proceedings against third parties.  The FBI also protected

communications between the attorneys and FBI Special Agents in relation to the drafting of

policy documents, which reflect the seeking and providing of legal advice related to statutory

requirements of the draft policy documents.  These communications were made within DOJ, and

thus satisfy Exemption 5's inter/intra-agency threshold.  Furthermore, the communications between clients and attorneys were made in confidence, were not shared with or circulated to individuals outside the attorney-client relationship, and were made for the purpose of securing legal assistance or advice in relation to the government's actions in criminal cases against third parties; or to seek legal assistance or advice during the creation of agency policies and practices. Accordingly, the FBI properly withheld these privileged communications pursuant to Exemption 5.

## EXEMPTION 7 THRESHOLD

(100)   Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the record at issue is related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(101)   Pursuant to 28 USC §§ 533, 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM") and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of  federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.  Under this investigative authority, the responsive records herein were compiled for the following specific law enforcement purposes.

(102)   Here, the responsive records pertain to the FBI's investigations of violent crimes, such as the shooting in Ft. Lauderdale, Florida; violent gang initiatives; counterterrorism

investigations; and counterintelligence investigations.  The investigative and the information

contained within administrative records at issue concern investigative matters, directly tied to

FBI efforts to enforce laws as well as consist of draft policies being created with the end goal of

enabling FBI SAs and Support Personnel to carry out their investigative/law enforcement duties.

In addition, these records consist of recompilations of FBI investigative records originally

created in furtherance of the FBI's law enforcement duties.  Thus, these records were compiled

and/or are related to records compiled for a law enforcement purpose; they squarely fall within

the law enforcement duties of the FBI; and they readily meet the threshold requirement of

Exemption (b)(7).

### *Exemptions 6 and 7(C) –Unwarranted Invasion of Personal Privacy[26]*

(103)   5 U.S.C. § 552 (b)(6) exempts from disclosure:

> Personnel and medical files and similar files when the disclosure of such
> information would constitute a clearly unwarranted invasion of personal privacy.

(104)   5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> Records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information …
> could reasonably be expected to constitute an unwarranted invasion of personal
> privacy.

(105)   In withholding information pursuant to these two exemptions, the FBI is required

to balance the privacy interests of the individuals mentioned in these records against any public

interest in disclosure.  For purposes of this analysis, a public interest exists when information

---

[26] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C).
Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted
invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower
standard of "could reasonably be expected to constitute an unwarranted invasion of personal
privacy," the analysis and balancing required by both exemptions is sufficiently similar to
warrant a consolidated discussion.  The privacy interests are balanced against the public's
interest in disclosure under the analysis of both exemptions.

would shed light on the FBI's performance of its mission to protect and defend the United States against terrorists and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In each instance where information was withheld pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI determined that the individuals' privacy interests outweighed the public interest, if any, in the information.

**(b)(6) and (b)(7)(C)-1**     **Names and/or Identifying Information[27] of FBI Special Agents and Professional Staff**

(106)   The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and/or identifying information of FBI Special Agents ("SAs") who are responsible for conducting, supervising, and/or maintaining the investigative activities in the investigative records at issue. These responsibilities include conducting interviews and compiling information, as well as reporting on the status of investigations. Assignments of SAs to any particular investigation are not by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they are or have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such

---

[27] Herein, "identifying information" is used to describe any of the following: addresses, phone numbers, aliases, dates of birth, social security numbers, FBI numbers (singular numbers given to those under investigation by the FBI), Unique Employee Identification numbers ("UEIDs" – unique identification numbers given to federal employees), and other personal, singular, identifying information.

law enforcement actions to carry a grudge which may last for years.  These individuals may seek

revenge on the agents and other federal employees involved in a particular investigation.  The

publicity associated with the release of an agent's identity in connection with a particular

investigation could trigger hostility toward a particular agent.  The FBI could identify no

discernible public interest in the disclosure of this information because disclosure of the names

and identifying information of FBI SAs would not shed light on the operations and activities of

the FBI.

(107)   The FBI also protected names and identifying information of its professional staff.

FBI professional staff are assigned to handle tasks related to the official investigations reflected

in the documents responsive to Plaintiff's FOIA requests.  They were, and possibly are, in

positions of access to information regarding official law enforcement investigations, and

therefore could become targets of harassing inquiries for unauthorized access to investigations if

their identities were released.  Thus, these individuals maintain substantial privacy interests in

not having their identities disclosed.  In contrast, the FBI concluded that no public interest would

be served by disclosing the identities of these FBI professional staff to the general public because

their identities would not, themselves, significantly increase the public's understanding of the

FBI's operations and activities.  Accordingly, after balancing these employees' substantial

privacy interests against the non-existent public interest, the FBI properly protected the names

and identifying information of SAs and professional staff pursuant to FOIA Exemptions (b)(6)

and (b)(7)(C).

