## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEEPING GOVERNMENT BEHOLDEN, INC.,

      Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
JUSTICE,

      Defendant.

Case No. 1:17-cv-1569-KBJ

## FOURTH DECLARATION OF DAVID M. HARDY

(1)      I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia.  For a full accounting of my duties and responsibilities, please see ¶¶ 1-2 of my Third Declaration of David M. Hardy (*herein* "Third Hardy Declaration") in this instant action.

(2)      Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiff's requests for information from its files pursuant to provisions of the FOIA, 5 U.S.C. § 552.  Specifically, I am familiar with the FBI's handling of the FOIA requests Plaintiff submitted to the FBI on March 20, March 21, April 3, May 10, and May 11, 2017.

(3)      This is my fifth declaration in this instant action.  This declaration supplements and incorporates by reference the information previously provided in my first declaration of November 15, 2017 (ECF No. 15-1), my second declaration of December 12, 2017 (ECF No. 20-1), my third declaration dated March 25, 2019, and my first *in camera* declaration dated March

1

14, 2019.  The FBI submits this declaration to address issues raised in Plaintiff's Memorandum

of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in

Support of Plaintiff's Cross-Motion for Summary Judgment (*herein* "Plaintiff's Opposition").

## COUNT 3: PLAINTIFF CHALLENGES THE FBI'S POSITION THAT PLAINTIFF'S REQUEST IS NOT A PROPER FOIA REQUEST

(4)      Plaintiff submitted a request to the FBI for "all email correspondence exchanged

between J.P. Schmidt," a NARA appraisal archivist, "and any FBI email address since 1 January

2016." *See* Third Hardy declaration, Exhibit T.  Plaintiff gave the instruction the FBI could

"limit the scope of this request to employees or contractors whose official duties would include

interacting with NARA regarding records management issues." *Id.*  On page three of Plaintiff's

Opposition, Plaintiff challenges the FBI's assertion that Plaintiff's request is not a proper FOIA

request, arguing that the "FBI never contacted its agency records officers or records schedulers

or otherwise attempted to ascertain which of its employees or contractors would be responsible

for interacting with NARA regarding records management issues as part of their official duties."

(5)      In my second declaration, I described how in order for the FBI to comply with

Plaintiff's request, the FBI would need to either conduct extensive research to compile a list of

those employees across the entire FBI who are most likely to contact NARA, and/or conduct a

dragnet search of all FBI employees' email accounts.  *See* ECF No. 20-1 at ¶¶ 11-12.

Countering this argument, at page 12 of Plaintiff's Opposition, Plaintiff argues the FBI could

have "searched the emails of all IMD personnel and a few other offices in which the records

management professionals expected responsive records were likely to be found."   However,

even Plaintiff's suggested narrowing does not constitute a "reasonably describe[d]" FOIA

request, that would allow the FBI to conduct searches with a "reasonable amount of effort."  5

U.S.C. § 552(a)(3)(A) and 28 C.F.R. § 16.3(b).  Considering most FBI employees have two

email accounts (unclassified and classified) and there are over 700 IMD employees, Plaintiff's suggested search would require the FBI to search through at least 1,400 accounts for emails sent for over an entire year.  This would likely require RIDS personnel to comb through tens of thousands of potentially responsive emails for records specifically responsive to his request. Furthermore, to satisfy the second part of Plaintiff's suggested search, searching "a few other offices in which the records management professionals expected responsive records were likely to be found," the FBI would still need to conduct research to establish who across the whole FBI is likely to correspond with NARA, and then conduct additional searches of the identified individuals' email accounts.  The FOIA does not require agencies to conduct research or compile records (create a list of employees likely to possess responsive emails), only conduct searches for reasonably described records.   It remains the FBI's position Plaintiff's request is not reasonably described, would require the creation of records, and/or would require an inordinate amount of time and resources to fulfill.

### COUNT 4: PLAINTIFF CHALLENGES THE FBI'S POSITION THAT PLAINTIFF'S REQUEST IS NOT A PROPER FOIA REQUEST

(6)     Plaintiff submitted a FOIA request to the FBI seeking "all email correspondence which is not stored in the Central Records System ("CRS") sent or received by" numerous senior FBI officials. *See* Third Hardy Declaration, Exhibit Y.  In my third declaration, I describe how a search for responsive records would require tedious, unduly burdensome, multi-level research. *See* ¶¶ 49-53.  In Plaintiff's Opposition, Plaintiff posits the "FBI needs to provide *evidence*…emails which are *not* stored in the [FBI Central Records System ("CRS")] are not able to be identified by some other means" other than those described by the FBI.  In responding to this, the FBI does believe additional explanation of the nature of its email system and its overlap with the CRS is warranted.

3

(7)    The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(8)    The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[1] Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

(9)    The FBI's email system is a separate, internal, communication system that interfaces with the CRS, but contains both record and non-record material. This material is stored in a Microsoft Outlook email platform. The reason there are both record and non-record

---

[1] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

4

emails within this system is because this system is primarily a means of internal communication and not a system for storing records – *i.e.* not all records existing within the FBI's email system are or should be stored within the CRS because not all FBI email communications constitute records. It is up to FBI investigators and professional staff to determine which of their email communications constitute FBI records and require retention within the CRS.

(10)     Within the FBI's email system, there is a built-in record marking tool allowing FBI personnel to designate an email "non-record," "transitory record," or "record." When an email is designated a record with this tool, FBI personnel must select a UCFN to which the email corresponds. After July 1, 2012, these UCFNs are stored electronically within the FBI's case management system, Sentinel.[2] Designation of an email as a record and part of a particular UCFN within the FBI's email system automatically routes a copy of the potential record email to Sentinel for review and potential uploading and serialization within the designated UCFN by FBI personnel. However, the serialization of such potential record emails within Sentinel is not a given. FBI personnel may inadvertently mark an email as a record only later to decide it is not a record, and it does not warrant uploading into Sentinel. Furthermore, the record marking tool in the FBI's email system displays all file numbers to which individual personnel are assigned in a drop down menu, and allows personnel to select from any of these assigned UCFNs when they designate an email a record. It is very easy for FBI personnel to select the wrong UCFN in its email system and then later have to rectify such mislabeling within Sentinel, to ensure they upload and serialize record emails within the proper UCFN. Also, emails may be marked as non-record or transitory within the FBI's email system and FBI personnel may later decide the

---

[2] Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012.

emails constitute records and manually upload and serialize emails within the proper UCFN in Sentinel. This means an email can be uploaded into the CRS as a record even if it was never designated a record within the FBI's email system.

(11)    Considering the above, Plaintiff's request would first require the FBI to gather all emails from its email system from the named FBI officials. These emails would be labeled within the FBI's email system as non-record, transitory record, or a record with a designated UCFN, but for the reasons described above, this would not be an absolute indication the email was or was not ever deemed a record and uploaded into the CRS. Therefore, if the FBI were to comply with Plaintiff's request, it would need to conduct extensive research within Sentinel/the CRS to determine whether or not emails within the FBI's email system were ever actually made a record in the CRS. In some instances, the instances where a potential UCFN was designated in an email, the FBI would have a great starting point to research whether or not the email was eventually stored within the CRS – it could simply look within the designated UCFN. However, if the email was not located within the designated UCFN, as described above, the FBI would need to continue its research. It would then need to discern key search terms from the content of the email to conduct an appropriate search within the CRS, to ensure the email was not originally mislabeled under the wrong UCFN but eventually stored elsewhere within the CRS. In instances where emails were marked "non-record" or "transitory record," the FBI would have no choice but to resort to gathering search terms and conducting searches in the CRS from the outset. This is because, as stated above, emails can be uploaded as records into the CRS, whether or not they were ever labeled as records within the FBI's email system.

