**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**KEEPING GOVERNMENT
BEHOLDEN, INC.,**

*Plaintiff,*

**v.**

**DEPARTMENT OF JUSTICE,**

*Defendant.*

---

**Civil Action No. 17-1569 (FYP)**

<u>**MEMORANDUM OPINION**</u>

Plaintiff Keeping Government Beholden ("KGB") is a non-profit organization that is conducting a "a pilot study of twelve agencies" pertaining to their "understanding of and compliance with records management directives, especially those involving emails."  *See* ECF No. 1 (Complaint), ¶ 8.  In connection with this study, between March and May of 2017, KGB submitted seven separate requests for records from the Federal Bureau of Investigation ("FBI"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  *See* Compl. ¶¶ 7, 13, 20, 30, 42, 53, 59.  Dissatisfied by the FBI's responses, KGB brought the instant suit.

Before the Court are the FBI's Motion for Summary Judgment, *see* ECF No. 30,[1] and KGB's Opposition and Cross-Motion for Summary Judgment.  For the reasons set forth below, the FBI's Motion for Summary Judgment will be **GRANTED** and KGB's Cross-Motion for Summary Judgment will be **DENIED**.[2]

---

[1]     Although the named Defendant in this case is the Department of Justice, this Memorandum Opinion will refer to the Defendant as the FBI throughout.

[2]     In addition, the FBI filed a motion for leave to submit a declaration under seal, *ex parte* and *in camera*, in support of summary judgment, *see* ECF No. 37; and KGB filed two motions for leave to file a sur-reply, *see* ECF

## BACKGROUND

The parties have narrowed the issues such that only three of KGB's FOIA requests are presently disputed.  *See* ECF No. 31 (Plaintiff's Opposition and Cross Motion) at 5 n.2.[3]  The disputed records are described in Counts 3, 4, and 5 of the Complaint.  KGB sought the records in question "to compare the information released in response to [KGB's FOIA] request[s] with the reports filed by [the FBI] so as to determine how the agency actually *executes* its records management policies and practices, as opposed to how it *reports* them."  *See* Compl. ¶¶ 22, 31 (emphasis in original).  The records at issue include:

(1) "all email correspondence exchanged between [the National Archives and Records Administration Appraisal Archivist] J.P. Schmidt and any FBI email address since 1 January 2016," or, "[i]f another Appraisal Archivist was assigned to FBI at any point in this time period, . . . that person's email correspondence with FBI as well," *see id.* ¶¶ 20–21 ("Count 3") (emphasis omitted);

(2) "all email correspondence which is not stored in the Central Records System ('CRS') sent or received by . . . [eighteen FBI officials] in the ten business days prior to the date [the FBI] commence[d] [its] search," *see id.* ¶ 30 ("Count 4"); and

(3) "all emails sent or received by former FBI Director James Comey between 1/1/17– 5/9/17 which contain the word 'transitory,'" *see id.* ¶ 42 ("Count 5").

---

Nos. 36, 42.  The Court will **GRANT** the unopposed motions by KGB for leave to file sur-replies, and it has considered the content of those filings in resolving the parties' dispositive motions for summary judgment.  The Court will **DENY AS MOOT** the FBI's motion to file a declaration *ex parte* and *in camera*, in light of the Court's intervening request for supplemental declarations.  *See* Order of March 11, 2020.

[3]     Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Filing System automatically assigns.

The FBI refused to process the first two requests on the ground that those searches would have been unduly burdensome.  *Id.* ¶¶ 26, 37.  With respect to the third request, the FBI invoked Exemption 5 to withhold some information from records that were responsive to the request.  *See* Pl.'s Cross Mot. at 14.

## I.     FOIA Request for the FBI Archivist's Emails

On March 20, 2017, KGB submitted a FOIA request to the FBI, asking for "copies of all email correspondence exchanged between J.P. Schmidt and any FBI email address since 1 January 2016."  *See* ECF No. 30-3 (Ex. T to Def. Mot.) at 75.  KGB explained that, according to a government website, "J.P. Schmidt is the Appraisal Archivist assigned to the Federal Bureau of Investigation," and if "another Appraisal Archivist was assigned to FBI at any point in this time period," KGB asked the FBI to "expand the scope of this request to include that person's email correspondence with FBI [employees] as well."  *Id.*  KGB's request acknowledged, however, that the FBI "may limit the scope of this request to employees or contractors whose official duties would include interacting with [the Appraisal Archivist] regarding records management issues."  *Id.*  Initially, the FBI issued a so-called *Glomar* response, refusing to confirm or deny that it had any such records, *see* ECF No. 30-3 (Ex. U to Def. Mot.) at 78, but it later took the position that KGB had "not reasonably described the subject of its request and the request does not provide enough detail to allow agency personnel to locate responsive records with a reasonable amount of effort," *see* ECF No. 30-3 (Ex. X to Def. Mot.) at 89.