**(b)(6) and (b)7)(C)-2          Names and/or Identifying Information of Third Parties Merely
                                Mentioned**

(108)   The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and

identifying information of third parties who were merely mentioned in the criminal investigative

information located within documents responsive to Plaintiff's requests.  The FBI has

information about these third parties in its files because these individuals came in contact with

the subject(s) of FBI investigation(s).  These individuals were not of investigative interest to the

FBI.  These third parties maintain substantial and legitimate privacy interests in not having this

information disclosed and thus, being connected with a criminal investigation.  Disclosure of

these third parties' names and/or identifying information in connection with an FBI investigation

of criminal activities carries an extremely negative connotation.  Disclosure of their identities

would subject these individuals to possible harassment or criticism and focus derogatory

inferences and suspicion on them.  The FBI then considered whether there was any public

interest that would override these privacy interests, and concluded disclosing information about

individuals who were merely mentioned in an FBI investigative file would not significantly

increase the public's understanding of the operations and activities of the FBI.  Thus, the FBI

properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.

**(b)(6) and (b)(7)(C)-3**     **Names and/or Identifying Information of Non-FBI Federal Government Employees**

(109)  The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and

identifying information of non-FBI federal government employees within the records at issue.

The relevant inquiry here is whether public access to this information would violate a viable

privacy interest of these employees, and whether their privacy interests outweigh the public

interest in disclosure.  Disclosure of this identifying information could subject these employees

to unauthorized inquiries and harassment which would constitute a clearly unwarranted invasion

of personal privacy.  Thus, the rationale for protecting non-FBI federal government employees is

the same as that for FBI agents and employees.

(110)   After identifying the substantial privacy interests of the non-FBI federal government employees, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of the non-FBI federal employees' names and/or identifying information will not shed light on the operations and activities of the FBI.  Accordingly, the FBI determined the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of personal privacy and asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.

**(b)(6) and (b)(7)(C)-4**          **Names and/or Identifying Data of Third Parties with Criminal Records/Rap Sheets**

(111)   The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and identifying information of third party individuals whose criminal records are discussed/memorialized within the FBI records at issue.  This includes the withholding of their past criminal activities.  Being linked with any law enforcement investigation carries a strong negative connotation and a stigma.  To release the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities in conjunction with their criminal records disclosed in this context.  In making a determination whether to release the names, personal identifying information, and criminal records of these third parties, the public's interest in disclosure was balanced against the individuals' rights to privacy.  It was determined this information would not enlighten the public on how the FBI conducts its internal operations and investigations.  Accordingly, the FBI concluded the disclosure of this information would constitute a clearly unwarranted and

unwarranted invasion of theses individuals' personal privacy.  The FBI properly withheld this information pursuant to Exemptions (b)(6) and (b)(7)(C).

**(b)(6) and (b)(7)(C)-5**        **Names and/or Identifying Information of State and Local Law Enforcement**

(112)   The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and identifying information of state and local law enforcement employees.  These employees were acting in their official capacity and aided the FBI in the law enforcement investigative activities reflected in the records responsive to Plaintiff's requests.  The rationale for protecting the identities of FBI employees discussed in ¶¶106-107, *supra*, applies equally to the names of state and local law enforcement employees.  Release of the identities of these law enforcement employees could subject them as individuals to unnecessary and unwelcome harassment that would invade their privacy, and could cause them to be targeted for compromise.  In contrast, disclosure of this information would serve no public interest because it would not shed light on the operations and activities of the FBI.  Accordingly, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.

 **(b)(6) and (b)(7)(C)-6**        **Names and/or Identifying Data of Third Parties of Investigative Interest**

(113)   The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and/or identifying data of third parties who were of investigative interest to the FBI.   Being identified as a subject of a criminal investigation carries a strong negative connotation and a stigma.  Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention.  Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed.  In contrast, disclosing personal information about these individuals would not significantly increase

the public's understanding of the FBI's performance of its mission and so the FBI concluded there was no public interest here sufficient to override these individuals' substantial privacy interests.  For these reasons, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.

**(b)(6) and (b)(7)(C)-7**          **Names and/or Identifying Information of Third Parties Who Provided Information to the FBI**

(114)   The FBI asserted Exemptions (b)(6) and (b)(7)(C), at times in conjunction with (b)(7)(D), to protect the names and identifying information of individuals who were interviewed and/or provided information to the FBI during the course of its investigation of criminal suspects/suspected criminal acts.  The FBI has found information provided by individuals during an interview is one of the most productive investigative tools used by law enforcement agencies. The largest roadblock to successfully obtaining the desired information through an interview is fear by the interviewee his or her identity will be exposed and consequently, he or she could be harassed, intimidated, or threatened with legal or economic reprisal, possible physical harm, or even death.  In order to surmount these obstacles, persons interviewed by the FBI must be assured their names and personally-identifying information will be held in the strictest confidence.  Continued access by the FBI to persons willing to honestly relate pertinent facts bearing upon a particular investigation far outweighs any benefit the public might derive from disclosure of the names of those who cooperated with the FBI.  Thus, the FBI has determined these individuals' privacy interests greatly outweigh public interest in disclosure of their identities.  In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these third parties' names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI.  Accordingly, the FBI properly asserted FOIA Exemptions (b)(6) and

(b)(7)(C), at times in conjunction with FOIA Exemption (b)(7)(D), to protect this type of information.