(12)    In summary, Plaintiff's request, as written, is not reasonably described, and would be impossible for the FBI to fulfill without conducting extensive, unduly burdensome, multi-

6

layered research.  Thus, it does not constitute a proper FOIA request.  Consider this in contrast

with the FBI's handling of Plaintiff's request for "all emails sent or received by former FBI

Director James Comey between 1/1/17-5/9/14 which contain the word "transitory."  *See* Third

Hardy Declaration at Exhibit F.  In this instance, Plaintiff requested emails that could easily be

identified as responsive on their face and the FBI could easily discern if records met the

parameters of Plaintiff's request without having to conduct research.[3]  In this instance, the FBI

found Plaintiff's request to be reasonably described, searched for responsive records, and

processed the records for release.

<u>**COUNT 5: PLAINTIFF CHALLENGES THE FBI'S EXEMPTION 5 WITHHOLDINGS**</u>

(13)      In its Opposition, Plaintiff avers the FBI improperly withheld information

pursuant to Exemption 5.  Plaintiff claims the "fundamental issue" is the "FBI does not even

attempt to offer evidence that the release of the withheld information would create a foreseeable

harm."  *See* Plaintiff's Opposition at page 16.  In regards to the deliberative process privilege,

this is completely false.  In my third declaration, in regards to information protected pursuant to

Exemption 5 and the deliberative process privilege, I stated the following:

> Disclosure of the protected information would lay bare the FBI's deliberative process as
> it would reveal internal discussions and information FBI personnel thought were
> pertinent to their analysis, and their compilation and sorting of facts…The *harm*
> associated with such a release would be a chilling effect on agency personnel's
> willingness to fully and frankly deliberate during decision-making, policy creation.
> Essentially, agency personnel would be much less likely to share their unrefined ideas
> while trying to make best agency decisions or adopt the best agency policies…If agency
> personnel believed their raw ideas would be subject to public scrutiny, they would be
> much more guarded in fully participating in the deliberation process.

*See* Third Hardy Declaration at ¶ 95

---

[3] The FBI did originally deemed this request not a proper FOIA.  However, upon *de novo* review
of its handling of this particular request, after Plaintiff initiated this instant action, the FBI
deemed Plaintiff's request to be reasonable described and conducted an appropriate search.

(14)     Additionally, in regards to information protected pursuant to Exemption 5 and the attorney work product privilege, I stated the following:

> The [attorney work product] privilege is predicated on the recognition that proper preparation of a case depends on an attorney's ability to assemble information, sort relevant from irrelevant facts, and prepare his/her legal theories and strategies without intrusive or needless scrutiny...[T]hese [protected] records are quintessential attorney work products...because they were created by attorneys during criminal litigation as part of the attorneys' representation of the government during criminal proceedings of third parties; or, consist of attorney-provided changes to policy guidance, made to formalize or finalize policy guidance for FBI employees.

*See* Third Hardy Declaration at ¶¶ 96-97.  While my description here does not specifically use the word *harm*, my description of the privilege and the withholdings makes the harm in release readily apparent.  The material protected readily meets the threshold requirements of the attorney work product privilege, and the privilege is designed to protect attorneys from "intrusive or needless scrutiny" during the formulation of legal theories or strategies.  Thus, release of this information would result in such intrusive or needless scrutiny.

(15)     Finally, in regards to information protected pursuant to Exemption 5 and the attorney-client privilege, I stated the following:

> This privilege encompasses confidential communications made to an agency attorney by decision-making personnel as well as lower echelon employees who possess information relevant to an attorney's advice-rendering function... [and] [d]isclosure of communications between the FBI attorneys and their clients, or between the FBI and the DOJ attorneys representing the Bureau, would inhibit candor between the clients and their attorneys in relation to the issues about which they are seeking legal advice.  Such candor and full disclosure is necessary in order to ensure that thorough and sound legal advice is provided.

*See* Third Hardy Declaration at ¶ 98.  Again, the term *harm* is not specifically used, but the harm in disclosure is adequately described.  Release of the information would inhibit candor between government clients and attorneys, degrading the quality of the attorneys' legal representation.

(16)    Following its broad argument regarding the FBI's harm analysis, Plaintiff transitions to challenges of specific withholdings made pursuant to Exemption 5 and the deliberative process privilege.

(17)    Bates Pages KGB-161-163 – Plaintiff claims the FBI withheld Bates pages KGB-161-163, an attachment to the email at Bates pages KGB-158-159, when the information "was neither pre-decisional nor deliberative."  *See* Plaintiff's Opposition at page 17.  As evidence of this, Plaintiff points to the fact the email describes how the attachment was circulated "to solicit participants for a pilot project." *Id.*  However, the attached document is not a finalized document and is also being circulated to solicit input on how to best formulate a final agency decision.  In this same email, the sender, the Assistant Director of the FBI's Directorate of Intelligence, also requests the recipient provide "any thoughts on the structure options provided in the attached Power Point." Bates page KGB-158.  Thus, the FBI decision-makers were still formulating a final agency decision and the attachment was a draft, being circulated as part of the deliberative process.  Therefore, this material is both predecisional and deliberative.

(18)    Draft Documents: Bates Pages KGB 233-368 and 1209-1264 – Plaintiff also challenges the FBI's protection of draft material pursuant to Exemption 5 and the deliberative process privilege.  Plaintiff posits the FBI "withheld [documents] simply because they are 'drafts' of something with no further information." Bates pages KGB-233-368 and 1209-1264 consist of draft copies of the FBI's "Victim Assistance Policy Implementation Guide," "Unified Relief Supervisors Policy Guide," "Storage, Handling, and Processing of Electronic Surveillance and Technical Investigative Materials Policy Guide," and documents used to track contributions by different reviewers of these drafts.  The drafts contain various changes and edits, and included with them are supplemental, administrative documents included to document such changes.

Draft documents are inherently part of the deliberative process. These documents predate final

agency decisions and reflect the give and take of deliberations, through the editing process,

integral to creating a final, refined product. These drafts, rife with stricken language, comments,

and draft language additions, were shared inter-agency, are pre-decisional (predate the final

products), and are deliberative (the material was shared to solicit feedback/edits), and release

could potentially harm agency deliberations. The harm in release of this information would be a

chilling effect on agency employees' willingness to share such drafts if they knew their unrefined

ideas would be subject to public disclosure. Furthermore, there would be a risk of public

confusion in that these drafts do not reflect final agency decisions. Also, the attached documents

used to track draft contributions also constitute wholly deliberative materials as they detail the

various deliberative edits made by various contributors. The harms in disclosing this material

matches directly the harms associated with releasing the drafts – it could make contributors more

reticent in providing candid feedback and it could also cause public confusion as the nature of

final agency decisions.

(19)    Draft Statements: Bates Page KGB-886, 1144-1145, and 1946-1948 – All of these

pages consist of draft statements for Director Comey, intended to be made either verbally or in

writing. KGB-886 is an email containing a draft statement compiled by Director Comey and

sent to a subordinate, Deputy Chief of Staff Dawn Burton, to solicit feedback on the statement.

This information is both predecisional as it predates the actual statement, and is deliberative as

Comey and Burton are working to refine the final statement. KGB-1144-1145 are emails

between Director Comey and his Chief of Staff, James Rybicki, concerning the development of

language to announce the appointment of four new assistant directors. This information is pre-

decisional as it predates the final announcement, and it is deliberative as it is being circulated for

10

different parties to edit and refine.  KGB-1946-1948 is a draft statement Director Comey

intended to deliver to the United States Senate.  It is both predecisional, as it predates the actual

statement, and deliberative as it is being circulated so Comey and his subordinates can edit and

refine the statement.  In all of these instances, Director Comey was trying to ascertain how best

to convey certain information and was seeking input from a subordinates in order to do so.

Release of this type of information could damage the deliberative process as future directors may

fear such deliberative, advice-seeking could be made part of the public record, and shy away

from seeking such advice.  Curtailing such necessary deliberation could harm the quality and

accuracy of Directors' statements in the future.