David Hardy of the FBI's Records Management Division submitted a declaration noting that, "[i]n order to fulfill this request, the FBI would have to search the individual email accounts of all FBI employees with [certain search] terms" and, because "FBI employees typically have two email accounts — one unclassified account and one classified account" — the FBI would

3

have to search approximately 73,552 accounts, running multiple searches for each email account. *See* ECF No. 20-1 (Second Hardy Declaration), ¶ 12.  Additionally, Hardy stated that, "[e]ven though Plaintiff states the search may be limited 'to employees or contractors whose official duties would include interacting with [the National Archives and Records Administration ("NARA")] regarding records management issues,' this still does little to pinpoint exact accounts the FBI would need to search" for two reasons.  *Id.*  First, according to Hardy, "proper records management is required of all FBI employees," and thus KGB's search would require "extensive research to determine who among [the FBI's] 36,776 employees regularly contact NARA."  *Id.* Second, Hardy noted that fulfilling KGB's request would require the FBI to "compile a list of FBI employees' email accounts to be searched," but "FOIA does not require that an agency create documents."  *Id.*  In short, Hardy explained that a "search of all of these accounts which likely involve millions of emails would cripple [the FBI's] ability to serve other FOIA requests, it would greatly tax FBI electronic systems," and it would "require the reassignment of a large percentage of [its] personnel currently working other FOIA requests."  *Id.*

## II.    FOIA Request for Emails Not in the Central Records System

On March 21, 2017, KGB filed another FOIA request, this time for "all email correspondence *which is not stored in the Central Records System ("CRS")* sent or received by the following officials . . . in the ten business days prior to the date [the FBI] commence[s] [its] search:  Director of the FBI and Chief of Staff[;] Chief Compliance Officer, Office of Integrity and Compliance[;] Chief of the Record/Information Dissemination Section[;] Assistant Director in Charge and Special Agents in Charge of the Washington Field Office[;] Assistant Director in Charge and Special Agents in Charge of the New York Field Office[;] Legal Attaché of the U.S. Embassy in London, England."  *See* Compl. ¶ 30 (emphasis in original); ECF No. 30-3 (Ex. Y to

Def. Mot.) at 94.  KGB sought these records to determine "which types of emails are not being

stored in the CRS, so that those results can be compared to the policies, guidance, and training

responsive to [KGB's] other requests."  *See* Compl. ¶ 29 (emphasis omitted).

According to Hardy, the CRS "spans the entire FBI organization" and "is an extensive

system of records consisting of applicant, investigative, intelligence, personnel, administrative,

and general files compiled and maintained by the FBI in the course of fulfilling its integrated

missions and functions."  *See* ECF No. 34-2 (Fourth Hardy Declaration), ¶ 7.  Hardy explains

that the CRS is organized by "classifications," which are numerically sequenced files

corresponding to "designated subject categories" such as "types of criminal conduct and

investigations conducted by the FBI," or "categorical subjects pertaining to counterterrorism,

intelligence, counterintelligence, personnel, and administrative matters."  *Id.* ¶ 8.  When a case

file is opened, it is assigned a Universal Case File Number ("UCFN"), consisting of:  (1) a CRS

classification number that refers to the type of subject matter involved; (2) the abbreviation of

the FBI Office of Origin opening the file; and (3) an individual case-specific file number.  *Id.*

When a pertinent record is added to the case file, the new record receives a "serialized"

document number "in the order which the document is added to the file, typically in

chronological order."  *Id.*  The various UCFNs are stored electronically within the FBI's case

management system, Sentinel, which provides a way to search case file records contained in the

CRS.  *Id.* ¶¶ 10–11.

Importantly, Hardy explains in his declaration that "[i]t is up to FBI investigators and

professional staff to determine which of their email communications constitute FBI records and

require retention within the CRS," *id.* ¶ 9, and this is accomplished through a "record marking

tool" that is built into the FBI's email system.  *Id.* ¶ 10.  This tool "allow[s] FBI personnel to

5

designate an email 'non-record,' 'transitory record,' or 'record'" and subsequently prompts the employee to "select a UCFN to which the email corresponds." *Id.* Notably, designation of an email as a "record" within the FBI's email system automatically routes a copy of the potential record email to the CRS "for review and potential uploading and serialization within the designated UCFN." *Id.* Hardy notes, however, that this system is prone to human error: "FBI personnel may inadvertently mark an email as a record" and prompt it to be stored in the CRS, "only later to decide it is not a record" and unmark it as such in the e-mail system; by the same token, "emails may be marked as non-record or transitory within the FBI's email system and FBI personnel may later decide the emails constitute records and manually upload" them to CRS. *Id.*

KGB's request prompted the FBI to "conduct[] a basic email search of both the classified and unclassified systems for potentially responsive records between September 4 and September 15, 2017," with respect to a list of eighteen officials. Through this process, the FBI "identified approximately 106,000 pages of potentially responsive emails." *See* ECF No. 30-1 (Third Hardy Declaration), ¶¶ 50, 52. Although "[t]hese emails would be labeled within the FBI's email system as non-record, transitory record, or a record[,] . . . this would not be an absolute indication the email was or was not ever deemed a record and uploaded into the CRS." *See* Fourth Hardy Decl. ¶ 11. Therefore, Hardy explains that "[t]o comply with Plaintiff's request as written, [the FBI] would then have to conduct an additional multi-layer review of each of these 106,000 [pages of] emails to identify the records responsive to Plaintiff's request" — that is, those emails "which [are] not stored in the CRS." *See* Third Hardy Decl. ¶ 53 (emphasis omitted). To do this, the FBI would have to "identify proper terms to search within the CRS for the individual emails" so that it could "carefully and diligently search these terms for every email to verify their status within the CRS." *Id.* According to Hardy, assuming each email is about

three pages long, the 106,000 pages of responsive records would correspond to approximately

35,333 e-mails.  Moreover, Hardy estimates that ascertaining whether an e-mail is within the

CRS would take about 30 minutes per e-mail.  Thus, responding to KGB's request would take

approximately 1,059,990 minutes (or 17,666 hours) of searching.  *Id.* ¶ 53 n.17.