**(b)(6) and (b)(7)(C)-8**          **Name and/or Identifying Data Regarding a Third Party Victim**

(115)   The FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names, addresses, and other identifying information of third party victims in a variety of criminal matters (i.e., carjacking, murder, robbery, etc.).   The details of these crimes were part of attachments to the transitory emails of former Director James Comey responsive to Plaintiff's request.   Releasing these victim's identities in the context of these records could cause embarrassment, cause them additional distress due to the revisiting of likely emotionally trying events, and expose them to unsolicited and unnecessary inquiries in regards to their association with these incidents.   There is no legitimate public interest to be served by releasing the identities of these victims because release would not shed light on the operations and activities of the FBI.   Disclosure would constitute a clearly unwarranted invasion of these individuals' personal privacy.   Therefore, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.

**Exemption (b)(7)(A)**
**Pending Law Enforcement Proceedings**

(116)   5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

> Records or information compiled for law enforcement purposes,
> but only to the extent that the production of such law enforcement
> records or information ... could reasonably be expected to interfere
> with enforcement proceedings.

(117)   Application of Exemption 7A requires:  the existence of law enforcement records; a pending or prospective law enforcement proceeding; and a determination that release of the information could reasonably be expected to interfere with the enforcement proceeding. Typically, to address records subject to pending enforcement proceedings, the FBI asserts

Exemption (b)(7)(A) to categorically withhold a variety of different documents in investigative records, which the FBI then groups into functional categories and describes in greater detail.  In this case, however, the FBI has asserted Exemption (b)(7)(A) in a limited fashion to protect the names, personal identifying information, file numbers, and activities of third-party subjects of pending FBI investigations among the responsive documents.  The release of the names, identifying information, file numbers, and activities of third parties of on-going FBI investigations could result not only in the acknowledgment of the existence of the investigations, but also expose the identity of suspects and or the types of investigative efforts being deployed by the FBI, thereby jeopardizing the investigations.  The FBI has applied Exemption (b)(7)(A) to protect the names, personal identifying information, file numbers, and activities of third parties of these open investigations on 194 pages as noted in the FBI's *Vaughn* Index.

### *Exemption (b)(7)(D)—Confidential Source Information*

(118)   Exemption 7(D) protects "records or information compiled for law enforcement purposes" when disclosure:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

(119)   Numerous confidential sources report to the FBI on a regular basis; they provide information under express assurances of confidentiality and are "informants" within the common meaning of the term.  Others are interviewed and/or provide information under implied assurances of confidentiality (i.e., under circumstances from which assurances of confidentiality may be inferred).  In either situation, these sources are considered to be confidential because they

furnish information only with the understanding their identities and the information they provided will not be divulged outside the FBI.  Information provided by these sources is singular in nature, and if released, could reveal the informants' identities.  The FBI has learned through experience sources assisting, cooperating with, and providing information to the FBI must be free to do so without fear of reprisal.  Only when protected from reprisal will they furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear their cooperation with the FBI will later be made public. Sources providing information to the FBI should be secure in the knowledge their assistance and their identities will be held in confidence.

(120)   The release of a source's identity would forever eliminate that source as a future means of obtaining information.  When the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources providing information to the FBI.  Such a result would greatly impair one of the FBI's most important means of collecting information and thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws.

**(b)(7)(D)-1**          **Names, Identifying Data and/or Information Provided by Individuals Under Implied Assurances of Confidentiality**

(121)   The FBI asserted Exemption (b)(7)(D) to protect information provided to the FBI by third parties under implied assurances of confidentiality.  The FBI frequently works with third parties during criminal investigations to obtain information and data.  In this case, individuals closely tied to the investigation(s) memorialized in the records at issue provided information to the FBI identifying additional third parties of investigative interest.  The individuals did not specifically request confidentiality, but considering the violent nature of the crimes, the FBI determined these individuals provided information to the FBI with probable fear their

cooperation with law enforcement could lead to violent reprisal.  Thus, it is reasonable for the FBI to infer individuals so closely tied to the violent events under investigation would not share information without an expectation of confidentiality, precisely in order to avoid such reprisal. The FBI solicits and receives assistance regularly from a variety of individuals providing information in connection with a wide variety of criminal and national security investigations. Inherent in this cooperative effort is the mutual understanding certain information provided will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests and other means.  If the FBI disclosed certain information shared by these third parties, it would jeopardize future cooperation between the FBI and these third parties, causing significant detriment to effective law enforcement.  Furthermore it would likely dissuade other current and future sources from providing information to the FBI because it would portray the FBI as unwilling to protect those who provide information with an implied expectation of confidentiality.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(D), at times in conjunction with FOIA Exemptions (b)(6) and (b)(7)(C), to protect this type of information.

**(b)(7)(D)-4**           **Names, Identifying Information About, and/or Information Provided by Sources Under Express Assurances of Confidentiality**

(122)   The FBI asserted Exemption (b)(7)(D), at times, in conjunction with Exemptions (b)(6) and (b)(7)(C), to protect from disclosure the names, identifying information about, and information provided by third parties to the FBI and/or law enforcement during the course of the investigations at issue here, under express grants of confidentiality.  In this case, these individuals, who provided specific and detailed information that is singular in nature, specifically requested their identities not be revealed due to fear of reprisal.  The FBI and/or law enforcement officials expressly promised these third parties that their identities and the information they provided would not be disclosed.