      (20)    <u>Office of Professional Responsibility ("OPR") Related Records: Bates pages</u>

<u>KGB-428-445 and 960-987</u> – Plaintiff challenges the assertion of Exemption 5 on records related

to OPR adjudications.  Bates pages KGB-428-445 consist of email communications between

Director Comey and his subordinates where all parties are attempting to develop and hone FBI

policy related to OPR adjudications for retired/resigned employees.  This email chain is

predecisional as the final agency policy is not established within this chain.  It is also deliberative

as Comey and his subordinates are trying to develop best practices and guidelines for certain

types of OPR adjudications.  The harm in release of this type of information would be two-fold.

First, it would harm the deliberative process as it would display an unwillingness on the part of

the FBI to protect from disclosure its employees' raw, unrefined thoughts and proposals when

developing agency policy.  During future deliberations, FBI personnel may be much less likely

to participate or may hedge their contributions, in fear of public scrutiny.  Additionally, releasing

policy mid-development would cause public confusion as to the nature of final agency decisions.

KGB-960-987 consists of a United States of America Merit Systems Protection Board ("MSPB")

initial decision regarding an appeal submitted to MSPB by a former FBI employee, following

termination of his or her employment. The FBI contacted MSPB to ascertain the status of the

document in question. MSPB informed the FBI that though unsigned, the document matches the

final version of the document available to the public. Therefore, the FBI is releasing in full a

copy of Bates pages KGB-960-987 to Plaintiff simultaneous to its filing of this declaration. *See*

**Exhibit A.**

(21)    <u>Bates pages KGB-1375-1377</u> – Plaintiff challenges the assertion of Exemption 5

to an email chain discussing a memo in which the final email in the chain is sent from Director

Comey and simply states "Looks good." Plaintiff posits this means the redacted language from a

previous email is final, accepted language. It is important to note in these emails Comey was

working with his Chief of Staff Rybicki to draft appropriate language to propose changes to

Office of Management and Budget's ("OMB") proposed FBI Fiscal Year ("FY") 2018 budget.

Though the "looks good" may appear to conclude the deliberation between Comey and Rybicki,

the draft language was being proposed as part of a larger deliberative process—the deliberation

between the FBI and OMB as to the FBI's FY 2018 budget. Furthermore, the final document in

regards to Comey's and Rybicki's communications would have been a finalized communication

drafted by Comey and directed to OMB, not an email between Comey and Rybicki. In

summary, these emails are pre-decisional as they predate the final decision in the more limited

deliberation between Comey and Rybicki because the final decision would be Comey's

communication with OMB; and they are part of a larger deliberation about the FBI's budget in

FY 2018 that was still ongoing at the time this language was drafted. Release of this deliberative

information could damage the deliberative process as future directors may fear such deliberative,

advice-seeking could be made part of the public record, and shy away from seeking such advice.

Curtailing such necessary deliberation could harm the quality and accuracy of Directors' communications in the future. Additionally releasing deliberations about preliminary budget discussions may cause public confusion as to the government's final FY 2018 budget allocations for the FBI.

## CONCLUSION

(22)    In regards to Counts 3 and 4, the FBI properly determined Plaintiff's requests do not constitute proper FOIA requests. Plaintiff's requests are not reasonably described and are impossible for the FBI to fulfill without conducting extensive, unduly burdensome, multi-layered research. In regards to its application of Exemption 5, the FBI adequately described the harms associated with the release of material it protected pursuant to Exemption 5. In regards to the specific challenges raised by Plaintiff, except in one instance, the FBI properly asserted Exemption 5 in conjunction with the deliberative process privilege to withhold predecisional, deliberative information. In the one instance challenged by Plaintiff where the FBI found Exemption 5 does not apply, the FBI is providing Plaintiff with a supplemental release of information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibit A attached hereto is a true and correct copy.

Executed this 6 day of June, 2019.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEEPING GOVERNMENT BEHOLDEN, INC.

    Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
    JUSTICE,

    Defendant.

Civil Action No. 17-cv-01569-KBJ

# **<u>Exhibit A</u>**

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### DALLAS REGIONAL OFFICE

GREGORY W. SHAFFER,

            Appellant,

    v.

DEPARTMENT OF JUSTICE,

            Agency.

DOCKET NUMBER
DA-0752-15-0466-I-2

DATE: March 8, 2017

Lawrence Berger, Esquire, Glen Cove, New York, for the appellant.

Amy Armstrong, Esquire, Washington, D.C., for the agency.

### BEFORE
Patrick J. Mehan
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

On June 29, 2015, the appellant filed a timely[1] appeal of the agency's action removing him from his position of Special Agent (Criminal Investigator) with the Federal Bureau of Investigation (FBI), in Dallas, Texas, effective May 28, 2015.  IAF1, Tab 1.  The appeal was Dismissed without Prejudice and then, on February 4, 2016, refiled.  Initial Appeal File 2 (IAF2), Tabs 1-2.  The Board

---

[1] On September 17, 2015, the appellant filed a request to dismiss his appeal without prejudice.  The appellant sought to exhaust the agency's internal appeal process before continuing his appeal before the Board.  The agency did not object to the dismissal.  In an Initial Decision issued on October 8, 2015, I dismissed the appellant's appeal without prejudice to refiling.  Initial Appeal File 1 (IAF1), Tab 12.

has jurisdiction to hear this appeal because the appellant is a preference eligible veteran.   5 U.S.C. § 7511(b)(8), *see* IAF1, Tab 10, Subtab 4f.   The appellant withdrew his request for a hearing and this decision is based on the written submissions of the parties.   IAF1, Tab 1; IAF2, Tab 12 at 1.   The record is closed.   IAF2, Tab 12 at 1.

Based on the following analysis and findings, the agency's removal action is AFFIRMED.

## ANALYSIS AND FINDINGS

Background

The agency appointed the appellant as a Special Agent (SA), GS-1811, on June 25, 1995.   IAF2, Tab 4 at 4, Tab 14 at 5.   In July 2011, the agency promoted the appellant to the position of Legal Attaché (Legat) in Budapest, Hungary. IAF1, Tab 10, Subtab 4e at 433, 444, 915.   The agency's Legal Attaché to Hungary is responsible for working closely with the Budapest Organized Crime Task Force (BOCTF) and the International Law Enforcement Academy (ILEA). IAF1, Tab 10, Subtab 4e at 433-34.   The Legat also provides training to Hungarian law enforcement personnel using ILEA's equipment and facilities.   *Id.* In addition, the Legat is responsible for collecting intelligence for the United States government.   IAF1, Tab 10, Subtab 4c at 3.   The agency conducted an investigation of the appellant and his alleged misconduct.   In March 2014, the appellant "self-curtailed" his assignment as Legat to Hungary and returned to the agency's Dallas Division as a lower-graded SA.   IAF1, Tab 10, Subtab 4e at 429, 436.

On February 20, 2015, based on the findings in the agency's investigation, the agency proposed removing the appellant based on five charges: (1) Unprofessional Conduct–Off Duty; (2) Failure to Report–Administrative; (3) Misuse of Government Computer; (4) Providing False/Misleading Information– Employment/Security Documents; and (5) Unprofessional Conduct–On Duty.

IAF1, Tab 10, Subtab 4d; IAF2, Tab 11 at 4.  The appellant submitted a written reply and made an oral response to the proposed removal.  IAF1, Tab 10, Subtab 4c, Subtab 4e at 62-69, 554-61.  On May 28, 2015, the deciding official, Candice Will, sustained all of the charges of misconduct and upheld the decision to remove the appellant.  IAF1, Tab 10, Subtab 4b at 1, 24; IAF2, Tab 11 at 4.  The appellant appealed the agency's decision to the Board.

The agency bears the burden of proving its charges by preponderant evidence.

The agency bears the burden of proving its charges by preponderant evidence.  5 U.S.C. § 7701(c)(1)(b) (2016).  Preponderant evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.4(q) (2016).  The agency must also show that the penalty of removal is reasonable and promotes the efficiency of the service. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981).