### III.    FOIA Request for James Comey's "Transitory" Emails

On May 11, 2017, KGB filed another FOIA request for "all emails sent or received by

former FBI Director James Comey between 1/1/17–5/9/17 which contain the word 'transitory'"

and stated that the FBI "may limit [its] search to Director Comey's email account and do[es] not

need to search other email accounts."  *See* ECF No. 30-3 (Ex. F to Def. Mot.) at 18.  Initially, the

FBI took the position that KGB's FOIA request did not provide enough detail to enable its

personnel to locate records "with a reasonable amount of effort."  *See* ECF No. 30-3 (Ex. H to

Def. Mot.) at 23.  After the filing of the instant lawsuit, however, the FBI changed its position,

"conducted a search of Comey's accounts within the FBI's unclassified and classified email

systems using the search term 'transitory,'" and identified approximately 2,086 pages of

potentially responsive records.  *See* Third Hardy Decl. ¶ 46.

The FBI produced the responsive documents in a series of six batches, redacting certain

information pursuant to a number of FOIA exemptions.  *See* ECF No. 30-3 (Exs. E, J, K, L, M,

N to Def. Mot.) at 12, 30, 34, 38, 42, 47.  In particular, pursuant to the deliberative process

privilege under FOIA's Exemption 5, the FBI withheld information that "consists of preliminary

opinions, evaluations, and comments of various Headquarters and Field Office Special Agents

pertaining to policies, policy decisions, and proposed investigative/prosecutorial actions" as well

as "administrative documentation (i.e., policy documents, organizational charts, flow charts,

Office of Professional Responsibility ('OPR') adjudication summaries, and executive statements)." *See* Third Hardy Decl. ¶¶ 93–94.[4]

## LEGAL STANDARDS

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Judicial Watch, Inc. v. Dep't of Navy*, 25 F. Supp. 3d 131, 136 (D.D.C. 2014) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). Rule 56 of the Federal Rules of Civil Procedure requires that a court grant a motion for summary judgment where the pleadings, disclosure materials on file, and any affidavits "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Judicial Watch*, 25 F. Supp. 3d at 136 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). In the FOIA context, a district court conducts a *de novo* review of the record when evaluating a motion for summary judgment, and the responding federal agency bears the burden of proving that it has complied with its obligations under FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 92–93 (D.D.C. 2008). The Court must analyze all underlying facts in the light most favorable to the FOIA requester, *see Willis v. DOJ*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008), and it may grant summary judgment to an agency only after the agency establishes that it has "fully discharged its [FOIA] obligations," *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996).

---

[4] Additionally, under the privilege for attorney work product protected by FOIA's Exemption 5, the FBI withheld "materials created by attorneys involved in criminal proceedings against third parties" and "communications between DOJ attorneys and FBI Special Agents in relation to the drafting of policy documents." *Id.* ¶ 97 Lastly, pursuant to the attorney-client privilege recognized under FOIA's Exemption 5, the FBI withheld "communications between and among FBI counsel and their FBI clients and employees that reflect the seeking and/or providing of legal advice with respect to those involved in the criminal proceedings against third parties" and "communications between the attorneys and FBI Special Agents in relation to the drafting of policy documents." *Id.* ¶ 99. The information withheld under the attorney work-product and attorney-client privileges are not at issue here.

"[A]ny factual assertion in the movant's affidavits will be accepted . . . as being true unless the [opposing party] submits his own affidavits or other documentary evidence contradicting the assertion." *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992) (citation omitted). In a FOIA case, "the court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations that describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *People for Am. Way Found. v. DOJ*, 451 F. Supp. 2d 6, 11 (D.D.C. 2006) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also, e.g.*, *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (explaining that an agency can meet its burden "by submitting reasonably detailed, nonconclusory affidavits describing its efforts" to locate records responsive to plaintiff's FOIA requests). Agency affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted).

## ANALYSIS

The parties have narrowed the disputes in the instant litigation to three issues: (1) whether KGB's FOIA request for emails exchanged between the FBI Archivist and certain FBI employees reasonably described the records sought; (2) whether KGB's FOIA request for emails not stored on the CRS reasonably described the records requested; and (3) whether the FBI properly invoked Exemption 5 to withhold information in documents responsive to KGB's FOIA request for former FBI Director Comey's "transitory" emails. *See* Pl. Cross Mot. at 9–10.

9

I.      **Reasonableness and Specificity of KGB's FOIA Requests**

A FOIA request must "reasonably describe[]" the records that the requestor is seeking. *See* 5 U.S.C. § 552(a)(3)(A).  A request generally satisfies this standard if "a professional employee of the agency who was familiar with the subject area of the request" could "locate the record with a reasonable amount of effort."  *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990) (quoting H.R. Rep. No. 93-876, at 5–6 (1974)); *see also, e.g.*, *Muckrock, LLC v. CIA*, 300 F. Supp. 3d 108, 136 (D.D.C. 2018).  Thus, the D.C. Circuit has held that, even if the agency can identify documents responsive to a request, a request does not reasonably describe documents if the request is "so broad as to impose an unreasonable burden upon the agency." *Am. Fed'n of Gov't Emps. v. Dep't of Commerce* ("*AFGE*"), 907 F.2d 203, 209 (D.C. Cir. 1990); *see also id.* ("An agency need not honor a request that requires 'an unreasonably burdensome search.'" (quoting *Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978))).  "The rationale for this rule is that FOIA was not intended to reduce government agencies to full-time investigators on behalf of requestors."  *Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989).