57

(123)   Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from Confidential Human Sources ("CHSs").   Without these assurances by the FBI, those with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements in order to lessen the severity of any backlashes; therefore, the FBI must provide credible assurances of confidentiality to these individuals in order to obtain factual, relevant, and timely information.  Release of these sources' identities and/or any singular information they provided may lead to the revelation of their identities and would also display unwillingness by the FBI to honor its assurances of confidentiality to current and future CHSs.  Therefore, releasing this information would have a lasting negative impact on the FBI's information program – it would greatly hinder the FBI's ability to recruit and maintain CHSs willing to provide accurate and relevant information pertaining to criminal activities.

(124)   In sum, release of the identifying information and/or the information provided by FBI CHSs who were given express assurances of confidentiality would endanger these CHSs and cause great detriment to the FBI's ability to recruit and maintain reliable CHSs; thus, this information is exempt from disclosure pursuant to Exemption (b)(7)(D.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(D), at times in conjunction with FOIA Exemptions (b)(6) and (b)(7)(C), to protect this type of information.

**(b)(7)(D)-3              Foreign Government Agency Information Provided with an Implied Assurance of Confidentiality**

(125)   The FBI asserted Exemption (b)(7)(D) to protect information provided to the FBI by a foreign government agencies under implied assurances of confidentiality.  Foreign government agencies frequently work with the FBI during criminal, counterterrorism and counterintelligence investigations.  Under most circumstances, these agencies expect the FBI

58

will not disclose information or parts of investigations in order to protect their capabilities and

their relationship with the United States.  It is reasonable for the FBI to infer that foreign

government agencies would not share information without an expectation of confidentiality,

precisely in order to avoid the harms described below.  The FBI solicits and receives information

regularly from state, local, and foreign agencies and authorities in connection with a wide variety

of criminal and national security investigations.  Inherent in this cooperative effort is the mutual

understanding that the identities of the foreign government agency's sources and the information

provided by them will be held in confidence by the FBI, and not released pursuant to FOIA and

Privacy Act requests.  As relevant here, the information withheld is directly related to how the

foreign government agencies gleaned specific information, and the results of the inquiries within

their own country.  Disclosure could reveal the information the foreign government agencies

provided to the FBI in confidence as well as alienate the agencies position within their country

for sharing such information with the United States.  Publicity, adverse or otherwise, concerning

information provided to the FBI by foreign government agencies could be detrimental to the

necessary cooperation of the foreign government agencies with the FBI.  The degradation of

perceived trust in the FBI by disclosing the information would seriously impair the FBI's

effectiveness in assisting with or participating in future investigations with the foreign

government agencies.  Accordingly, the FBI properly withheld this information under FOIA

Exemption (b)(7)(D).  The FBI also cited FOIA Exemptions (b)(6) and (b)(7)(C) in some

instances to protect this information.

**(b)(7)(D)-4**               **Foreign Government Agency Information Provided with an Express Assurance of Confidentiality**

(126)   The FBI asserted Exemption (b)(7)(D), at times with (b)(6) and (b)(7)(C) to

protect the identities of and the information provided by foreign law enforcement authorities to the FBI under "express" assurances of confidentiality.  It is only with the understanding of complete confidentiality that the aid of such a source can be enlisted, and only through this confidence that a foreign government agency can be persuaded to continue providing valuable assistance in the future.  To identify this source could subject it to unofficial inquiries not anticipated by its contact with the FBI.  The FBI's ability to obtain information quickly and discreetly in future law enforcement investigations would be negatively affected.  There is no public interest to be served by releasing this information.

(127)   The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged.  The agreements specify the extent of confidentiality requested by the respective foreign authorities.  While one foreign law enforcement agency might request confidentiality for its identity and not necessarily the information provided, another agency might request confidentiality for both its identity and the information provided, and yet another agency may request that its information be protected while it does not object to the disclosure of its relationship with the FBI.  Accordingly, the FBI asserted Exemption (b)(7)(D) to withheld the identity of foreign law enforcement agencies, their personnel, and their information because these law enforcement agencies expressly requested their identities, information, and relationships with the FBI be kept confidential.  Accordingly, the FBI properly withheld this information under FOIA Exemption (b)(7)(D), and at times FOIA Exemptions (b)(6) and (b)(7)(C) to protect this information.

### *Exemption (b)(7)(E) – Investigative Techniques and Procedures*

(128)   5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> Law enforcement records which would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(129)   The FBI asserted Exemption (b)(7)(E) to protect information from these records, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(130)   Within the responsive documents, the FBI asserted FOIA Exemption (b)(7)(E) to protect non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement and intelligence gathering missions, and also to protect non-public details about techniques and procedures that are otherwise known to the public.  Specifically, the FBI asserted FOIA Exemption (b)(7)(E) to protect the following types of information.