In this appeal, the appellant did not contest the charges and conceded that the agency submitted sufficient evidence to establish the factual allegations supporting the charges of misconduct by preponderant evidence.  IAF2, Tabs 12 at 4 n.3 and 14.  Therefore, I find that the appellant stipulated or admitted the occurrence of the facts necessary to prove the charges in this appeal.  5 C.F.R. § 1201.63 (stating that a stipulation of fact satisfies a party's burden of proving the fact alleged); *Cole v. Department of the Air Force*, 120 M.S.P.R. 640, ¶ 9 (2014) (holding that when an appellant admits that the charged misconduct occurred, that the agency may rely upon that admission and need not submit any additional evidence to support its charge).  Nevertheless, a review of the record evidence shows, even in the absence of appellant's stipulation, that the agency met its burden to establish the five charges at issue in this appeal.

<u>Charges 1 & 2: The appellant engaged in Unprofessional Conduct–Off Duty and Failure to Report—Administrative.</u>

In its first charge, the agency contends the appellant violated FBI Offense Code 5.21 (Unprofessional Conduct –Off Duty).  IAF1, Tab 10,Subtab 4b at 1-2. The factual allegations supporting the agency's charge are that the appellant: (1) engaged in extra-marital affairs with at least seven Hungarian female foreign nationals; and (2) engaged in inappropriate sexual advances towards women.  *Id.* FBI Offense Code 5.21 states that agency employees are prohibited from "[e]ngaging in conduct, while off duty, which dishonors, disgraces, or discredits the FBI; seriously calls into question the judgment or character of the employee; or compromises the standing of the employee among his peers or the community."  *Id.* at 2. In addition, section 4-5 of the agency's Legal Attaché Manual reads:

> [E]mployees on foreign assignment are official representatives of the U.S. Government and bear an additional responsibility for projecting a positive and professional image.  The personal life, conduct and demeanor of all employees are under constant scrutiny by members of the diplomatic and foreign community.  All employees will be held strictly accountable for any conduct which could impair the effectiveness of the office or lessen their ability to carry out their assignments.

*Id.* at 4, , IAF1, Tab 10, Subtab 4e at 496.  Section 1-1 of the same Manual dictates: "The effectiveness of Legal Attachés will be measured to a large extent by the effectiveness of their liaison programs**** It is the responsibility of the Legal Attaché to assure that the mission of the FBI is carried out in a most professional manner."  IAF1, Tab 10, Subtab 4b at 4.

In its second charge, the agency alleged the appellant violated FBI Offense Code 5.7 (Failure to Report–Administrative).  *Id.* at 7.  FBI Offense Code 5.7 states: "It is a violation for an employee to "[f]ail[] to inform the appropriate FBI official, in a timely manner, about an administrative manner which the employee knew, or should have known, was required by FBI or DOJ regulation or policy to

5

be reported." *Id.* Section 2.24.3 of the FBI's Security Policy Manual (SPM) provides: "[a]ll individuals will report all continuing and close contact with foreign nationals…to the CSO…using form FD-981." *Id.* The SPM defines a foreign national as "[a]ny individual who is not a citizen of the U.S. by birth or through naturalization, including resident aliens, students, refugees, and emigres. The term 'foreign national' and 'non-U.S. Citizen' may be used interchangeably." *Id.*

It is undisputed that while in the Legat position, the appellant engaged in extra-marital affairs with as many as seven Hungarian foreign nationals.[2] IAF1, Tab 10, Subtab 4c at 3, Subtab 4e at 428, 433-36, 444-48. The appellant's sexual activity with some or all of these women occurred during official work hours. IAF1, Tab 10, Subtab 4e at 435. Further, the appellant exchanged sexually explicit text messages with additional women, some whom were foreign nationals and others who were U.S. citizens. The appellant's text messages show that he routinely made aggressive sexual advances toward women. IAF1, Tab 10, Subtab 4b at 5-6. He also engaged in offensive text messages when a woman rejected his sexual advances. IAF1, Tab 10, Subtab 4b at 6-7. It is also undisputed that the appellant did not report to the agency any of his paramours as foreign contacts prior to its investigation into his misconduct. IAF1, Tab 10, Subtab 4e at 428-29, 434, 436. In his sworn statement to the agency, the appellant characterized his failure to report as an "oversight, not an intentional means to hide [his] foreign contacts." IAF1, Tab 10, Subtab 4e at 436. In his oral response, he maintained that he was unaware he was required to report his close and continued contact with foreign nationals while serving as the Legat. IAF1, Tab 10, Subtab 4b at 7.

The appellant contended that some of his sexual contacts were not misconduct because he intended to advance the interests of the agency and the United States. Specifically, the appellant claimed his communications with FN8,

---

[2] The subjects are referred to as FN1-FN7.

a female Hungarian government official, were to gain intelligence on the new radio system FN8 was implementing for Hungarian police, and reporting such intelligence back to the United States government.  IAF1, Tab 10, Subtab 4c at 3, Subtab 4e at 450.  However, the overwhelming evidence fails to establish that engaging in inappropriate communications with a Hungarian government official was part of the appellant's official duties or mandate as the Legat.  *See* IAF1, Tab 10, Subtab 4c at 3, Subtab 4e at 433, 444, 915.  Moreover, it appears his advances toward FN8 may have harmed U.S. interests because these unprofessional advances caused FN8 to raise concerns about the appellant with the Hungarian Police Chief for the second-largest county in Hungary.  IAF1, Tab 10, Subtab 4b at 3-4, n.2, Subtab 4d at 5-6.  Further, the appellant acknowledged that his behavior put himself at risk of being compromised by a foreign intelligence service and, therefore, was unacceptable.  IAF1, Tab 10, Subtab 4c at 3, Subtab 4e at 556.  Based on the record of this appeal, I find that the appellant engaged in inappropriate, intimate relationships that were not justified by his official duties as the Legat.

The undisputed facts show that the appellant engaged in unprofessional conduct off-duty as a result of his relationships with female foreign nationals and his sexually-explicit text messages to other women.  *See Doe v. Department of Justice*, 565 F.3d 1375, 1380 (2009) (citing *Ludlum v. Dep't of Justice*, 87 M.S.P.R. 56, ¶ 29 (2000), aff'd, 278 F.3d 1280 (Fed. Cir. 2002) (finding, with respect to off-duty consensual sexual encounters charged as unprofessional conduct, the FBI "has the right to hold its special agents to a high standard of conduct.")).  The appellant resigned from the Legat position, in part, to spare the agency any further embarrassment.  *See* IAF1, Tab 10, Subtab 4e at 436-37. Based on a careful review of the record, I find the appellant's conduct tended to disgrace and discredit the FBI's mission in Hungary in violation of agency policy.  Accordingly, I find that charge 1 is sustained.

Further, the record shows that the appellant failed to report his contacts with Foreign Nationals in violation of agency policy. Section 2.24.3 of the SPM required the appellant to report each of the appellant's close sexual relationships with Foreign Nationals to the agency. It is undisputed that the appellant failed to do so. The appellant claims that his failure to report these seven relationships was an "oversight" and "not an intentional means to hide [his] foreign contacts." IAF1, Tab 10, Subtab 4e at 436. However, there is no evidence that the policy allowed exceptions to reporting based on carelessness or oversight. Moreover, the policy does not require proof the appellant intended to deceive the agency. *See generally Otero v. U.S. Postal Service*, 73 M.S.P.R. 198, 204-05 (1997). Therefore, even if the appellant unknowingly violated agency policy, it is not relevant in determining if a violation occurred. I find the agency proved by preponderant evidence that the appellant violated FBI Offense Code 5.7 and Section 2.24.3 of the SPM. Consequently, charge 2 is sustained.

Charge 3: Misuse of Government Computer.

In charge 3, the agency alleged the appellant misused his FBI-issued Blackberry cellular telephone (cell phone). IAF1, Tab 10, Subtab 4b at 7. The agency specifically charged that the appellant "engaged in a substantial amount of inappropriate, sexually explicit communications, both with [his] wife and other women." IAF1, Tab 10, Subtab 4b at 8. Pursuant to FBI Offense Code 3.6 it is a violation for an employee to "[u]s[e] a government computer for personal, unofficial, or unauthorized use." The policy provides an exception for *de minimis* use, where the cost to the government is negligible, as long as the use is not otherwise objectionable (*e.g., pornography*)." IAF1, Tab 10, Subtab 4b at 8.