It is the agency's burden, when claiming a search to be unreasonably burdensome, to "provide sufficient explanation as to why such a search would be unreasonably burdensome." *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995).  "This Court will not find a search unduly burdensome on conclusory statements alone."  *Hall v. CIA*, 881 F. Supp. 2d 38, 53 (D.D.C. 2012).  Instead, "[c]ourts often look for a detailed explanation by the agency regarding the time and expense of a proposed search in order to assess its reasonableness."  *Wolf v. CIA*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008) (finding a search of microfilm that would take an estimated 3675 hours and cost $147,000 to be unreasonably burdensome); *see also People for*

*the Am. Way v. DOJ*, 451 F. Supp. 2d 6, 13 (D.D.C. 2006) (finding a search unreasonably burdensome where the agency provided an affidavit explaining that compliance would require the agency to devote 25,000 hours to manually searching all 44,000 files encompassed in the request); *Pub. Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1, 6 (D.D.C. 2003) (rejecting agency's claim that requested search was unreasonably burdensome "[w]ithout more specification as to why a search certain to turn up responsive documents would be unduly burdensome"). "Where an agency has provided a good faith estimate of the excessive amount of time required to complete a search that it feels is unreasonably burdensome, this Court has upheld the agency's refusal to conduct the requested search." *Pinson v. DOJ*, 80 F. Supp. 3d 211, 216 (D.D.C. 2015).

      A.    <u>E-Mails Between Any FBI E-Mail Address and Any Appraisal Archivist Assigned to the FBI</u>

As described in Count 3 of KGB's Complaint, KGB requested disclosure of all e-mails between any NARA Archivist assigned to the FBI and any FBI e-mail address over a period of about 20 months, but also noted that the FBI "may limit the scope of this request to employees or contractors whose official duties would include interacting with NARA regarding records management issues." *See* Compl. ¶¶ 20–21. According to the FBI, however, KGB's request "would require substantial research and unduly burdensome searches" because, "[i]n order to fulfill Plaintiff's FOIA request, the FBI would have to search the individual email accounts of all FBI employees" and, given that the "FBI currently employs approximately 36,776 individuals, each with their own individual email accounts," the number of responsive documents would "likely involve millions of emails" and would thus "cripple the agency's ability to serve other FOIA requests, greatly tax FBI electronic systems, and require the reassignment of a large percentage of agency personnel currently working other FOIA requests." *See* Def. Mot. at 15–

11

17.  What is more, according to the FBI, KGB's concession that the search could be limited to employees whose "official duties" include interacting with NARA "regarding records management issues," *see* Compl. ¶ 21, is unhelpful because "proper records management is required of all FBI employees," *see* Def. Mot. at 16.

This Court is skeptical that a FOIA request may be denied based on sheer volume of records requested alone.  In fact, "the dominant objective of FOIA is disclosure, and exemptions are to be narrowly construed."  *Tereshchuk v. Bureau of Prisons*, 67 F. Supp. 3d 441, 454–55 (D.D.C. 2014) (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)).  FOIA puts no restrictions on the quantity of records that may be sought, but rather anticipates requests for voluminous records:  When an agency is asked to "search for, collect, and appropriately examine a voluminous amount of separate and distinct records," it may have extra time to comply.  *See* 5 U.S.C. § 552(a)(6)(B)(i)–(iii).  Accordingly, the D.C. Circuit has noted that the number of records requested appears to be irrelevant to whether a FOIA request is sufficiently specific.  *See Yeager v. DEA*, 678 F.2d 315, 322, 326 (D.C. Cir. 1982) (rejecting the argument that a request for all the records within a particular computer system, which included over one million documents, was overbroad).

Nonetheless, when it would be unreasonably burdensome for the agency to *identify* what records are responsive to a FOIA request, the agency is not obliged to honor that request.  *See Truitt*, 897 F.2d at 545 n.36.  In the instant case, the FBI's affidavits explain that KGB's request for all e-mail correspondence between the NARA Archivist assigned to the FBI and all FBI employees and contractors whose official duties include interacting with NARA regarding record management issues would require the agency to search over 73,000 e-mail accounts, because *all* of the FBI's employees have record-management duties as part of their employment.  *See, e.g.,*

Second Hardy Decl. ¶ 12.  The FBI's declarations further indicate that, even if there were some discrete subset of FBI employees whose "official duties" include interacting with NARA, the agency "would still need to conduct extensive research to determine who among its 36,776 employees regularly contact NARA."  *Id.*  Although KGB emphatically argues that, "[w]hile proper records management may be required of all FBI employees, interacting with NARA regarding records management issues would only be an 'official duty' for a select few," *see* Pl. Cross Mot. at 15 (emphasis omitted), it appears that the alleged "select few" are not readily identifiable.  KGB's contention is insufficient to controvert the FBI's affidavits about the procedures it would need to undertake to fulfill KGB's request.  Indeed, agency affidavits are entitled to a presumption of good faith, *see Shapiro v. DOJ*, 944 F.3d 940, 943 (D.C. Cir. 2019), and this Court must accept the FBI's uncontroverted statements because they are "plausible and reasonable," *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C. Cir. 1982).  Because this Court cannot identify "some reason to believe that the [requested] documents could be located without an unreasonably burdensome search," *Goland*, 607 F.2d at 353, it will accept the reasons provided in the FBI's affidavits.