**(b)(7)(E)-1**          **Internal FBI Email Addresses, IP Addresses, or Intranet/Web Addresses**

(131)   FBI asserted Exemption (b)(7)(E) to protect non-public intranet web addresses, IP addresses and internal e-mail addresses.  With the current emerging news of data breaches and other hacking attempts, it is highly likely the release of this type of information could allow individuals under investigation to exploit the FBI's Information Technology system to gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's non-public intranet system.  Such actions could arm them with the information or ability to circumvent the law.  Additionally, release of this information would allow individuals to disrupt

official business and could subject FBI employees to harassing e-mails.  This has the potential to greatly hinder the FBI's investigative capabilities by disabling a valuable communication method.  This would reduce the FBI's effectiveness at enforcing the law, and increase the likelihood of law enforcement circumvention.  Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption (b)(7)(E).

**(b)(7)(E)-2**             **Collection/Analysis of Information**

(132)   The FBI asserted Exemption (b)(7)(E) to protect methods the FBI uses to collect and analyze the information it obtains for investigative purposes.  The release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it, once it is collected.  Such disclosures would enable subjects of FBI investigations to circumvent similar currently used techniques.  The relative utility of these techniques could be diminished if the actual techniques were released in this matter.  This in turn would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained.  Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and the types of information of greatest value to FBI investigations.  This would allow these individuals to take countermeasures to circumvent the effectiveness of these techniques, deprive the FBI of key investigative intelligence, and to continue to violate the law and engage in criminal activities.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-3**          **Locations and Identity of FBI and/or Joint Units, Squads, and/or Divisions**

(133)   The FBI asserted Exemption (b)(7)(E) to protect methods and techniques involving the location and identity of FBI units and/or joint units, squads and/or divisions that were involved in the investigations at issue in the records responsive to Plaintiff's requests. Disclosure of the location of the units conducting these investigations would reveal the targets, the physical areas of interest in the investigations, and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not.  If the locations are clustered in a particular area, it would allow hostile analysts to determine where geographically the FBI is focusing its investigative resources, and allow them to relocate their criminal activities elsewhere.  This would disrupt the FBI's investigative process and deprive the FBI of valuable information.  The withholding of units, squads and/or divisions involved is justifiable as well under a similar rationale.  As these specialized units focus on very specific crimes and/or intelligence gathering activities, once identified within the context of the records at issue, the units' area of expertise is revealed, and an individual would then be aware of exactly what the FBI's interest is.  For example, knowing that a unit, squad and/or division whose focus is on financial crimes is involved in the investigation is quite different than knowing that the unit, squad and/or division involved has a focus on crimes of violence.  This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and/or to avoid altogether activities in a particular location.  The revelation of the involvement of one or more units of differing focus in an investigation is critical information that can allow for adjustments of behaviors and activities by criminals, to avoid detection and/or disruption by the FBI.  The same justification can be made for information shared within the transitory emails at issue in this case.  FBI employees

within different units, squads and/or divisions share and disseminate information through email correspondence concerning investigative actions and deliberative conversations.  Their particular unit, squad and/or division is located in either the signature block at the end of the email or the To/From area at the beginning of the email, and revealing this information in the context of the information being discussed risks the harms described above.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-4**              **Database Information and/or Printouts**

(134)   The FBI asserted Exemption (b)(7)(E) to protect database search results located through non-public databases used for official law enforcement purposes by the FBI and/or other law enforcement personnel.  These non-public databases serve as repositories for counterterrorism and investigative data.  They are essentially "one-stop" shops that allow law enforcement to query information and develop investigative leads from a variety of source data using state-of-the-art analytical tools.  FBI personnel and often task force members from local, state and other federal agencies have access to these databases.  Disclosure of the printouts or information compiled from these search results would provide criminals with an understanding as to what information is being gathered, analyzed, and utilized by the FBI in the investigations described within the responsive records, and similar investigations.  Release of this information could enable criminals to employ countermeasures to avoid providing the FBI with key investigative data and/or allow them to predict how the FBI utilizes certain data to further its investigations.  In addition, revealing the data stored within the databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is housing specific investigative data.  This would make these databases attractive targets for compromise. Criminals who could gain access to FBI systems would know where to go to corrupt or delete this type of data to

deprive the FBI of its use and/or discover when and what the FBI has discovered about their criminal activities.  Additionally, release of printouts or descriptions of information compiled in these databases would provide criminals with an understanding as to what information is being gathered, how the FBI analyses this information, and the investigative methodology of the FBI in utilizing these databases.  This would allow hostile analysts to determine what types of evidence/information are most important to the FBI, and how they might deprive the FBI of this key evidence/information.  They could also discover how the FBI plans to track and disseminate certain pieces of key evidence information, allowing them to accurately predict the FBI's investigative response to receipt of various pieces of intelligence.  Because disclosure  of this information would impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI properly asserted FOIA Exemption (b)(7)(E), cited at times in conjunction with FOIA Exemptions (b)(6), (b)(7)(C) and (b)(7)(D), to protect this type of information.