It is undisputed that the appellant used his government issued cell phone to exchange sexually-explicit text messages, including graphic photographs of

nudity, with several women. *Id; see* IAF1, Tab 10, Subtab 4c.[3]  Based on the record of undisputed facts, I find that the appellant's use of his cell phone violated agency policy and did not fall within the *de minimis* exception for personal use of agency computers.   Consequently, the agency established the appellant violated FBI Offense Code 3.6 and I find that charge 3 is sustained.

Charge  4:  Providing  False/Misleading  Information–Employment/Security Documents.[4]

In charge 4, the agency alleged the appellant provided false/misleading information on security financial disclosure forms (SFDFs) and required confidential financial disclosure reports, specifically the Office of Government Ethics (OGE) Form 450.  IAF1, Tab 10, Subtab 4b at 9-14, Tab 4d at 12-17.  FBI Corporate Policy Directive 534D states that "employees with access to sensitive compartmented information are required to file annual Security Financial Disclosure Forms (SFDF)."  IAF1, Tab 10, Subtab 4b at 9; *see* IAF1, Tab 10, Subtab 4e at 843, 987, 990-1007.  The appellant filed SFDFs during the relevant time period, from 2006 to 2010.  *See* IAF1, Tab 10, Subtab 4e at 698.  The appellant filed OGE Form 450s for 2008, 2009, and 2010.  IAF1, Tab 10, Subtab 4e at 970-84.  The OGE Form 450 instructs the employee that he must report "all sources of salary…and other earned income greater than $1,000" for both the employee and his wife, "not including a federal government salary."  IAF1, Tab 10, Subtab 4e at 971.

An agency investigation revealed that the appellant's wife worked for a Virginia-based company engaged in a fraudulent investment scheme.  IAF1, Tab 10, Subtab 4e at 772-74, 838-46, 849.   Upon learning of this, the agency

---

[3] It was undisputed that a Blackberry cellular telephone qualifies as an agency "computer" as provided by FBI Offense Code 3.6.

[4] The removal letter references Charge 5 of the proposal letter as Charge 4.  I reference the removal letter's numbering system.

investigated the appellant.   Records revealed the appellant's wife received approximately $200,000 from the Virginia-based company from 2006 to 2010, and that the income was deposited into a bank account the appellant shared with his wife.   IAF1, Tab 10, Subtab 4e at 692, 772, 838-41, 849, 863-65.   The appellant acknowledged that he knew his wife earned a salary in 2006 through 2009, but he was unsure as to 2010.[5]  IAF1, Tab 10, Subtab 4e at 843, 916.

In 2008, 2009, and 2010, the appellant filed his OGE Form 450s with the agency.  IAF1, Tab 10, Subtab 4e at 113, 698, 839, 844, 970-84.[6]  The appellant failed to report any income from his wife on those forms.  IAF1, Tab 10, Subtab 4e at 970, 977-78, 984.   The appellant filed SFDFs in 2006 and 2007 and reported no income for his wife.  IAF1, Tab 10, Subtab 4e at 844, 917, 925-30.   On his SFDFs for 2008 and 2009, he reported his wife's income of $80,000, but acknowledged that he was "never fully aware" of how much money his wife earned.  IAF1, Tab 10, Subtab 4b at 12, Subtab 4d at 16, Subtab 4e at 917. Instead, he filed his official reports to the agency regarding his wife's income based on her "casual" statement to him of the same.  IAF1, Tab 10, Subtab 4e at 917, 931-37.  The appellant did not report any income for his wife in 2010 on his SFDF, even though text messages show that he was aware that his wife earned income in that year.  IAF1, Tab 10, Subtab 4b at 13, Subtab 4d at 16-17, Subtab 4e at 698, 938.

The appellant asserted that he did not intentionally conceal his spouse's earnings or intend to deceive the agency.  In his written response to the agency's proposal letter, the appellant acknowledged that he "readily admits he failed to

---

[5] The agency's criminal investigation revealed that the appellant's spouse earned the following incomes: $49,625 in 2008; $114,460 in 2009; and $50,167 in 2010.  IAF1, Tab 10, Subtab 4e at 698, 844.

[6] In 2009, the appellant reported $30,000 in assets in a Commonwealth Financial Network Account, comprised of various stocks including Pfizer, Under Armour, BioGen, and Western Refining.  IAF1, Tab 10, Subtab 4e at 977-78.

[keep] track of and ensure accurate documentation of his personal finances. He takes full responsibility for this." IAF1, Tab 10, Subtab 4c at 4. However, the record shows that the appellant was aware of his wife's income and he completely failed to report the income. Moreover, when he did report his wife's income, he failed to take reasonable steps to ensure his reporting to the agency was accurate. Regardless of the appellant's assertions that his wife handled his finances, he was responsible for submitting accurate financial filings to the agency. Based on the foregoing, I find that the appellant failed to properly disclose income and sources of income on his SFDFs and OGE 450 forms submitted for 2006, 2007, 2008, 2009, and 2010. Therefore, the agency established that the appellant violated FBI Offense Code 2.1.[7] Consequently, I find the agency sustained charge 4.

Charge 5: Unprofessional Conduct–On Duty.

In charge 5, the agency alleged the appellant with Unprofessional Conduct–On Duty, specifically that he used or attempted to use advantages of his employment to benefit his family and friends. IAF1, Tab 10, Subtab 4d at 8-12. The agency claims the appellant's conduct violated FBI Offense Code 5.22, which provides that employees are prohibited from "[e]ngaging in conduct, while on duty, which dishonors, disgraces, or discredits the FBI; seriously calls into question the judgment or character of the employee; or compromises the standing of the employee among his peers in the community." IAF1, Tab 10, Subtab 4b at 14. Here, the agency must establish the essential factual allegations in support of this general charge of misconduct. *See Otero*, 73 M.S.P.R. 198; *Hicks v Department of the Treasury*, 62 M.S.P.R. 71, 74 (1994), *aff'd*, 48 F.3d 1235 (Fed. Cir. 1995) (Table).

---

[7] FBI Offense Code 2.1 defines a violation as "Knowingly providing false or misleading information in an employment-related or security-related document; or signing or attesting to the truthfulness of information provided in an employment-related or security-related document in reckless disregard of the accuracy or completeness of pertinent information contained therein." IAF1, Tab 10, Subtab 4e at 699.

*Specification 1*

First, the agency alleged that in April 2007, the appellant improperly attempted to obtain a concealed handgun permit for his wife. Specifically, the appellant drafted a letter, which he never sent, to the State of Virginia on FBI-letterhead certifying that his wife had successfully completed "the FBI's basic firearms certification course" in Quantico, Virginia. IAF1, Tab 10, Subtab 4b at 14-15. At the time, the appellant was an FBI-certified firearms instructor. *Id.* The agency has asserted that it does not have a recognized program to provide civilians such basic training or certification and the appellant acknowledged that he never provided any firearms' training to his wife at Quantico. *Id.*

The preponderant evidence shows the appellant fabricated facts when he drafted the letter at issue. In particular, the program was fictitious. In his written and oral responses to the proposal, the appellant argued that he did not engage in the alleged misconduct because he did not send the letter to the State of Virginia. IAF1, Tab 10, Subtab 4b at 14-15, Tab 4c at 5. The appellant refrained from sending the letter, not because he realized it was inappropriate to lie to a state official in his official capacity as an FBI agent; instead, he learned that because he was not a State-certified firearms instructor, his letter would not help his wife obtain the permit. IAF1, Tab 10, Subtab 4b at 15. Although the appellant did not send the letter, such conduct in drafting the letter calls into question his judgment and character. Further, because the letter was drafted on official agency letterhead, I find the agency established it was on-duty misconduct. Specification 1 is sustained.