In short, because KGB points to no evidence suggesting a reason to disbelieve the FBI's declarations, this Court finds that KGB's FOIA request did not "reasonably describe[]" the records that the requestor is seeking, *see* 5 U.S.C. § 552(a)(3)(A), because those records cannot be located "with a reasonable amount of effort," *Truitt*, 897 F.2d at 545 n.36 (internal quotation marks and citation omitted).

B.     E-Mails Not Stored in the Central Records System

The FBI raises similar objections to the request described in Count 4 of KGB's Complaint, *see* Def. Mot. at 19, which asked for all emails that were sent or received by certain

FBI employees over the course of approximately two weeks and that were not stored in the CRS, *see* Compl. ¶ 30.  In particular, the FBI contends that, to comply with the request under Count 4, the FBI "conducted a basic email search of both the classified and unclassified systems" of the eighteen individuals who held the positions listed in KGB's request, identifying "approximately 106,000 pages of potentially responsive emails."  *See* Third Hardy Decl. ¶¶ 50, 52–53.  In order "[t]o comply with Plaintiff's request as written" and "verify which emails constitute 'email correspondence which is not stored in the CRS,' [the FBI] would have to conduct an in-depth analysis of each email to identify proper terms to search within the CRS for the individual emails" and then "carefully and diligently search these terms for every email to verify their status within the CRS" — which would require "approximately 17,666 hours of searching."  *Id.* (emphasis omitted).  The FBI describes what undoubtedly would be "an unreasonably burdensome search," one that the agency is not required to conduct.  *AFGE*, 907 F.2d at 209 (quoting *Goland*, 607 F.2d at 353).  Asking for all records not stored in a particular database is overbroad where the agency has identified 106,000 potentially responsive records and the only way to confirm whether those records are in the database is to check them one by one.

Moreover, to the extent that KGB suggests that the FBI should have liberally construed its FOIA request and used a search method that would have yielded imperfect results, such as relying on the FBI's record marking tool on its email system, *see* Pl. Reply at 6, it would have been "unreasonable for the [FBI] to ignore . . . clear instructions conveying the intended scope of [KGB's] FOIA request," *Nat'l Sec. Couns. v. CIA*, 931 F. Supp. 2d 77, 102 (D.D.C. 2013). KGB's specific request was for records *not* stored in CRS, and the FBI was not at liberty to ignore that request and instead provide e-mails labeled "records" in its email system.  To be sure, in evaluating the description of the records sought, "even if the [agency's] narrow reading is a

reasonable one, an agency 'has a duty to construe a FOIA request liberally.'" *Conservation Force v. Ashe*, 979 F. Supp. 2d 90, 101 (D.D.C. 2013) (quoting *Nation Mag.*, 71 F.3d at 890). But the FBI is also unquestionably "bound to read [a FOIA request] as drafted, not as either agency officials or [the requester] might wish it was drafted." *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984). The FBI appropriately read KGB's request as it was written and responded accordingly.

The plain language of FOIA makes clear that the agency's obligation to search for responsive records is triggered only when a request "reasonably describes" the records sought. *See* 5 U.S.C. § 552(a)(3)(A); *see also Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (tying agency obligation to FOIA statutory language). Because the search here would be unreasonably burdensome, the agency is not required to honor KGB's request.

## II.   Exemption 5

Lastly, the FBI invoked FOIA's Exemption 5 — in particular, under the deliberative process privilege — to refuse disclosure of certain information from documents responsive to KGB's FOIA request for "all emails sent or received by former FBI Director James Comey between 1/1/17–5/9/17 which contain the word 'transitory.'" *See* Compl. ¶ 42; Def. Mot. at 30–33; ECF No. 49 (Seidel Declaration), ¶ 10. Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." *See* 5 U.S.C. § 552(b)(5). It "incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 783 (2021).

Importantly, "Exemption 5 is a discretionary exemption," *Rosenberg v. Dep't of Def.* ("*Rosenberg II*"), 442 F. Supp. 3d 240, 256 (D.D.C. 2020) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)), and thus falls under the FOIA Improvement Act, *see* Pub. L. No. 114-185, 130 Stat. 538.  Enacted in 2016, the Act provides that an agency may withhold information pursuant to a discretionary FOIA exemption "only if . . . the agency reasonably foresees that disclosure would harm an interest protected by [one of the nine FOIA] exemption[s]," *see* 5 U.S.C. § 552(a)(8)(A)(i)(I).[5]  From "the few decisions to have addressed the new foreseeable-harm requirement at any length . . . [t]hree key principles may be gleaned."  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106.  First, the foreseeable-harm requirement imposes an "independent and meaningful burden on agencies," *id.* (citation omitted), and represents a "heightened standard," *Judicial Watch I*, 375 F. Supp. 3d at 100.  Second, to meet this meaningful burden, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[] the harms in [a] meaningful way to the information withheld."  *Judicial Watch, Inc. v. DOJ* ("*Judicial Watch II*"), No. 17-cv-832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019)*.*  Third, agencies "may take a categorical approach" and "group together like records," *Rosenberg v. Dep't of Def.* ("*Rosenberg I*"), 342 F. Supp. 3d 62, 78 (D.D.C. 2018) (citation