**(b)(7)(E)-5**              **Sensitive File Number or Subfile Names**

(135)   The FBI asserted Exemption (b)(7)(E) to protect sensitive case file numbers.  The FBI determined this Exemption is appropriate for protecting these file numbers as the release of file numbering conventions identifies the investigative interest or priority given to such matters.  Applying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities, etc.  Exacerbating this harm, releasing these file numbers provides criminals with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts.  Continued release of sensitive investigative file numbers would provide criminal with an idea of how FBI investigations may be interrelated and when, why, and

how the FBI pursued different investigative strategies.  This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence.  Given this data, determined criminals could obtain an exceptional understanding as to how they might structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-6**            **Operational Directives**

(136)   The FBI asserted Exemption (b)(7)(E) to protect certain information concerning FBI operational directives described within records responsive to Plaintiff's request.  These operational directives provide information about and instruct FBI employees on the proper use of certain sensitive non-public FBI procedures, techniques, and guidance for conducting investigations.  In the course of providing these instructions, these directives identify the procedures, techniques, and strategies at issue.  Specifically, the protected information consists of the following sub-types: tactical instructions contained in FBI operational plans and operational directives concerning sensitive investigative techniques and strategies.  Releasing such information would not only provide sensitive, unknown investigative techniques, it would also reveal sensitive unknown uses of these specific techniques and procedures.  If released, the information would provide individuals and entities with a unique look inside the FBI's law enforcement "playbooks."  Armed with such information, criminals could predict how and when the FBI will respond to certain suspicious/criminal activities, and the investigative techniques the FBI is most likely to employ in those situations.  This would afford criminals the ability to

preemptively modify their behavior in a manner that avoids detection, thwarting the very

investigative procedures, techniques, and strategies governed by these policy directives.

Consequently, the release of this information would increase the risk targets of criminal

investigations could develop countermeasures and avoid detection by interfering with the FBI's

ability to effectively use these important law enforcement techniques.  Release of this

information would allow individuals and entities seeking to commit crimes an opportunity to

avoid detection and circumvent the law.    Accordingly, the FBI properly asserted Exemption

(b)(7)(E) to protect this information.

## (b)(7)(E)-7    Specific Law Enforcement Technique Utilized to Conduct National Security Investigations

(137)   The FBI asserted Exemption (b)(7)(E) to protect sensitive law enforcement

techniques employed in a national security investigation.  The FBI cannot name this technique,

even generically, without revealing information that is, itself, exempt.  This sensitive technique

was used by the FBI to obtain valuable intelligence information.  While the technique may be

known by the pubic in a general sense, its use in the specific context of this case is not a

publically-known fact.  In other words, details about and analysis of this sensitive law

enforcement technique, to include the specifics of how, when and in what setting it is employed,

are not generally known to the public.  Such details include implementation procedures; the

targets of the technique; and the nature of the information gleaned by its use in the context of the

investigation.  Revealing the technique and these details would effectively reveal the specifics of

how and in what settings the technique is employed.  As a result, criminal and national security

targets would be better able to avoid detection by developing countermeasures to circumvent the

ability of the law enforcement officials to use the technique, thus rendering it useless to the FBI

and other law enforcement agencies.  Revealing details about this sensitive law enforcement

technique would compromise a crucial means of collecting intelligence information and severely

hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to

violate United States criminal and national security laws. Accordingly, the FBI protected this

information pursuant to Exemption (b)(7)(E), at times, in conjunction with Exemptions (b)(1)

and (b)(3).

**(b)(7)(E)-8**                      **Information Regarding Targets, Dates, and Scope of Surveillance**

(138)   The FBI asserted Exemption (b)(7)(E) to protect information concerning the

targets, locations, and types of devices utilized in surveillance operations conducted by the FBI

described within the records at issue.  The FBI utilized these surveillance operations to obtain

investigative intelligence relevant to the investigations.  The law enforcement techniques used to

conduct these surveillance operations are the same techniques utilized by the FBI in current

criminal and national security investigations.  Certainly, it is publicly known the FBI and other

law enforcement agencies engage in different types of surveillance in investigations.  However,

disclosure of non-public details about when, how, under what circumstances, and on whom the

FBI conducts surveillance would allow current and future subjects of FBI investigations and

other potential criminals to develop and utilize countermeasures to defeat or avoid different types

of surveillance operations, thus rendering the techniques useless to the FBI and other law

enforcement agencies.  Accordingly, the disclosure of this information could reasonably be

expected to reveal non-public details about law enforcement techniques still being used by the

FBI, and risk circumvention of the law.  Accordingly, the FBI properly asserted FOIA

Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-9**                    **Investigative Focus of Specific Investigations**

(139)   The FBI asserted Exemption (b)(7)(E) to protect the investigative focus of specific FBI investigations.  Revealing the broader investigative focus as they relate to interconnected investigations would reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal activity.  Release of this type of information would allow criminals to gauge the FBI's strengths and weakness within certain areas of the criminal arena and structure their activities in a manner that avoids detection and disruption by the FBI.  For example, if criminals knew certain individuals were being investigated based on their association with on particular individual, they would be able to discern their association with this particular individual may cause them to be subjects of an FBI investigation.  They may then decide to cut ties with this individual and find different ways to pursue criminal activities thus avoid the FBI's investigative reach.  Releasing the focus of specific FBI investigations would enable criminals to predict the FBI's investigative strategies, structure their activities in a manner that thwarts the FBI's investigative efforts, and continue to circumvent the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