*Specification 2*

Second, the agency stated the appellant improperly provided his friends and family unauthorized access to the firearms range owned by the Dallas County Sheriff's Office (DCSO), to which he had access as an FBI-certified firearms instructor. IAF1, Tab 10, Subtab 4b at 15. The record shows that the appellant

KGB-970

sent text messages to family and friends, from March 2011 through July 2011, inviting them to socialize and shoot firearms at the DCSO's range.  IAF1, Tab 10, Subtab 4b at 15-16, Tab 4d at 9.   One invitation states: "[l]ots of drinking, dancing, eating & nakedness!"  IAF1, Tab 10, Subtab 4b at 15.  In his oral and written responses, the appellant indicated he was "totally unaware" that his personal usage of the firearms range could be "considered against the rules."  *Id.* at 16; IAF1, Tab 10, Subtab 4c at 5.

The preponderant evidence reflects that the appellant, without authorization, allowed his friends and family members to use the DCSO firearms range.   Moreover, it appears that he viewed the facility as a club for entertainment as opposed to a law enforcement training facility.  Such conduct would tend to dishonor and discredit the FBI even if the appellant was permitted to allow his friends and family to use the DCSO's firearms range.  Moreover, had one of the appellant's unauthorized guests injured themselves, it could have been detrimental to the agency's working relationship with DCSO.   I find the appellant's actions call into question his judgment or character under FBI Offense Code 5.22.  Specification 2 is sustained.

*Specification 3*

Third, the agency alleged the appellant improperly provided agency passes to friends and family to attend sporting events in the Dallas area.  IAF1, Tab 10, Subtab 4b at 16-17.  Specifically, the appellant worked in his official capacity for various professional sports teams in Dallas and used this connection to obtain such passes.[8]    *Id.*    Through a series of text messages to "Friend2" in

---

[8] The agency noted that in OPR case number 2012-0048, its OPR previously suspended the appellant for three days for similar misconduct.  IAF1, Tab 10, Subtab 4b at 16.  In that case, OPR found the appellant improperly provided his spouse and his cousin access to the 2010 NBA All-Star Game and related events in Dallas.  *Id.*  The agency stated that throughout its current investigation, it learned the appellant committed three additional incidents of misconduct related to his suspension in 2012.  IAF1, Tab 10, Subtab 4b at 16-17.  However, the agency further stated, the appellant did not disclose

February 2010, the appellant invited this friend to the NBA All-Star Game, but the friend declined.  IAF1, Tab 10, Subtab 4b at 17.  Second, through two text messages to "Relative6" in November 2010, one of the appellant's relatives asked him for passes to a sporting event.  IAF1, Tab 10, Subtab 4b at 17.  In his text message response to Relative6's request, the appellant declined to provide passes, but added that "Freebies to FBI is always an issue."  *Id.*  Third, through a text message to "Relative5" who requested passes to a Dallas Cowboys football game in January 2011, the appellant stated he hoped he could provide the relative passes, but that "the Cowboy org can be finicky. Strange org to work with." IAF1, Tab 10, Subtab 4b at 18.  During his oral reply to the instant charges, the appellant and his counsel acknowledged "that offering passes to family and friends was misconduct."  IAF1, Tab 10, Subtab 4b at 17.  Accordingly, through the undisputed text messages outlined above, I find the appellant improperly used his official position to obtain, or attempt to obtain, free passes for friends and family to sporting events.  Such conduct discredits the agency and seriously calls into question the appellant's judgment and character under FBI Offense Code 5.22.  I find the agency has proven the appellant violated FBI Offense Code 5.22 by preponderant evidence.  Specification 3 is sustained.  Consequently, because the agency established all of its specifications, I find that charge 5 is also sustained.

---

this conduct during his prior inquiry.  *Id.*  Here, it appears that the agency imposed discipline for similar acts of misconduct, but that its charge was based on factually distinct, and additional, acts of misconduct.  Therefore, I find that this specification did not unfairly subject the appellant to double punishment for the same misconduct. *See, Gartner v. Department of the Army*, 104 M.S.P.R. 463, ¶¶ 5-6 (2007) (stating that an agency may not impose additional discipline for the same acts of misconduct) and *Williams v. Defense Logistics Agency*, 34 M.S.P.R. 54, 58 (1987) (finding that when charge depends on different facts that the imposition of separate disciplinary actions did not amount to double punishment).

<u>The appellant did not establish the agency committed a harmful procedural error.</u>

Although I have sustained the agency's charges, the agency's action may not be upheld if the appellant shows that the agency's action resulted from harmful error or is not in accordance with law.  5 U.S.C. § 7701(c)(2)(A), (C). The appellant has the burden of proving these affirmative defenses by preponderant evidence.  *See* 5 C.F.R. § 1201.4(q).  Under section 7701(c)(2)(A), an agency's decision may not be sustained if the employee "shows harmful error in the application of the agency's procedures in arriving at such decision[.]" 5 U.S.C. § 7701(c)(2)(A) (2017).  *See Doe*, 121 M.S.P.R. 596, ¶¶ 11-12 (stating appellant's allegation that agency did not follow its own regulations reviewable under harmful error standard); *see also Romero v. Department of Defense*, 527 F.3d 1324, 1329 (Fed. Cir. 2008).

Here, the appellant argues the agency committed harmful procedural error when it terminated the Disciplinary Review Board (DRB) process before the DRB reached a final decision on the merits of his removal action.  IAF2, Tab 14 at 4-10.  The agency's decision letter dismissing the appellant from the agency included the following:

APPEAL RIGHTS

> If you are appealing a . . . dismissal, the Disciplinary Review Board (DRB) will decide the appeal.  The standard of review on appeal in examining OPR's factual findings and penalty is the substantial evidence standard of review.

IAF 1, Tab 1 at 33; IAF1, Tab 10, Subtab 4b at 25.  It is undisputed that on or about June 5, 2015, the appellant advised the DRB of his intent to appeal the agency's decision removing him.  IAF2, Tab 14 at 5, Tab 15 at 9.  The appellant's DRB appeal challenged the same removal action at issue in this appeal.  During the pendency of the DRB appeal, the appropriate agency authority reached a final decision revoking the appellant's Top Secret security clearance.  IAF2, Tab 15 at 20-22.  Through a letter dated November 10, 2015, the agency informed the appellant that it administratively closed his DRB appeal due to the revocation of

his Top Secret security clearance.  IAF2, Tab 14 at 5, Tab 15 at 9.  The agency determined that a DRB decision on the merits of the appellant's removal was not necessary because he no longer could maintain a required condition of employment of a Special Agent.  *Id.*

The appellant argues that the termination of the DRB process was harmful error because the appellant was deprived of an opportunity to challenge the agency's removal action and the agency's decision to revoke his security clearance.  IAF2, Tab 14 at 6.  In making this argument, the appellant conflates the two agency processes, the DRB process for his removal action and the security clearance process.  *See* IAF1, Tab 1 at 6; IAF2, Tab 11 at 8-9.  At issue in this appeal, and before the DRB, was the appellant's removal based on 5 charges of misconduct.  The challenged removal action was not based upon the appellant's failure to maintain his security clearance.  There is no evidence to show the agency considered the appellant's failure to maintain a security clearance in its penalty determination.  The Board lacks authority to review the merits of the decision to suspend or revoke a security clearance.  *Egan v. Department of the Navy,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).

I also find unavailing any contention by the appellant that the agency committed a due process violation because he was prevented from invoking the discretion of the DRB or the deciding official regarding the loss of his security clearance.  Because the agency action was not based on the security clearance revocation, this appeal is inapposite to Board appeals finding that an appellant must be given an opportunity to invoke the discretion of the agency's deciding official prior to the agency taking an adverse action based upon the revocation of a security clearance.  *See, e.g., Putnam v. Department of Homeland Security*, 121 M.S.P.R. 532, ¶¶ 12-13 (2014).  Moreover, to the extent the appellant contends he was precluded from responding to the agency's decision to revoke his security clearance, the record shows otherwise.  The appellant was notified of the

revocation of his clearance and provided an opportunity to respond.  See IAF2, Tab 15 at 12-22.