---

[5]        "The foreseeable-harm requirement began not as a creation of the Legislative Branch, but of the Executive."  *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019).  It derives from the well-recognized purpose of FOIA, which was to establish a "presumption of openness." *Id.* (citation omitted).  Despite the Executive Branch's efforts to self-regulate, Congress remained concerned that, "from the beginning, agencies have taken advantage of these exemptions to withhold any information that might technically fit."  *See* 162 Cong. Rec. H3717 (daily ed. June 13, 2016) (statement of Rep. Mark Meadows) (noting that although some agencies "have made an effort to comply with the letter of the law, very few have complied with the spirit of the law").  To that end, through the FOIA Improvement Act, Congress sought to require an agency to "first determine whether [it] could reasonably foresee an actual harm" before the agency claims an exemption.  *Id*. "Congress intended that the technical application of an exemption was not sufficient without a showing that disclosure also harmed an interest the exemption sought to protect in the first place."  *Judicial Watch, Inc. v. Dep't of Commerce* ("*Judicial Watch I*"), 375 F. Supp. 3d 93, 101 (D.D.C. 2019).

omitted), but when using a categorical approach, agencies must provide more than "nearly identical boilerplate statements" and "generic and nebulous articulations of harm," *Judicial Watch II*, 2019 WL 4644029, at *4–5, and instead must offer "context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure," *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107 (citation omitted).[6]

For the FBI to succeed on its Motion for Summary Judgment, it must demonstrate both that the withheld records are within the scope of Exemption 5, and that the FBI reasonably foresaw harm as a result of disclosure.

A.    Predecisional and Deliberative

To start, the Court is persuaded that the withheld information is covered by the deliberative-process privilege and thus falls within the scope of Exemption 5.  *See* 5 U.S.C. § 552(b)(5).  The deliberative-process privilege protects government documents that are "both predecisional and deliberative." *Judicial Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).  "Documents are predecisional if they are generated before the adoption of an agency policy, and deliberative if they reflect[] the give-and-take of the consultative process." *Id.* (alteration in original) (internal quotation marks and citation omitted); *see also Sierra Club*, 141 S. Ct. at 786 (observing that "[t]here is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional").

---

[6]      The degree of detail necessary to substantiate a claim of foreseeable harm is "context-specific." *Rosenberg II*, 442 F. Supp. 3d at 259.  In some instances, the withheld information may be so obviously sensitive — such as the disclosure of internal deliberations between a high-ranking military commander and senior government officials about a new detention operation in the United States — that a simple statement illustrating why the privilege applies and identifying the harm likely to result from release "may be enough." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107.  In other instances — such as where the withheld deliberations involve more mundane, quotidian matters or the decision has already been made — more explanation may be necessary. *See id.* (noting that it was not "axiomatic" that the disclosure of discussions involving the selection of contractors would cause foreseeable harm, since the successful bidder "ha[d] already been selected and the bids awarded"); *see also* S. Rep. No. 114-4, at 8 (2015) (explaining that the foreseeability of harm from disclosure will turn on the "age, content, and character" of the document in question).

Here, the emails from which the FBI withheld information under Exemption 5 generally contain drafts of, revisions to, or comments on documents such as public and internal statements by former FBI Director James Comey and agency policies on subjects such as personnel matters and technology initiatives.  *See, e.g.*, Seidel Decl. ¶¶ 14, 20, 24, 27, 30, 32.  These records plainly are both predecisional, because they are "generated before the adoption of an agency policy," and deliberative, because they "reflect[] the give-and-take of the consultative process." *Judicial Watch*, 847 F.3d at 739; *see also, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (noting that deliberative-process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency").

KGB's arguments to the contrary are unavailing in light of the FBI's more detailed descriptions of the withheld documents in its supplemental materials.[7]  For instance, KGB complains that "[m]any pages are withheld simply because they are 'drafts' of something with no further information," *see* Pl. Cross Mot. at 21, such as Bates pages 233 to 368, which the FBI's original *Vaughn* Index described as "[d]raft internal FBI policy document[s]," *see* ECF No. 30-2 (Ex. A to Def. Mot.) at 17–20.  But the agency's revised *Vaughn* Index explains that the withheld pages are from a "Draft Policy Guidance regarding the programmatic efforts . . . to strengthen and improve field engagement through communication of updates to affected field personnel," and that the draft documents contain "stricken language, comments, and draft language additions" and "were shared inter-agency to elicit feedback and suggested revisions."  *See, e.g.*, ECF No. 49-3 (Supplemental *Vaughn* Index), at 6.  Similarly, KGB asserts that Bates pages 428

---

[7]       After KGB filed its Cross-Motion on July 1, 2019, the Court issued an order on March 11, 2020, requiring the FBI to file a supplemental declaration and/or a revised Vaughn Index with respect to Count 5.  The FBI filed the Declaration of Michael G. Seidel and a supplemental Vaughn index on July 31, 2020.  *See* ECF No. 49.

to 445 were "withheld only because they are 'concerning [Office of Professional Responsibility] adjudications'" without "any explanation for why they are either predecisional or deliberative." *See* Pl. Cross Mot. at 21–22.  According to the FBI's supplemental declaration, however, these pages "consist of email communications between Director Comey and FBI staff wherein all parties are attempting to draft and further refine an FBI policy related to OPR adjudications for retired and/or resigned employees."  *See* Seidel Decl. ¶ 25.  The foregoing examples are representative of the level of detail that is contained in the supplemental materials.  Based on the descriptions of the documents in question, "[t]hese materials are, at their core, the back-and-forth deliberative process required for an agency to reach a decision" and thus fall within Exemption 5's protection.  *In re Anthem, Inc. Data Breach Litig.*, 236 F. Supp. 3d 150, 164 (D.D.C. 2017).