 **(b)(7)(E)-10**               **Dates and/or Types of Investigations**

(140)   The FBI asserted Exemption (b)(7)(E) to protect information pertaining to the types and dates of investigations referenced in the records at issue.  Specifically, the information withheld is referenced in connection with an actual investigation and reveals whether it is a "preliminary" or "full" investigation and the date it was initiated.  Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation, and the particular dates the investigation covered,

69

allowing savvy criminals to judge when and how the FBI will react when it detects certain criminal/possibly criminal activities. This would allow these criminals to predict FBI investigative reactions, adjust their behavior accordingly, and avoid detection and/or disruption by FBI investigative activities.  Moreover, the knowledge specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid triggering FBI interest.  Disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-11**              **Computer Analysis Response Team ("CART") Reports and/or Data**

(141)   The FBI asserted Exemption (b)(7)(E) to protect reports and/or data resulting from the FBI's analysis of computer and other digital media seized pursuant to a search warrant. The FBI's CART personnel provide digital forensics, technical capabilities, and related services and support to the FBI investigators, outside intelligence organizations, and other law enforcement agencies. CART provides support to investigations that are reliant, in whole or in part, upon digital evidence, namely through the acquisition, preservation, examination processing, and presentation of stored digital information in computers or other electronic devices or media.  CART analyzes a variety of digital media, including, but not limited to, desktop and laptop computers, CDs/DVDs, cell phones, digital cameras, digital media players, and flash media.  CART examiners are experts at extracting data from digital media.  Providing detailed information about CART software, equipment, techniques, procedures, and/or types of reports generated by CART during their forensic testing processes would impede the FBI's effectiveness in investigating crimes where evidence can be found on computers and other digital media.  It would aid in circumvention of the law by providing criminals the information

necessary for them to adjust behaviors in order to avoid detection, develop and/or utilize technology less susceptible to law enforcement detection or scrutiny, and/or use or develop technology to counteract techniques used by CART.  Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E).

**(b)(7)(E)-12**                    **Suspicious Activity Report ("SAR") material**

(142)   The FBI asserted Exemption (b)(7)(E) to protect techniques and procedures used or reflected in the eGuardian information sharing platform to detect and prevent terrorist attacks. More specifically, the FBI protected Suspicious Activity Report ("SAR") information.  As detailed in the 2007 National Strategy for Information Sharing ("NSIS"), the National Security Council directed the FBI to share more terrorism-related information with law enforcement agencies.  When planning attacks, terrorists frequently engage in surveillance and otherwise suspicious activities.  The detection and dissemination of these suspicious activities are vital to preventing and disrupting future terrorist attacks.  As a result, the eGuardian system was developed to meet the challenges of collecting and sharing terrorism-related activities amongst law enforcement agencies across federal, state, local, and tribal jurisdictions.  The sensitive but unclassified eGuardian information sharing platform is available only to law enforcement users via Law Enforcement Online ("LEO") and performs three critical functions in the prevention of terrorist attacks:  (1) it allows law enforcement agencies to input terrorism-related information into the system so that it is electronically shared with the FBI's Joint Terrorism Task Force ("JTTF"); (2) it allows the FBI to share its unclassified terrorism-related information with the rest of the domestic law enforcement community; and (3) and most pertinent here, the system allows information entered by users – including SARs – to be seen nationwide by other law enforcement users who also have the ability to add information to such reports.

71

(143)   As noted above, the eGuardian system is a secure, unclassified system used to track and share potential terrorist threats, terrorist events, and SARs among state, local, tribal, and federal law enforcement partners (to include state fusion centers) and the FBI's JTTFs. Although the existence of the eGuardian system is publicly known, the specific identifying SAR material withheld from the records at issue is not known.  Simply stated, the revelation of these details could enable criminal targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI and domestic law enforcement to effectively use this important national law enforcement tool.  Accordingly, because disclosure could enable terrorists or other targets of these techniques to avoid detection or develop countermeasures to the eGuardian system, the FBI properly protected the information pursuant to FOIA Exemption (b)(7)(E).

**(b)(7)(E)-13**               **Sensitive Group Login and/or Event Authorization Numbers**

(144)   The FBI asserted Exemption (b)(7)(E) to protect confidential event funding authorization numbers and sensitive group login numbers.  Releasing this information would reveal specific techniques which enable the FBI to confidentially provide funding for government employees' travel, and login codes for sensitive, but unclassified, communication systems, which they need to utilize to pursue investigations.  The FBI withheld these numbers in Employee E-Briefs concerning sensitive, investigative briefings and in ECs concerning event funding. Revealing the event funding authorization numbers for travel to specific FBI conferences would reveal confidential funding techniques which would allow criminals to detect the FBI's movements by tracing FBI funds through the use of the event funding authorization number from the agency to certain locations and operations.  Continued release of this type of information through the FOIA or otherwise would allow criminals to determine whether or not

they are under investigation by the FBI and/or predict the FBI's investigative strategies by

allowing them to pinpoint, through use of these event funding authorization numbers, where they

FBI is coming from or going to.  This would enable these criminals to preemptively abort their

criminal plots or take further measures to avoid detection and/or disruption by the FBI.