The appellant also failed to establish the agency's decision to close its DRB appeal process before it reached a decision on the merits was a harmful procedural error.  Harmful error under section 7701(c)(2)(A) cannot be presumed; an agency error is harmful only where the record shows that the procedural error was likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error.  *Doe v. Department of Justice*, 123 M.S.P.R. 90, ¶ 7 (2015); *Ray v. Department of the Army*, 97 M.S.P.R. 101, ¶ 12 (2004) (citing *Stephen v. Department of the Air Force*, 47 M.S.P.R. 672, 681, 685 (1991)).  The appellant failed to show that if the DRB process was allowed to continue until the agency reached a decision on the merits that the agency would have reached a different conclusion on the appellant's removal.  As explained above, the appellant does not contest the material facts that support the agency's charges.  Nonetheless, the appellant contends the agency impaired his ability to defend himself by depriving him of "a meaningful opportunity to seek to mitigate or reverse the penalty before a newly constituted board."  IAF2, Tab 14 at 6-7, 9.  The appellant reasons that an appeal before the DRB is a "unique opportunity to defend himself against the adverse action."  IAF2, Tab 14 at 8.  However, the appellant did not allege any additional facts or evidence that he would have presented to the DRB had he been given the chance. *See Handy v. U.S. Postal Service*, 754 F.2d 335, 338 (1985).  The evidence shows that the agency deciding official considered all of the relevant mitigating factors when arriving at her decision, and there is no evidence that the DRB would have reached a different conclusion as to the penalty imposed here.  Indeed, the misconduct was egregious and the appellant's prior service was not unblemished. As explained *infra*, the penalty was consistent with other Special Agents who engaged in similar misconduct.  Therefore, I find that the appellant failed to meet his burden of establishing that the error was harmful.  Consequently, the

appellant failed to establish that the agency committed a harmful procedural error when it concluded its DRB process before issuing a final decision on the merits of the appellant's removal.[9]

<u>The agency established a nexus between the charged misconduct and the efficiency of the service, and that the penalty of removal was reasonable.</u>

An adverse action, such as dismissal, may be taken by an agency only for such cause as will promote the efficiency of the service. 5 U.S.C. § 7513(a). To establish that there is a nexus between the charged conduct and the efficiency of the service, the agency must show the appellant's conduct: (1) affected the appellant's or his co-worker's job performance; (2) affected management's trust and confidence in his job performance; or (3) interfered with or adversely affected the agency's mission. *See Adams v. Department of Labor*, 112 M.S.P.R. 288, ¶ 8 (2009). Here, the conduct set out in the sustained charges occurred while the appellant acted in his official capacity on duty and off duty; affected his ability to carry out his duties with trust by management; affected his financial reporting obligations to the agency; and directly interfered with the agency's mission. Indeed, regarding Charges 1 and 2 specifically, the appellant acknowledged that his actions affected his superiors' confidence in him. Moreover, the Board has held there is sufficient nexus between the employee's conduct and the efficiency of the service when the conduct occurs, at least in part, at work. *Scheffler v. Department of the Army*, 117 M.S.P.R. 499, ¶ 10 (2012)

---

[9] Inasmuch as the appellant alleges a violation of law, he has failed to establish a law, rule, or regulation that was violated based upon the agency's dismissal of his DRB appeal. 5 U.S.C. § 7701(c)(2)(C) (an agency's decision may not be sustained if the employee shows that the decision was not in accordance with law); *see Stephen v. Department of the Air Force*, 47 M.S.P.R. 672, 684 (1991) (stating, "when an appealable action is unlawful in its entirety, i.e., there is no legal authority for the agency's action, the Board will reverse such an action as 'not in accordance with law' under 5 U.S.C. § 7701(c)(2)(C)."). Therefore, I find that he has not met his burden of proof to establish a violation of law.

(citing *Parker v. U.S. Postal Service*, 819 F.2d 1113, 1116 (Fed. Cir. 1987)). Accordingly, I find that the agency has met its burden to establish nexus.

Where, as here, all of the agency's charges have been sustained, the Board will review an agency-imposed penalty only to determine if the agency considered all of the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Portner v. Department of Justice*, 119 M.S.P.R. 365, ¶ 10 (2013). In determining whether the selected penalty is reasonable, the Board gives due deference to the agency's discretion in exercising its managerial function of maintaining employee discipline and efficiency. *Id.* The Board recognizes that its function is not to displace management's responsibility or to decide what penalty it would impose, but to assure that management judgment has been properly exercised and that the penalty selected by the agency does not exceed the maximum limits of reasonableness. *Id.* Thus, the Board will modify a penalty only when it finds that the agency failed to weigh the relevant factors or that the penalty the agency imposed clearly exceeded the bounds of reasonableness. *Id.*

The Board has enumerated factors relevant to a determination of discipline in a particular case, among them the employee's past disciplinary record and past work record; the effect of the offense upon his ability to perform at a satisfactory level; the consistency of the penalty with those imposed on other employees for the same or similar offenses and with any applicable agency table of penalties; the clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question; any mitigating circumstances surrounding the offense; and the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Douglas*, 5 M.S.P.R. at 305-06.

In evaluating a penalty, the Board will consider first and foremost the nature and seriousness of the misconduct and its relationship to the employee's duties, position, and responsibilities. *Raco v. Social Security Administration*, 117

M.S.P.R. 1, ¶ 14 (2011).  It is well-established that agencies are warranted in holding law enforcement officers to a higher standard of conduct, particularly when such conduct implicates questions of honesty and integrity.  *See, e.g., Jones v. Department of Justice*, 87 M.S.P.R. 91, ¶ 12 (2000) (despite twenty-five years of federal service, removal was reasonable penalty for immigration inspector who provided false information, due to seriousness of misconduct).

Will, the deciding official, determined that the appellant's conduct was egregious.  IAF1, Tab 10, Subtab 4b at 20-23.  In support, Will discussed the agency's two previous substantiated inquiries of misconduct against the appellant.[10]  *Id.*  Further, Will noted that the appellant's sexual conduct with foreign nationals, many of whom were employed by a foreign government, made him susceptible to possible exploitation by foreign intelligence agencies.  *Id.* at 20-21.  In addition, the appellant admitted that he engaged in such conduct during official business hours.  *Id.*  Finally, Will considered that the appellant's misconduct was not an isolated incident, but instead was repeated with seven women and lasted throughout his entire tenure as Legat.  *Id.* at 21.  The FBI Offense Codes and Penalty Guidelines specify "Repetitive Misconduct" as an aggravating factor.  *Id.* at 20.  Will further considered the appellant's concealment of his improper relationships as an aggravating factor.  *Id.* at 21.  Will found the appellant's behavior was intentional because it appeared that he used his position of Legat to facilitate his extra-marital affairs with foreign nationals.  *Id.*  Further, Will determined the appellant knew of his obligation to

---

[10] The record indicates that the appellant was disciplined by the agency for three prior instances of misconduct: OPR Case 96-0381 (oral reprimand for losing his FBI badge), *see* IAF1, Tab 10, Subtab 4e at 453-59, 783-87; OPR Case 10-0207 (non-disciplinary counseling for charity and fundraising events and using agency-issued Blackberry as his point of contact), *see* IAF1, Tab 10, Subtab 4e at 465-70, 781, 792-96; and OPR Case 12-0048 (three-day suspension for giving his wife and relative passes he received to a professional sports event which were for official use), *see* IAF1, Tab 10, Subtab 4e at 471-76, 485, 780, 797-99.

report foreign contacts, as he reported his contact "with several individuals while assigned as Legat." *Id.*

The deciding official also found that the appellant's misuse of his government cell phone was serious because he used his agency-issued cellular telephone for his personal use over an extended period of time in his pursuit of extra-marital affairs, and he had exchanged clearly inappropriate photographs via text messages. *Id.* Will noted that the appellant's conduct with respect to concealing his wife's income was also intentional. *Id.* at 22. The appellant claimed he had no idea how much income his spouse earned from 2006 through 2010, and he claims that he "did not pay careful attention to his household finances." IAF1, Tab 10, Subtab 4c at 3. However, the record shows that the appellant accurately reported his wife's income to obtain financing to purchase a home. *Id.* Therefore, I find that Will correctly considered this misconduct was intentional. Will noted that the appellant's failure to accurately report his finances was serious because it hindered the agency's ability to assess his suitability to access sensitive information. *Id.* at 23. In light of the appellant's foregoing financial misrepresentations and discrepancies, Will determined that removal was appropriate. *Id.*

Will considered that the appellant intended to induce the State of Virginia to issue his wife a concealed weapons permit based on a fraudulent letter, on FBI letterhead, claiming he provided his wife a training course that did not exist. *Id.* Will found that the appellant displayed "a profoundly disturbing lack of judgment by taking friends and family to the firearms range owned and operated by the [DCSO]." *Id.* She added that the appellant's conduct went behind the DCSO's intended FBI-use of the facility for training purposes. *Id.* In fact, the appellant's actions exposed the agency and the DCSO to significant liability if anyone was injured at the facility. *Id.* Further, Will established that the record showed the appellant "repeatedly offered friends and family passes to sports events [he] obtained for official purposes." *Id.* at 24. As demonstrated by the appellant's

text messages to friends and family members, he knew this conduct was improper. *Id.* Will found the appellant's conduct especially egregious because during the agency's prior inquiry, OPR number 2012-0048, he stated he "did nothing wrong" by providing his relatives his NBA All-Star Game passes; indeed, the appellant continued this conduct as evidenced herein. *Id.* Through the instant inquiry, Will determined that the appellant's failure to disclose the additional occasions of providing official agency event passes to friends and family "extremely troubling." *Id.* I find that the agency correctly determined that the appellant's misconduct in this matter was egregious, intentional, and was repeated.

Will noted the appellant's prior suspension letter cautioned: "progressive discipline is applied, where appropriate. Thus, you can expect to receive a more severe disciplinary penalty in the future for a similar disciplinary offense." *Id.* Will considered the prior discipline was an aggravating factor. The evidence also shows that Will considered all mitigating factors supported by the record. *Id.* at 20-23. Such mitigation included the appellant's long tenure and strong performance record as a Special Agent with the agency. *Id.* Will also considered that the appellant stepped down to a non-supervisory position after he returned from Hungary, experienced financial difficulties, and attended on-going therapy. *Id.* Nonetheless, Will decided that the mitigating factors did not outweigh the seriousness of the misconduct.

It appears the appellant alleges that he was subjected to disparate penalties. IAF2, Tab 11 at 1,9. *See* IAF1, Tab 10, Subtab 4e at 181-423. The consistency of a penalty with those imposed on other employees for the same or similar offenses is only one factor to be considered in determining the reasonableness of an agency-imposed penalty. *See Yeager v. General Services Administration*, 39 M.S.P.R. 147, 151 (1988). To establish disparate penalties, the appellant has the initial burden of showing that there is enough similarity between both the nature of the misconduct and other factors (such as whether he and the comparator were

in the same work unit, had the same supervisor and/or deciding official, and whether the events occurred relatively close in time) to lead a reasonable person to conclude that the agency treated similarly situated employees differently. *McNab v. Department of the Army*, 121 M.S.P.R. 661, ¶ 11 (2014); *Boucher v. U.S. Postal Service,* 118 M.S.P.R. 640, ¶ 20 (2012); *Villada v. U.S. Postal Service*, 115 M.S.P.R. 268, ¶ 10 (2010); *Lewis v. Department of Veterans Affairs*, 113 M.S.P.R. 657, ¶ 6 (2010); *Whelan v. U.S. Postal Service,* 103 M.S.P.R. 474, ¶ 12 (2006) (citing *Archuleta v. Department of the Air Force,* 16 M.S.P.R. 404, 407 (1983)); *Yeager*, 39 M.S.P.R. at 151.  Here, the appellant has failed to meet his burden of establishing that another similar employee, who was charged with similar offenses, was subjected to a penalty lesser than removal. *See Reid v. Department of the Navy*, 118 M.S.P.R. 396, ¶ 22 (2012) (comparator who engaged in similar conduct with respect to only one of the three charges sustained against the appellant was not sufficiently similar to establish disparate penalties).

To the extent that there are comparator employees, the appellant failed to establish that anyone similar to him was given a penalty less than removal.  After reviewing the comparator data, I find the penalty of dismissal is consistent with the penalties imposed on other Special Agents for the same or similar misconduct.  For example, in OPR #2013-0062, OPR dismissed an SES Special Agent on the following charges: Failure to Report (Administrative) (for failing to report a three-year relationship with a foreign national); Misuse of Government Computer (for receiving sexually-explicit photographs on a Blackberry); Security Violation (for providing the foreign national access to agency computer devices); False/Misleading Information on Employment/Security Documents) (for failing to disclose relationship with foreign national or separation from spouse on financial documents); and Lack of Candor/Lying-Under Oath, and Unprofessional Conduct–Off Duty (involving alcohol-related misconduct).  IAF1, Tab 10, Subtab 4e at 182.  Much like the appellant and his charges, the SES comparator "was a

long-term employee with a strong performance record. Employee voluntarily stepped down to a GS-13 SA." *Id.* In OPR #2009-0018, the agency dismissed a Special Agent for writing checks with insufficient funds and for failing to accurately report financial condition on security forms. *Id.* at 192. The DRB voted to affirm the employee's dismissal in light of prior misconduct. *Id.* Therefore, the disparate penalty evidence in this appeal does not suggest that the agency has treated the appellant more harshly than other agency employees.

In addition, dismissal is consistent with the agency's Penalty Guidelines for aggravated offenses. IAF1, Tab 10, Subtab 4b at 19-20, 22-23, Subtab 4e at 1008. The penalty of dismissal is also reasonable in light of the seriousness of the appellant's misconduct in the five instant charges and his past discipline, as well as his position as a law enforcement officer. *See Jones*, 87 M.S.P.R. 91, ¶ 12; *Shoemer v. Department of the Army*, 81 M.S.P.R. 363, 367 (1999). Considering the evidence of record, I find that Will gave adequate consideration to the *Douglas* factors. The appellant's misconduct severely undermined the agency's trust and confidence in his ability to carry out his duties and his suitability for the position. His misconduct was serious and willful. As a law enforcement officer, he was held to a higher standard of conduct than other employees. Because I find that Will appropriately considered the mitigating and aggravating factors in this appeal and the selected penalty is not beyond the bounds of reasonableness, it is not for the Board to decide if it would have weighed the factors differently or imposed a different penalty and the agency's determination is entitled to deference. *See Whelan v. U.S. Postal Service*, 103 M.S.P.R. 474, ¶ 10 (2006); *Douglas*, 5 M.S.P.R. at 302; *see Beard v. General Services Administration*, 801 F.2d 1318, 1322 (Fed. Cir. 1986). Therefore, I find no basis to disturb the agency's removal action and I conclude that the penalty of removal is reasonable.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:           /S/_____
                         Patrick J. Mehan
                         Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **April 12, 2017** unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, <u>whichever comes first</u>.  You must establish the date on which you or your representative received it.  The date on which the initial decision becomes final also controls when you can file a petition for review with the Equal Employment Opportunity Commission (EEOC) or a federal court.  These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently only one member is in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least one additional member is appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice to the Appellant Regarding Your Further Review Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

The criteria for review are set out at 5 C.F.R. § 1201.115, as follows:

The Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact;  (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision.  (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case;

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case;

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed;

(e) Notwithstanding the above provisions in this section, the Board reserves the authority to consider any issue in an appeal before it.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of

authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.