     B.    <u>Reasonably Foreseeable Harm</u>

To meet FOIA's foreseeable-harm requirement, the agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials."  *Judicial Watch II*, 2019 WL 4644029, at *5.  The agency must also "connect[] the harms in [a] meaningful way to the information withheld, such as by providing context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure."  *Id.*

With respect to some of the documents at issue, the FBI's justification for its Exemption 5 withholdings easily meets this standard.  For instance, the FBI explains that Bates page 886 is "an email from former Director James Comey to former Deputy Chief of Staff . . . Dawn Burton containing a draft statement forwarded to FBI staff to solicit feedback," and that "[t]he draft statement pertains to Director Comey's response to the Trump investigation."  *See* Seidel Decl. ¶ 16.  The entry for that record on the FBI's revised *Vaughn* Index asserts that disclosure of this "draft[] of Comey's statement[] would reveal the drafters' evolving thought-processes regarding

19

these subjects, as well as ideas and alternatives considered but ultimately rejected by the

Director," and thus would "undermine the ability of future directors to freely engage in the

candid 'give and take' and to seek advice and input to further agency policy or actions." *Vaughn*

Index at 3. In particular, the FBI states that "[e]ven the slightest possibility that a rejected draft

public statement on such a high-profile matter as the Trump investigation would impair everyone

involved in the drafting of such a statement" from "thinking, writing, and advising freely," which

in turn "could harm the quality and accuracy of Directors' statements in the future." *Id.* Further,

according to the FBI, "the public would be confused as to the intent of such decision makers

when their rejected drafts and phrasing were ultimately published." *Id.*

　　That explanation sufficiently "identif[ies] specific harms to the relevant protected

interests" that would result from disclosure of the withheld materials. *Judicial Watch II*, 2019

WL 4644029, at *5. The deliberative-process privilege "serves to preserve the open and frank

discussion necessary for effective agency decisionmaking," *Abtew v. Dep't of Homeland Sec.*,

808 F.3d 895, 898 (D.C. Cir. 2015) (internal quotation marks and citation omitted), and to

"protect against . . . misleading the public by dissemination of documents suggesting reasons and

rationales for a course of action which were not in fact the ultimate reasons for the agency's

action," *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 874 (D.C. Cir. 2010) (citation omitted); *see

also Sierra Club*, 141 S. Ct. at 785 ("To encourage candor, which improves agency

decisionmaking, the [deliberative-process] privilege blunts the chilling effect that accompanies

the prospect of disclosure.") The FBI's justification for its withholding expressly identifies those

interests and explains why the agency reasonably foresees that those interests would be harmed

by disclosure of the document. And the agency's explanation adequately "connect[s] the harms

in [a] meaningful way to the information withheld," *Judicial Watch II*, 2019 WL 4644029, at *5,

by describing how disclosure of the specific information at issue — the FBI Director's

preliminary views regarding the Trump investigation — would discourage FBI employees from

seeking advice about public statements regarding high-profile matters in the future.  Indeed, "it is

difficult to see how [the FBI] could have provided any additional explanation as to how

disclosure of the draft will cause future agency communications to be chilled."  *Nat'l Immigr.*

*Project of Nat'l Lawyers Guild v. ICE*, No. 17-cv-2448, 2020 WL 5798429, at *5 (D.D.C. Sept.

29, 2020).

      The FBI's justifications for other withholdings present a closer call.  For example, as to

Bates pages 230 to 232, 456 to 457, 1201 to 1202, 1310 to 1311, 1633 to 1634, 1759 to 1760,

and 1889 to 1890, the FBI's revised *Vaughn* Index states:

> The foreseeable harm in releasing this information would be a
> chilling effect on agency employees' willingness to share such
> drafts if they knew their unrefined ideas would be subject to
> disclosure.  The release of these policy directives would reveal the
> deliberative process undertaken by the FBI as it considered how best
> to address important program policy matters.    Releasing this
> information could cause harm to the Agency's deliberative process
> because it would ultimately reveal ideas proposed by government
> officials that were later not accepted as final policy, resulting in a
> future chilling effect on the free an[d] open discussion of ideas.
> Furthermore, there would be a risk of public confusion in that these
> drafts do not reflect final agency decision.

*Vaughn* Index at 3–4.  Similarly, with respect to all the documents listed under "Category 4:

Policy Guides/Policy Directives," the revised *Vaughn* Index articulates the foreseeable harm

from disclosure in part as follows:

> These internal draft policy documents, [rife] with stricken language,
> comments, and draft language additions, were shared inter-agency
> to elicit feedback and suggested revisions.  (*See* Email at Bates KGB
> 230-232).  The foreseeable harm in releasing this information would
> be a chilling effect on agency employees' willingness to share such
> drafts if they knew their unrefined ideas would be subject to
> disclosure.  The release of these draft policy directives would reveal
> the deliberative process undertaken by the FBI as it considered how

best to address important policy matters.  Releasing this information
could cause harm to the Agency's deliberative process because it
would ultimately reveal ideas proposed by government officials that
were later not accepted as final policy, resulting in a future chilling
effect on the free [and] open discussion of ideas.  Furthermore, there
would be a risk of public confusion in that these drafts do not reflect
final agency decisions.

*Id.* at 6–18.

Read in isolation, these descriptions largely fail to link the asserted harms to the "specific

information contained in the material withheld," *Judicial Watch I*, 375 F. Supp. 3d at 100, and

instead resemble the "boilerplate statements" and "generic descriptions of harm" that have been

held to be insufficient to meet the foreseeable-harm requirement, *Judicial Watch II*, 2019 WL

4644029, at *4–5.  But the *Vaughn* index must be considered in conjunction with the FBI's

supplemental declaration, which provides a detailed description of the contents of each withheld

document to which these explanations apply.  *See, e.g.*, Seidel Decl. ¶ 26 (noting that certain

documents subject to exemption "consist of emails addressed to nine FBI SACs from RPO AD

Hayden Temin requesting SAC policy collaboration on various policy drafts," such as "draft

revisions to the [Office of Professional Responsibility] Disciplinary Policy," and that the emails

"solicit additional feedback and revisions to the draft policies attached to the emails").  The

descriptions in the Seidel Declaration "provid[e] context or insight into the specific decision-

making processes or deliberations at issue," and when viewed in tandem with the harms

articulated in the *Vaughn* Index, the overall picture is sufficient to illustrate how the agency's

deliberations "in particular would be harmed by disclosure."  *Judicial Watch II*, 2019 WL

4644029, at *5; *see also Ctr. for Investigative Reporting*, 436 F. Supp. at 107 (observing that

"the foreseeable-harm claims the defendants have already provided — once attached to a more

detailed document description that includes, *inter alia*, the information the defendants must

22

already provide to enable assessment of whether the deliberative process privilege was properly asserted in the first instance — may be enough" to establish foreseeable harm).

Notably, the FBI's articulation of the reasonably foreseeable harm caused by disclosure of the information withheld here is at least as specific as an explanation the D.C. Circuit upheld in a recent decision. *See Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020). The records at issue in that case were so-called "Blitz Forms" used by the Department of Justice to adjudicate FOIA appeals; line attorneys fill out the forms "to identify issues presented in an appeal, to analyze those issues, and to make recommendations to senior attorneys." *Id.* at 370. In response to a FOIA request, the agency produced the forms but "redacted the fields for recommendations, discussion, and search notes," invoking the deliberative-process privilege. *Id.* The D.C. Circuit held that the agency had satisfied FOIA's foreseeable-harm requirement because the agency "reasonably foresaw that disclosure would harm an interest protected by the deliberative-process privilege." *Id.* at 371. The court observed that the agency's "affidavit adequately explained that full disclosure of the Blitz Forms would discourage line attorneys from candidly discuss[ing] their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals." *Id.* (internal quotation marks omitted). Importantly, the court rejected the requestor's contention that the agency impermissibly "rel[ied] on 'generalized' assertions that disclosure 'could' chill deliberations." *Id.* It noted that the agency "specifically focused on the information at issue in the Blitz Forms under review, and it concluded that disclosure of that information would chill future internal discussions." *Id.* (internal quotation marks omitted). In other words, the court explained, "[t]he agency correctly understood the governing legal requirement and reasonably explained why it was met here." *Id.*

Here, as in *Machado Amadis*, the FBI "specifically focused on 'the information at issue' in the [documents] under review" by providing a detailed description of each document's contents in the supplemental declaration; and the agency reasonably explained why it "concluded that disclosure of that information would chill future internal discussions." *Compare id.*, *with* Seidel Decl. ¶ 26, *and Vaughn* Index at 3–4.  And, notably, the FBI's explanations in the instant matter are similar to foreseeable-harm explanations that other courts in this jurisdiction have held to be sufficient after the D.C. Circuit's decision in *Machado Amadis*.  *See, e.g.*, *Judicial Watch, Inc. v. DOJ*, No. 17-cv-832, 2020 WL 5593930, at *5 (D.D.C. Sept. 18, 2020) (holding that agency satisfied foreseeable-harm requirement where agency's affidavit "identified the content of the withheld documents (draft statements on the validity of Executive Order 13,769)," "affirmatively conclude[d] that these documents would reveal . . . ideas and alternatives regarding the Executive Order, which were considered but ultimately rejected in the final agency decision," and "specifically connected the disclosure of these drafts to a tangible chilling effect, here amongst high-level DOJ personnel when crafting public statements on agency policy" (cleaned up)); *Nat'l Immigr. Project*, 2020 WL 5798429, at *5 (concluding that agency met foreseeable-harm requirement where agency "explained that disclosure of the withheld information, which includes editorial judgments and significant changes between the draft and final versions" of an agency handbook, "would discourage the expression of candid opinions and would result in a chilling effect on intra- and inter-agency communications" (cleaned up)).

*     *     *

This Court has reviewed the description of each withheld document in the FBI's supplemental declaration and the corresponding entries in the agency's revised *Vaughn* Index. While the Court does not specifically address each document from which the agency withheld

24

information under Exemption 5, the Court concludes that the FBI has sufficiently connected the disclosure of all the withheld information to a reasonably foreseeable harm, as required by the FOIA Improvement Act.  The agency's descriptions of the remaining documents and its explanations of foreseeable harm are similar to those regarding the documents expressly addressed above.  Thus, the agency is entitled to summary judgment on this claim as well.

## CONCLUSION

The FBI has established that it correctly determined that KGB's first and second FOIA requests did not reasonably describe the records sought, and that the agency properly invoked FOIA Exemption 5 to justify its withholdings and redactions in documents responsive to KGB's third FOIA request.  Therefore, as set forth in the accompanying Order, the FBI's Motion for Summary Judgment will be **GRANTED**, and KGB's Cross-Motion for Summary Judgment will be **DENIED**.

_____
Florence Y. Pan
United States District Judge

Date:   December 13, 2021