Additionally, providing group login codes for sensitive, but unclassified briefings would provide

criminals the means to gain access to closed, FBI briefings.  This would allow them to uncover

unknown FBI investigative targets, techniques and strategies.  This would undoubtedly allow

them to predict and thwart FBI investigative efforts, enabling them to circumvent the law.

Accordingly, the FBI properly protected the information pursuant to FOIA Exemption (b)(7)(E).

**(b)(7)(E)-14**              **Tactical Information Contained in Operational Plans**

(145)   The FBI asserted Exemption (b)(7)(E) to protect a form detailing

investigative/coordinating efforts of the FBI and local law enforcement agencies.  Specifically,

the FBI asserted Exemption (b)(7)(E) to protect an operational plan for investigating violent

gang incidents.  An operational plan is an internal tool limited for official use only, and properly

marked as such.  It provides a complete overlay of the case being investigated, contemplated

actions and potential techniques to be used, personnel needed, and coordinates the efforts of the

investigators involved.  In sum, the withheld operational plan constitutes the investigative blue

print for property very specific investigative operation.  The FBI will use the same or similar

techniques in this investigative blue print to conduct future investigations involving violent gang

incidents.  Armed with this information, criminals in similar investigative circumstances could

effectively predict and thwart the FBI's investigative actions.  This would not only enable

criminals to circumvent the law, it would also potentially endanger law enforcement personnel

involved in such operations.  Accordingly, the FBI properly asserted Exemption (b)(7)(E) to withhold this type of information.

## OTHER GOVERNMENT AGENCY ("OGA") INFORMATION

(146)    During the processing of Plaintiff's requests, the FBI consulted with numerous OGAs concerning their information located within documents responsive to Plaintiff's requests. These agencies include the Bureau of Prisons ("BOP"), Defense Intelligence Agency ("DIA"), Office of the Director of National Intelligence ("ODNI"), United States Postal Inspection Service ("USPIS"), Department of Defense ("DOD"), United States Deputy Attorney General's Office ("ODAG"), and Immigration and Customs Enforcement ("ICE").  The following agencies have provided the attached declarations in support of their withholding of information within these records: BOP at Exhibit DD, DIA at Exhibit EE, USPIS at Exhibit FF and ODNI at Exhibit GG.

(147)    DOD further consulted with DIA and Naval Criminal Investigative Service ("NCIS").  The information withheld by DOD was on behalf of DIA and DIA's actions are supported in their attached declaration.  NCIS did not request any additional withholdings on their behalf.

## SEGREGABILITY

(148)    The FBI reviewed 3,616 pages of records responsive to Plaintiff's six requests. The FBI was able to segregate for release approximately 2,149 pages.  Of the 3,616 responsive pages identified, 558 were RIF, 1,595 were RIP, 1,086 were WIF per exemptions, 373 pages were deemed duplicates, and 4 pages were found to be non-responsive.  These pages are discussed below to further address segregability.

A.      Pages RIF.  Following the segregability review, RIDS determined 558 pages

could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption.

B.      Pages RIP.  Following the segregability review, RIDS determined 1,595 pages could be released in part with redactions per the identified FOIA Exemptions herein.  These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interest protected by the FOIA Exemptions cited on these pages.

C.      Pages WIF.  Following the segregability review, RIDS determined 1,459 pages were required to be withheld in their entirety.  Of these pages, 1,086 pages were withheld pursuant to one or more FOIA Exemptions.  RIDS determined that all information on these pages was either fully covered by one or more of the cited FOIA exemptions, or determined that any non-exempt information on these pages was so intertwined with exempt material, that no information could be reasonably segregated for release.  Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content.  Additionally, 373 pages were found to be duplicates of pages accounted for elsewhere within the FBI's production.  The FOIA and DOJ regulations do not require agencies to provide multiple copies of the same record to a requester.  To do so would be an unduly burdensome exercise not calculated to provide additional responsive information to requesters.  Accordingly, it is the well-settled practice of RIDS to withhold duplicate copies of a record already reviewed in order to speed processing and reduce duplication costs – all to the

benefit of its requester community.

## **CONCLUSION**

(149)   The FBI properly determined two (2) of Plaintiff's FOIA requests did not constitute proper FOIA requests under the requirements of the FOIA.  For all other requests at issue, the FBI performed adequate and reasonable searches for responsive records subject to the FOIA, processed all such records, and released all reasonably segregable non-exempt information from documents responsive to Plaintiff's FOIA requests.   Information was properly withheld pursuant to FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E).  The FBI carefully examined the documents and determined the information withheld from Plaintiff in this case, if disclosed: would reveal classified information; would reveal statutorily protected information; would reveal privileged information; could reasonably be expected to interfere with pending or prospective enforcement proceedings; would cause a clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; could disclose the identities of confidential sources and/or the information they provided; and/or would disclose techniques and procedures for law enforcement investigations, enabling criminals to circumvent the law.  OGA information exempt from disclosure was also properly withheld, as described in separate declarations provided by these OGAs.  After extensive review of the documents at issue, I have determined that there is no further non-exempt information that can be reasonably segregated and released without causing harms protected by one or more Exemptions, as described *supra*.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through GG attached hereto are true and correct copies.

Executed this ___25th___ day of March, 2019.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia